# Exhibit B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 25-cv-02878-NYW-CYC**
   *Consolidated with Civil Action No.* **25-cv-03555-NYW-CYC**

SHARON BRENTON, Individually and on
Behalf of All Others Similarly Situated,

   Plaintiff,

v.                                                   JURY TRIAL DEMANDED

V.F. CORPORATION,
BRACKEN P. DARRELL,
MATTHEW H. PUCKETT, and
PAUL AARON VOGEL,

   Defendants.

---

**CORRECTED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................ii

V.F. CORPORATION'S FISCAL CALENDAR ................................................................vii

I.    NATURE OF THE ACTION................................................................................... 2

II.   JURISDICTION AND VENUE............................................................................. 12

III.  PARTIES ............................................................................................................ 13

    A.   Plaintiffs................................................................................................... 13

    B.   Defendants .............................................................................................. 14

    C.   Relevant Non-Parties .............................................................................. 15

IV.   SUBSTANTIVE ALLEGATIONS ........................................................................ 17

    A.   VFC is a Global Apparel, Outerwear, Footwear, and Accessory Company......... 17

    B.   VFC Markets its Products Globally through Direct-to-Consumer and
        Wholesale Channels................................................................................. 18

    C.   Vans' Wholesaling Operates According to Sixth-Month Fashion Seasons
        Which Dictates Its Forecasting ................................................................ 19

    D.   Leading up to the Class Period, Deteriorating Vans Demand Attracted
        Immense Investor and Analyst Scrutiny Prompting Detailed Internal Analysis
        and Assurances to the Market That Corrective Measures Were Already
        Underway ................................................................................................. 21

    E.   Despite Defendants' Assurances, Vans Product Innovation and Revenue
        Issues Persisted Throughout the Class Period....................................... 27

        1.   Vans' Limited New Product Innovations Were Inconsequential ....................... 27

        2.   Defendants Routinely Inflated Vans EMEA's Forecasts through Baseless
            Top-Down Forecasting, and Wholesale Customers' Orderbooks through "Ghost
            Orders".................................................................................................. 34

        3.   Vans Consistently Experienced Mass Order Cancellations and Discounts
            Due to Ghost Orders and Unwanted Products.................................... 39

        4.   VFC's "Reinvent" Turnaround Plan Did Not Return Vans to Growth ............... 44

    F.   During the Class Period, Vans' Revenue and the Active Segment's Profitability
        Plummet ................................................................................................... 47

ii

V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD, AS THE TRUTH WAS PARTIALLY REVEALED THROUGH FOUR SETS OF PARTIAL DISCLOSURES ........................................ 48

A.    False and Misleading Statements at the September 28, 2022 Investor Day ...... 49

B.    False and Misleading Statements during the October 26, 2022 2Q2023 Earnings Call ........................................................................................... 51

C.    Misleading Risk Statements in the November 2, 2022 2Q2023 Report.............. 54

D.    False and Misleading Statements during the February 7, 2023 3Q2023 Earnings Call ........................................................................................... 58

E.    Misleading Risk Statements in the February 8, 2023 3Q2023 Report............... 62

F.    False and Misleading Statements in the May 23, 2023 FY2023 Press Release ............................................................................................... 63

G.    False and Misleading Statements during the May 23, 2023 FY2023 Earnings Call and in the FY2023 Investor Presentation ..................................... 65

H.    Misleading Risk Statements in the May 25, 2023 FY2023 Report..................... 73

I.    False and Misleading Statements in the June 12, 2023 Proxy Statement.......... 77

J.    False and Misleading Statements during the August 1, 2023 1Q2024 Earnings Call ................................................................................................ 79

K.    Misleading Risk Statements in the August 3, 2023 1Q2024 Report .................. 85

L.    Defendants Partially Disclosed the Truth on October 30, 2023 in VFC's 2Q2024 Press Release and During the 2Q2024 Earnings Call .......................... 87

M.    Continued False and Misleading Statements during the October 30, 2023 2Q2024 Earnings Call ................................................................................... 92

N.    Continued Misleading Risk Statements in the November 3, 2023 2Q2024 Report.......................................................................................... 94

O.    Defendants Partially Disclosed the Truth on February 6, 2024 in VFC's 3Q2024 Press Release and During the 3Q2024 Earnings Call .......................... 95

P.    Continued Misleading Risk Statements in the February 7, 2024 3Q2024 Report.......................................................................................... 98

Q.    Continued False and Misleading Statements during the May 22, 2024 FY2024 Earnings Call ................................................................................... 99

R.    Continued Misleading Risk Statements in the May 23, 2024 FY2024 Report .. 102

S.   Continued False and Misleading Statements during the August 6, 2024 1Q2025 Earnings Call ................................................................................ 105

T.   Continued Misleading Risk Statements in the August 7, 2024 1Q2025 Report ................................................................................................................. 108

U.   Continued False and Misleading Statements during the October 28, 2024 2Q2025 Earnings Call ................................................................................ 110

V.   Continued False and Misleading Statements at the October 30, 2024 Investor Day ......................................................................................................... 112

W.   Continued Misleading Risk Statements in the October 30, 2024 2Q2025 Report ................................................................................................................. 113

X.   Continued False and Misleading Statements in the October 31, 2024 Yahoo! Finance Interview ..................................................................................... 114

Y.   Continued False and Misleading Statements during the January 29, 2025 3Q2025 Earnings Call ................................................................................ 116

Z.   Continued Misleading Risk Statements in the January 29, 2025 3Q2025 Report ................................................................................................................. 118

AA.   Defendants Partially Disclosed the Truth on March 6, 2025 at VFC's 2025 Investor Day ..................................................................................................... 119

BB.   Continued False and Misleading Statements during the March 6, 2025 Investor Day ..................................................................................................... 121

CC.   Defendants Partially Disclosed the Truth on May 21, 2025 in VFC's FY2025 Investor Presentation and During the FY2025 Earnings Call .......................... 122

VI.   POST-CLASS PERIOD EVENTS ...................................................................... 126

A.   July 30, 2025 Admissions during VFC's 1Q2026 Earnings Call ........................ 126

VII.   ADDITIONAL SCIENTER ALLEGATIONS ........................................................ 127

A.   Defendants Admittedly Knew Vans Continued to Lack Product Innovation and an Ability to Keep Pace with Consumer Trends ........................................ 127

B.   Defendants Reviewed and Discussed Vans' Consumer and Product Data, Including Conducting Comprehensive Consumer Insight Assessments and Closely Monitoring Consumer, Inventory, and Product KPIs in Real-Time ....... 131

1.   Defendants Closely Tracked Vans' Brand Health and Consumer Trends via Several Metrics, Including "Brand Heat," Google Search Trends, Pricing, and Customer Loyalty Numbers .................................................................. 131

2. Defendants Conducted Ongoing Comprehensive Consumer Insight
Assessments ...................................................................................... 136

C. CWs Confirmed That Defendants and Senior Management Frequently
Attended Meetings and Received Reports Regarding Vans' Product
Innovation, Inventory and SKU Performance, Brand Performance, and
Sales Forecasts .................................................................................... 137

D. Defendants Frequently Provided Detailed Updates on Vans' Purported
Product Innovations and Alignment with Consumer Trends, Evidencing Their
Knowledge of the Same ......................................................................... 145

E. Defendants' Evasive Answers to Analysts' Pointed Questions are Indicative
of Scienter ............................................................................................ 151

F. Several Defendants Were Intimately Involved in Vans, Including Product
Development and the Purported Turnaround...................................... 158

1. Bracken P. Darrell ......................................................................... 158

2. Kevin D. Bailey ............................................................................. 160

3. Steven E. Rendle and Matthew H. Puckett.................................. 162

G. Defendants' False and Misleading Statements Were Made on the Heels of
VFC's 2022 Investor Day Where Defendants Discussed Vans' Product
Innovation, Consumer Understanding, and Turnaround in Detail,
Demonstrating Defendants' Awareness of Those Issues and Their
Importance to Investors ......................................................................... 163

H. Suspiciously Timed Turnover of Defendants Supports Scienter ...... 164

I. Defendants' Statements Concerned Vans, a Core Operation of VFC, Further
Supporting Scienter .............................................................................. 166

VIII. LOSS CAUSATION ...................................................................................... 168

A. October 30, 2023 Partially Corrective Disclosures .......................... 170

B. February 6, 2024 Partially Corrective Disclosures............................ 174

C. March 6, 2025 Partially Corrective Disclosures ............................... 177

D. May 21, 2025 Final Corrective Disclosures ...................................... 179

IX. CLASS ALLEGATIONS ............................................................................... 184

X. PRESUMPTION OF RELIANCE .................................................................. 186

XI. NO STATUTORY SAFE HARBOR................................................................ 188

XII. CLAIMS FOR RELIEF ...................................................................................... 189

COUNT I ............................................................................................................... 189

COUNT II .............................................................................................................. 192

PRAYER FOR RELIEF .......................................................................................... 194

DEMAND FOR JURY TRIAL .................................................................................. 195

## V.F. CORPORATION'S FISCAL CALENDAR

| Period | Start | End | Class Period |
|---|---|---|---|
| **FY2022** | **April 4, 2021** | **April 2, 2022** | |
| 1Q2022 | April 4, 2021 | July 3, 2021 | |
| 2Q2022 | July 4, 2021 | October 2, 2021 | |
| 3Q2022 | October 3, 2021 | January 1, 2022 | |
| 4Q2022 | January 2, 2022 | April 2, 2022 | |
| **FY2023** | **April 3, 2022** | **April 1, 2023** | |
| 1Q2023 | April 3, 2022 | July 2, 2022 | |
| 2Q2023 | July 3, 2022 | October 1, 2022 | Start (9/28/2022) |
| 3Q2023 | October 2, 2022 | December 31, 2022 | X |
| 4Q2023 | January 1, 2023 | April 1, 2023 | X |
| **FY2024** | **April 2, 2023** | **March 30, 2024** | X |
| 1Q2024 | April 2, 2023 | July 1, 2023 | X |
| 2Q2024 | July 2, 2023 | September 30, 2023 | X |
| 3Q2024 | October 1, 2023 | December 30, 2023 | X |
| 4Q2024 | December 31, 2023 | March 30, 2024 | X |
| **FY2025** | **March 31, 2024** | **March 29, 2025** | X |
| 1Q2025 | March 31, 2024 | June 29, 2024 | X |
| 2Q2025 | June 30, 2024 | September 28, 2024 | X |
| 3Q2025 | September 29, 2024 | December 28, 2024 | X |
| 4Q2025 | December 29, 2024 | March 29, 2025 | X |
| **FY2026** | **March 30, 2025** | **March 28, 2026** | X (partial) |
| 1Q2026 | March 30, 2025 | June 28, 2025 | End (5/20/2025) |
| 2Q2026 | June 29, 2025 | September 27, 2025 | |
| 3Q2026 | September 28, 2025 | December 27, 2025 | |
| 4Q2026 | December 28, 2025 | March 28, 2026 | |

1.      Court-appointed co-lead plaintiffs MainStage Capital Partners, LP and Robert Ruzich ("Lead Plaintiffs" or "Co-Lead Plaintiffs") and additional plaintiff Miguel Nogales Pacheco (together with Lead Plaintiffs, "Plaintiffs") bring this action against V.F. Corporation ("VFC" or the "Company"), as well as against Steven E. Rendle ("Rendle"), Bracken P. Darrell ("Darrell"), Matthew H. Puckett ("Puckett"), Paul Vogel ("Vogel"), Kevin D. Bailey ("Bailey"), and Benno O. Dorer ("Dorer" and, collectively with Rendle, Darrell, Puckett, Vogel, and Bailey, the "Individual Defendants," and with VFC, "Defendants"). This action is brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), on behalf of themselves and all persons and entities similarly situated, other than Defendants, who purchased or otherwise acquired securities of VFC between September 28, 2022 and May 20, 2025, inclusive (the "Class Period"), and were damaged thereby.

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding VFC; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with former employees of VFC; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis

1

concerning VFC and the industry in which the Company operates; and (v) pertinent court filings.

3.      Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION[1]

4.      Plaintiffs allege that throughout the Class Period, VFC and the Individual Defendants knowingly or severely recklessly made material misrepresentations to investors concerning: the lack of new, in-demand products designed for VFC's flagship brand—Vans; VFC's lack of investments in Vans' product innovation and marketing; Vans' bloated inventories of off-trend Stock Keeping Units ("SKUs", *i.e.*, products) that necessitated pervasive, margin-eroding discounts to offload; and Vans' turnaround progress.

5.      VFC is a global seller of footwear, apparel, and accessories through its brand portfolio which includes Vans footwear. For many years prior to the Class Period, the Vans brand experienced significant growth and was VFC's largest brand by revenue—and thereby, VFC's most important brand.

6.      However, as consumer trends changed, particularly following the COVID-19 pandemic, Vans' sales reversed course to such an extent that by April 2022 (*i.e.* during

---

[1] Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

the first quarter of VFC's fiscal year 2023 ("1Q2023")), Vans' sales began constituting a declining share of VFC's total revenue, prompting significant scrutiny from VFC's investors.

7.      Thus, on September 28, 2022—the first day of the Class Period—Defendants Rendle (then VFC CEO), Puckett (then VFC CFO), and Bailey (then Vans' President) held an Investor Day (the "2022 Investor Day") to assure the market that they knew why Vans' sales declined and that they had implemented corrective actions to drive positive revenue. In fact, Defendant Bailey announced VFC completed "a major study to really understand the consumer in a big way," concluding, in great detail, how Vans had become over-reliant on its historically "core icons" (or "franchise") designs and lacked innovation and investments in new products such as "athleisure" that were dominating sales. Defendant Rendle summarized the study's findings as the "root causes" of Vans' revenue declines.

8.      Market analysts came away from VFC's 2022 Investor Day encouraged by Vans' purported investments in new products and pivot away from its former "core" SKUs. For example, Wells Fargo published a report following the 2022 Analyst Day stating that "[p]lans to fix the Vans model are underway" and "[n]ew management is focused on fixing execution issues in brand heat, product innovation and the operating model." Citi analysts likewise observed that the "key brand discussion was Vans" and management is "confident it can reaccelerate growth."

9.      Seeing this positive reaction, and knowing the market would punish any unfavorable news concerning VFC's most important brand, Defendants spent the entire

3

Class Period misrepresenting the truth of Vans' business by falsely and misleadingly: disclaiming or downplaying Vans' reliance on off-trend "core" styles; touting new products and product innovation that did not exist (or falsely portraying the significance of new products that constituted a *de minimus* portion of Vans' business); claiming Vans was making material investments into new product innovation and marketing; overstating the health of Vans' inventory; and presenting a false timeline for Vans' turnaround progress.

10.    For instance, Defendants made numerous patently false or misleading claims, including, among many others:

- that Defendants had a "**clear plan to accelerate**" profitable growth through "**an increase in product and marketing investments**";

- that Vans was "**increasing our level of investments to create new relevant products**";

- that Defendants had "**worked**" with Vans "**to make sure that we balance**" development SKUs of historically "core" styles against new styles "**correctly**" rather than becoming "**overly reliant**" on them;

- that "**[a]ctions that we took and continue to initiate to turn around Vans® and improve profitability include** […] **investing in product innovation**" and "**eliminating unnecessary Stock Keeping Unit ("SKU") complexity**";

- that "**from an inventory standpoint,**" for VFC brands including Vans, Defendants were "**making really good progress. A little bit ahead of schedule in reducing our inventories**" such that Vans would "**see a moderating promotional environment**" relative to past fashion seasons;

4

- that Vans' return to growth was "**aided by … SKU simplification[,]**" which Vans had purportedly implemented;

- that Vans was seeing wholesale customers' "**order books stick**";

- that Vans' "**new products**" were "**performing well across regions**"; and

- that Defendants were "**seeing success with our wholesale partners and our consumers who want newness**."

11.    In addition, throughout the Class Period, every annual and quarterly report filed with the SEC on behalf of VFC, and signed by Defendants Rendle, Dorer, Darrell, Puckett, and Vogel during their respective tenures, falsely posed risks of VFC's "**[f]ailure to compete effectively or to keep pace with rapidly changing consumer preferences**," the Company's "**product innovation**[,]" and customers increasingly seeking "**markdown allowances, incentives and other forms of economic support**[,]" *inter alia*, as mere hypotheticals that "**could have a material adverse effect**" on VFC or cause the Company's "**actual results**" to "**differ materially**" from projections, when in reality, those risks were not mere hypotheticals, but had actualized by the time the statements were made.

12.    However, in direct contrast to the impression caused by Defendants' misstatements throughout the Class Period, Vans' revenues steadily declined and the brand's turnaround was continuously elongated due to the Company's failure to invest in new product innovation and overreliance on unpopular historically "core" styles that caused customer cancellations and had to be sold at promotional pricing.

5

13.    Indeed, multiple Confidential Witnesses ("CWs"), who are former employees of Vans, confirmed: (i) Vans' limited new product innovation was inconsequential in scope; (ii) the Company was not materially investing in new product innovation and marketing; (iii) wholesale consumers were routinely cancelling order bookings as well as receiving deep discounts and promotions; and (iv) VFC's Reinvent plan was a pure cost cutting exercise without reinvestment into new product.

14.    For instance, CW4 confirmed that throughout the Class Period, Vans' investments in technical lifestyle and performance products (including "athleisure"), accounted for only about 10% of Vans' total business and "would not offset losses" from the diminished popularity of icons and classic styles. Further, CW4 stated there was **no** increase in either new product innovation or marketing investment in 2024. CW1 corroborated CW4 stating that, at Vans, there wasn't the "overinvestment that's required," including in marketing and product innovation, to keep up with competitors, which CW2 confirmed meant Vans stood in stark contrast to the likes of New Balance and Adidas.

15.    Instead of developing new, relevant products, CWs recounted that Vans merely relied on unpopular iterations of its core franchises. For example, throughout CW3's tenure, Vans' merchandising teams were "doubling down" on the core classics, such as taking Vans' classic Old Skool shoe "and putting another color on it." Moreover, CW3 explained that Vans did not implement and perform "SKU rationalization" until 2024 (with benefits not seen until late 2024 or early 2025), meaning that merchandising teams had "no guard rails" or "red tape" to prevent a proliferation of non-performing styles and SKUs. Indeed, all CWs confirmed that Vans was not producing new, relevant products

6

during the Class Period. CW2 specifically recalled that VFC's customers provided "regular feedback" and "one of the biggest concerns" was Vans' lack of product innovation.

16.    Vans' failure to develop new styles, in favor of endless variations of former classics, devastated sales. For instance, throughout CW1's tenure at Vans, cancellations of orders across the Company's entire Europe, Middle East, and Africa ("EMEA") region were around **20–25%—more than double** VFC's 10% allowance. Orders canceled by Vans' wholesale customers were unloaded to "value channel" buyers like TK Maxx, who CW2 confirmed was buying Vans product at a stark **66% average discount** during the Class Period. Moreover, as wholesale customers learned throughout the Class Period that their cancelations lacked consequences for them, CW2 and CW1 stated that wholesalers adjusted their behavior by further reducing future orders and exacting price concessions, decimating the brand's sales and margins.

17.    To mask these issues, Vans routinely inflated sales forecasts through unachievable top-down targets and fictitious "**ghost orders**." For example, CW2 recalled that Vans' EMEA leadership always assigned sales targets "**about 20 to 40 percent**" beyond what CW2 had originally forecasted based on a data-centered bottom-up approach. Because of the dramatically inflated forecasts, CW2 explained, there were large gaps between actual order book volumes from customers made in advance of each six-month fashion season and the "unrealistic forecast" targets. To bridge these gaps, both CW2 and CW1 were instructed to record fake orders, or "ghost orders," in the Company's sales software systems. Ghost orders also created a vicious cycle for Vans. Because the ghost orders had not actually been made by a customer, both CW2 and

7

CW1 recounted mass cancellations of ghost orders near the end of the fashion seasons. However, the placement of the ghost order resulted in procurement of the corresponding inventory—meaning Vans had to flush out a glut of unordered inventory through promotions and discounts.

18.    Importantly, Defendants knew or recklessly disregarded the falsity of their Class Period misstatements, including by their own admissions. Indeed, at the onset of the Class Period, Defendant Bailey admitted the specific product issues affecting Vans, describing how the brand had become over-reliant on its core designs and lacked adequate product innovation and investments. Then, more than halfway through the Class Period, Defendant Darrell partially admitted that Vans' product innovation was still poor, stating that "we offered more and more color waves of the same old things to pour more fuel into a fire built on a trend." And just before the end of the Class Period, Darrell went even further, admitting, in reference to Vans' assortment of icon designs, that "**we rode that thing way too long**."

19.    Defendants also repeatedly touted a trove of consumer and product data readily available to, and closely tracked by, them. Such data systems included: a "control tower" report showing how consumers are engaging in "real time[;]" "Consumer Pulse" dashboards with sales numbers and consumer data by brand and region; and a "brand health tracker" displaying competitor comparisons and consumer sentiment. Defendant Bailey demonstrated acute awareness of Vans' brand health tracker, providing updates on specific attributes like aided awareness and perception. Defendants also admitted to conducting ongoing consumer insight assessments.

20.    CWs also recalled countless meetings with VFC and Vans senior management, where Vans' sales, product innovation, and inventory issues were frequently discussed and bubbled up. For instance, CW4 stated that, on at least a quarterly basis, VFC's C-suite would attend Quarterly Business Review ("QBR") Meetings to review Vans' sales volumes and margins, update the brand's three-year plan based on the trajectories of historical sales, future bookings, and forecasts, and give back to the brands the "number"—*i.e.*, sales revenue target—they needed to hit for a given quarter. According to CW4, from 2022 through at least the end of CW4's tenure in March 2025, Vans consistently fell short of the brand's revenue target that was set at these QBR meetings. Further, CW3 personally met with Defendant Puckett in approximately Q4 2022 to get "buy in" and "sign off" on certain profitability initiatives, including the implementation of "SKU Rationalization" which was not implemented until 2024.

21.    The truth concerning Vans' new product innovation pipeline and inventory issues gradually leaked out to investors over four sets of partially corrective disclosures. Overall, each of the four sets of disclosures, in turn, revealed that the Vans turnaround was further elongated and less successful than investors had been led to expect.

22.    *First*, after market close on October 30, 2023, Defendants revealed, *inter alia*, that Vans' second quarter fiscal year 2024 ("2Q2024") revenue declined a whopping 21%, VFC's Americas region revenue was down 11% due largely to Vans, and that FY2024 guidance for VFC's inventory reduction had been slashed from "down 10%" to just "down mid- to high single digits" also due in large part to Vans. Specifically, Defendants disclosed that driving these poor results was the fact that Vans' "innovation

9

engine" had "drifted down over the past few years" and new products "continue[d] to have limited impact in offsetting the declines in classic products"—*i.e.* Vans' icons, and thus Vans would "not see a turnaround this year" (FY2024). On this news, VFC's common stock price fell approximately ***13.96%*** in a single trading day, declining $2.39 per share from a closing price of $17.12 per share on October 30, 2023 to $14.73 per share on October 31, 2023 on unusually heavy trading volume. Analysts were caught off guard by Defendants' disclosures, with Seaport Research Partners writing that "we weren't expecting it to be this bad[,]" and Guggenheim noting that they were now expecting a "longer than anticipated turnaround at Vans (we no longer contemplate an improvement in [the second half of FY2024).]"

23.    *Second*, after market close on February 6, 2024, Defendants announced that Vans' third quarter fiscal year 2024 ("3Q2024") revenue was down a massive 28%. Specifically, Defendants revealed that they had deliberately "made our results this quarter a little worse by cleaning up Vans" still-highly-elevated inventory levels, which had meant maintaining "elevated levels of promotional activity[.]" Following this news, VFC shares fell roughly ***9.68%*** in a single trading day, from a close at $16.95 per share of common stock on February 6, 2024, down $1.64 per share to a close at $15.31 on February 7, 2024. Shocked by Defendants' disclosures, analysts reacted negatively, with Evercore expressing "[w]e're still surprised at the magnitude of the Vans declines at -28% YOY (with further wholesale [inventory] clean-up expected to spill into FY25)[,]" which meant a "Vans turnaround still taking longer than expected[.]"

10

24.     *Third*, during market hours on March 6, 2025, Defendant Darrell revealed that in contrast to major competitors like Nike and New Balance, VFC had continued to over-rely on Vans' core icon designs "way too long[,]" which had led to the market being oversaturated with stale styles. On this news, VFC stock fell approximately ***18.42%*** over a two-day period, from a closing price of $23.45 per share on March 5, 2025, down $4.32 per share to a closing price of $19.13 on March 7, 2025. Analysts covering the Company were again shocked. For example, Wells Fargo lamented that "the turnaround timing is being pushed out" on Vans yet again.

25.     *Fourth and finally*, before market open on May 21, 2025, Defendants revealed that Vans' fourth quarter fiscal year 2025 ("4Q2025") revenue had dropped a staggering 22% year-over-year, far worse than expected. Specifically, Defendants revealed that "60% of the decline" was "a direct effect of deliberately reduced revenue" due to VFC needing to "eliminate unprofitable or unproductive" products and channels, that 40% of the decline was due to weak traffic to Vans' direct-to-consumer ("DTC") stores, and, relatedly, that Vans' new product offerings were still too limited to "deliver the Vans turnaround" because they remained "more than offset by declines in [Vans'] icons[.]" Upon this news, VFC's common stock price fell roughly ***15.8%*** in a single trading day, dropping $2.28 from a close at $14.43 per share on May 20, 2025 to a close at $12.15 per share on May 21, 2025.

26.     Analysts again expressed surprise and disappointment. For instance, Seaport analysts wrote that while it was "most important[]" for a company to manage its product development, it was clear that "VFC didn't do this[.]" Also, numerous analysts

11

expressed that the takeaway from the May 21, 2025 news was that Vans' supposed turnaround, over two and a half years in, was yet again pushed down the road—but this time, indefinitely: Evercore analysts stated they were "disappointed at yet another large-scale Vans reset[;]" Goldman Sachs highlighted that "a sustainable inflection in Vans momentum remains longer-dated"; and BNP Paribas wrote that "the VF[C] turnaround is taking time and becoming harder for investors to underwrite."

27.    Defendants would later admit after the Class Period on July 30, 2025 that Vans *still* did not "have enough new products in the premium or the mainline yet," adding that new products as needed to fuel a brand turnaround were still "coming."

28.    Defendants' false and misleading statements served to artificially inflate the price of VFC's securities throughout the Class Period, causing massive investor losses when the price of those securities precipitously declined as the truth was revealed. Plaintiffs hereby seek damages individually and on behalf of the Class.

## II.    JURISDICTION AND VENUE

29.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

30.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to

12

render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

32.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. VFC is headquartered in this District, with its principal place of business located at 1551 Wewatta Street, Denver, Colorado 80202.

## III.    PARTIES

### A. Plaintiffs

33.    Plaintiff MainStage Capital Partners, LP ("MainStage"), Court-appointed Co-Lead Plaintiff, purchased or otherwise acquired the VFC securities set forth in its Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 20-1), which MainStage incorporates by reference herein, during the Class Period at prices artificially inflated as a result of Defendants' materially false and misleading public statements, and was damaged thereby.

34.    Plaintiff Robert Ruzich ("Ruzich"), Court-appointed Co-Lead Plaintiff, pursues claims in this litigation on behalf of his brother, Richard Ruzich, and his wife, Margaret Ann Ruzich, who have each assigned their claims to him. Richard Ruzich and Margaret Ann Ruzich purchased or otherwise acquired the VFC securities set forth in Ruzich's Damages Analysis (ECF No. 22-1), which Ruzich incorporates by reference herein, during the Class Period at prices artificially inflated as a result of Defendants' materially false and misleading public statements, and were damaged thereby.

35.    Additional named Plaintiff Miguel Nogales Pacheco ("Nogales") purchased or otherwise acquired the VFC securities set forth in his Certification Pursuant to Federal Securities Laws, filed herewith, during the Class Period at prices artificially inflated as a result of Defendants' materially false and misleading public statements, and was damaged thereby.

**B. Defendants**

36.    Defendant V.F. Corporation is a Pennsylvania corporation with its principle executive offices located at 1551 Wewatta Street, Denver, Colorado 80202. During the Class Period, the Company's common stock publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "VFC."

37.    Defendant Steven E. Rendle served as the CEO, President, and as Chairman of the board of VFC beginning before the start of the Class Period and until his departure from the Company on December 2, 2022.

38.    Defendant Bracken P. Darrell has served as CEO, President, and a director of VFC at all relevant times since his appointment effective July 17, 2023. Darrell also served as interim President of Vans from October 30, 2023 until July 29, 2024.

39.    Defendant Matthew H. Puckett served as the CFO and Executive Vice President of VFC beginning before the start of the Class Period and until his departure effective July 8, 2024.

40.    Defendant Paul Vogel has served as CFO and Executive Vice President of VFC at all relevant times since his appointment effective July 8, 2024.

14

41.     Defendant Kevin D. Bailey served as President of Vans from prior to the Class Period [March 2022] until approximately October 30, 2023. Thereafter, Bailey remained on VFC's Executive Leadership Team ("ELT") reporting to Defendant Darrell, and led the Company's Reinvent business transformation plan until August 2024.

42.     Defendant Benno O. Dorer served as interim President and CEO of VFC from December 5, 2022 until July 17, 2023, when Defendant Darrell was appointed as CEO. Prior to and after Dorer's role as interim CEO, Dorer served as Lead Independent Director of VFC's board of directors.

## C. Relevant Non-Parties

43.     Michelle "Sun" Choe has served as the President of Vans at all relevant times since July 29, 2024, when she took over for Defendant Darrell who temporarily held the role after Defendant Bailey.

44.     CW1 was a former Manager of Strategic Accounts for Vans EMEA, based in the United Kingdom ("UK"). Prior to the Class Period, CW1 worked at VFC's North Face brand for over a decade. In August 2022, CW1 moved to Vans and remained there until after the Class Period. CW1 was responsible for managing Vans' relationship with JD Sports, a pan-European account with over 700 store locations and omnichannel sales, who CW1 stated was "arguably the largest global account" and "one of the top 3 catalysts for EMEA."[2] CW1 reported to a Line Manager, Matthew Lloyd, who reported to the Director for Strategic Accounts, Dominik Jahn. Jahn reported to the General Manager

---

[2] JD Sports is a British multinational retailer and constituent member of the FTSE 100 Index, which represents the 100 most capitalized stocks on the London Stock Exchange.

of Vans EMEA, Andreas Olsson ("Olsson"), who in turn reported to Martino Scabbia Guerrini ("Guerrini"), VFC's Chief Commercial Officer, President of Emerging Brands, and a direct report to Defendant Darrell.

45.     CW2 worked at the Company for over two decades prior to the Class Period through November 2024. For the decade leading up to November 2024, CW2 worked within Vans as Country Manager for the UK and Ireland. CW2 reported to Vans' European Commercial Director, Nick Welton. Welton, in turn, reported to Vans' Vice President of Marketplace, Massimo Martini, who reported to Olsson.

46.     CW3 worked at Vans as senior member of the Finance department before, throughout, and after the Class Period. CW3's immediate manager reported directly to the VFC CFO. Throughout CW3's tenure at Vans, CW3 was primarily responsible for driving profit margins for Vans products.

47.     CW4 worked at Vans for over a decade prior to leaving the Company in March 2025. Throughout the Class Period, CW4 worked on Vans' Global Product Team and was responsible for Vans' go-to-market process, meaning "the entire calendarization for how we made things as well as rolled those things out and launched them[,]" including overseeing portions of product and planning. CW4 reported to Vans' Chief Product and Merchandising Officer, Marissa Pardini, who reported to the President of Vans, Defendant Kevin Bailey. Bailey, in turn, reported to the CEOs of VFC, except during the time in which Defendant Darrell served as Vans President after taking over for Bailey, during a part of which CW4 reported to Darrell directly.

16

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  VFC is a Global Apparel, Outerwear, Footwear, and Accessory Company

48.    VFC is a global company that sells footwear, apparel, and accessories across a portfolio of brands that, as of VFC's financial and operational report for the fourth quarter and full year ended March 29, 2025, filed with the SEC on May 22, 2025 on Form 10-K (the "FY2025 Form 10-K"), fall into three reportable segments: Outdoor, Active, and Work.

49.    The Company's Outdoor segment's product offerings include performance outdoor apparel, footwear, equipment, and accessories. VFC's Outdoor segment includes The North Face, Timberland, Altra, Smartwool, and Icebreaker brands.[3]

50.    The Active segment's product offerings include active apparel, footwear, backpacks, luggage, and accessories. The Company's Active segment includes the Vans, Kipling, Napapijri, Eastpak, and Jansport brands.

51.    The Work segment's product offerings include active apparel, footwear, and accessories. VFC's Work segment include the Dickies and Timberland PRO brands.

52.    VFC refers to core products within each brand as "icons" or "franchises." For example, within Vans, there are five icons or "classics": Authentic, Era, Classic Slip-On, Old Skool, and Sk8-Hi. The Company refers to product variations of an icon/franchise, like color or pattern, as "styles."

---

[3] Brands within each reportable segment are based on descriptions in the FY2025 Form 10-K, VFC's most recent annual report at the time of filing.

**B. VFC Markets its Products Globally through Direct-to-Consumer and Wholesale Channels**

53.    VFC markets its products through DTC and wholesale channels. DTC channels encompass VFC-owned-and-operated stores, concession retail stores (*i.e.*, areas that VFC operated inside larger stores), VFC brand e-commerce sites, and other digital platforms. Wholesale channels are not owned by the Company. Rather, wholesalers buy VFC product and re-sell it. Such entities include specialty stores, national chains, mass merchants, department stores, and independently-operated partnership stores with strategic digital partners.

54.    CW1 explained that VFC internally organizes wholesale customers into tiers zero to three, spanning from hip, independent "opinion-influencing" stores at tier zero, high end retailers (like Bloomingdales) at tier one, "authentic" stores (like REI) at tier two, to "value doors" (like Walmart) at tier three.

55.    Throughout the Class Period, VFC's wholesale channel remained the largest driver of the Company's revenues. VFC disclosed the following annual revenues by channel:[4]

|  | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| **Wholesale** | $6,305,029k | $5,422,017k | $5,300,094k |
| **Direct-to-consumer** | $4,709,390k | $4,426,588k | $4,142,275k |
| **Royalty** | $74,940k | $67,073k | $62,322k |

---

[4] VFC's financial figures presented in tables and charts incorporate, to the extent available, the most recently published figures in the Company's SEC filings for the relevant period.

18

56.    VFC's revenues span several geographic regions, but during the Class Period (including in its the FY2025 Form 10-K), the Company disclosed that Europe was its largest international market. Moreover, throughout the Class Period, Europe constituted a growing share of Vans' revenue, accounting for over 28% of Vans revenue by the end of the Class Period. VFC disclosed the following annual Vans revenue by geographic region:

|  | FY2023 | FY2024 | FY2025 |
|---|---|---|---|
| **Americas** | $2,380.5M (64.6%) | $1,708.2M (61.3%) | $1,435.8M (61.1%) |
| **Europe** | $838.3M (22.8%) | $726.3M (26.1%) | $661.2M (28.1%) |
| **Asia-Pacific** | $464.1M (12.6%) | $351.2M (12.6%) | $252.4M (10.7%) |
| **Total** | $3,682.9M | $2,785.7M | $2,349.4M |

## C. Vans' Wholesaling Operates According to Sixth-Month Fashion Seasons Which Dictates Its Forecasting

57.    CW1 explained that, for wholesale customers, the Company's sales interactions are commenced by presenting "collections" of styles to customers approximately seven months in advance of when Vans products would begin shipping for each of the brand's two six-month fashion seasons: the spring/summer season, and the fall/winter season.

58.    According to CW1, after collections were presented, VFC sales teams (including Vans) would agree with customers before each season to "pre-book" orders—representing the total dollar (or euro) amount of inventory that the customer wished to pre-book to last the season, with actual purchase orders to be made later. These pre-booked orders were also referred to as Vans' "orderbook." As CW1 explained, Vans gave its customers deadlines by which to pre-book orders, generally starting six to seven

months prior to when Vans would begin shipping products for that fashion season, and, depending on the customer, additional deadlines rolling on a periodic basis (sometimes monthly, sometimes fortnightly) until shipping for the season began. During CW1's tenure, pre-book order for JD Sports (a strategic pan-European account managed by CW1) was approximately €15 million per annum.

59.    Additionally, CW2 stated that as part of Vans' go-to-market process for each fashion season, regional managers, like CW2, were responsible in the first instance to build sales forecasts for wholesale customers "from the bottom up, with input from all of the sales guys[,]" and present them to senior leadership. Bottom-up forecasting was meant to ensure that forecasts set "realistic sales targets" based on the historical sales volume and revenues for each account from the past year. As CW2 explained, "essentially if you did $2 million last year and you've lost" some sales since then, "chances are you won't be doing above $2 million this year," and a bottom-up forecast would reflect that reality.

60.    For example, CW2 was responsible for forecasting demand for each Vans wholesale customer in the U.K. and Ireland. CW2 would submit the bottom-up forecasts to CW2's manager and European Commercial Director, Nick Welton, as well as Dominic Jahn, Senior Director for Strategic Accounts for Vans EMEA, and Massimo Martini, Vans' Vice President of Marketplace. Welton, Jahn, and Martini would then round up CW2's country forecast with the forecasts given by the other EMEA countries.

61.    According to CW1, VFC's ELT prepared a full-year sales forecast that was distributed to the Company's geographic regions, including EMEA, APAC (Asia-Pacific),

20

and NORA (North America), via CCO Guerrini. CW1 stated that the forecast was then "carved up" by regional level geography and by brand. Likewise, CW2 confirmed VFC leadership provided a sales target to Vans EMEA leadership who then allotted that overall EMEA target down to the individual countries.

62.    According to CW1, Vans' sales contracts (which CW1X recalled seeing) permitted wholesale customers to cancel ten percent (10%) of their pre-book orders if demand did not materialize during the season. For instance, CW1 explained that "say the value was $20 million" in pre-book orders for a customer, "we'd give them a $2 million cancellation" allowance on the pre-book orders. Conversely, CW1 explained that Vans also historically budgeted its inventory by procuring 10% of "free stock," which was an unallocated pool of product that customers could purchase during a season if actual order bookings exceeded the pre-booked orders. According to CW1, contracts for strategic accounts were negotiated by Jahn, Vans EMEA Vice President Massimo Martini, and the Sales Director.

**D. Leading up to the Class Period, Deteriorating Vans Demand Attracted Immense Investor and Analyst Scrutiny Prompting Detailed Internal Analysis and Assurances to the Market That Corrective Measures Were Already Underway**

63.    Leading up to the Class Period, the Vans brand experienced significant growth and was VFC's largest brand by revenue—and thereby, the Company's most important brand.

64.    Indeed, during the Company's September 28, 2022 Investor Day, Defendant Rendle summarized that Vans had "experienced rapid growth, growing from $2 billion to $4 billion between the years of 2017 and 2019." That same day, then-

21

President of Vans, Kevin Bailey, stated that, between VFC acquiring Vans in 2004 and 2022, Vans "averaged a 15% compound annual growth rate" and had become "V.F.'s. largest brand and our most profitable one." As depicted on the following slide from the 2022 Investor Day presentation, Vans was VFC's largest brand by revenue and profit contribution both before and after the COVID-19 pandemic:



65.     A September 29, 2022 Guggenheim report noted the same, observing that "[d]espite the ongoing challenges including the over-reliance on core classics, brand heat, Americas DTC and China, Vans remains the largest and the most profitable brand in VF's portfolio."

66.     Leading up to and during the Class Period, the Vans brand remained among VFC's top two brands by revenue. Indeed, VFC disclosed the following "Top Brand Revenues":

|  | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| **Vans** | $3,465.7M | $4,161.9M | $3,682.9M | $2,785.7M | $2,349.4M |
| **The North Face** | $2,457.4M | $3,259.7M | $3,612.7M | $3,673.3M | $3,703.4M |
| **Timberland[5]** | $1,513.0M | $1,823.1M | $1,784.7M | $1,556.9M | $1,607.7M |
| **Dickies** | $701.5M | $837.7M | $725.2M | $618.4M | $542.1M |

67.     However, VFC also disclosed that Vans' revenue constituted a declining

share of VFC's total revenue:

|  | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| **Vans Rev.** | $3,465.7M | $4,161.9M | $3,682.9M | $2,785.7M | $2,349.4M |
| **Total Rev.** | $9,238.8M | $11,841.8M | $11,612.5M | $9,915.7M | $9,504.7M |
| **% of Total Rev.** | 37.51% | 35.15% | 31.71% | 28.09% | 24.72% |

68.     Starting in about 2022 and continuing through the end of CW4's tenure in

March 2025, it was a "decline quarter after quarter"—*i.e.*, for *thirteen* consecutive

quarters—across all of Vans' business, including both wholesale and Vans' DTC

ecommerce site, such that CW4 did not see a turnaround in Vans through the end of

CW4's tenure.

69.     Thus, as of the 2022 Investor Day, VFC management recognized that Vans

was the primary brand within the Company that needed fixing. Indeed, while then-Vans

President Kevin Bailey noted that Vans had grown to be "V.F.'s largest brand and our

most profitable one" by 2022, then-CEO Defendant Rendle acknowledged that "one of

our key brands"—*i.e.* Vans— was "not achieving its potential[.]"

---

[5] These figures include revenues from both the Timberland® and Timberland PRO®
brands.

23

70.     Accordingly, VFC performed a deep analysis of Vans' issues around the middle of the Company's FY2021. Speaking at the 2022 Investor Day, Vans President Bailey described the analysis and the brand's efforts to become more responsive to consumers, stating:

> **We just completed**, about 9 months ago, **a major study to really understand the consumer in a big way**. But more importantly than that major study is that we're leveraging consumer data and analytics, as Velia referenced, and our consumer insights team to be less reliant on those large-scale studies and **moving to be more agile and responsive to a constantly-changing consumer landscape**.

71.     VFC also identified specific issues that led to the Vans brand's pre-CP underperformance. In particular, Bailey summarized that "[w]e missed some market and consumer signals, and with our significant growth, we became complacent to the changes we needed to make[,]" elaborating that:

> First, we became over-reliant on our core canvas classic styles and needed to innovate more than we did. Next, we overlooked some of the early signs that were telling us that we needed to evolve, and we had bigger consumer opportunities that we really weren't paying attention to and taking advantage of. That affected our product, that affected our marketing, that affected our brand heat, and ultimately led to impacting the traffic in our own brick-and-mortar D2C fleet.

72.     During the 2022 Investor Day, Bailey also described that Vans had over-relied on its core or "Heritage" designs, *i.e.* canvas-based shoes, and had underwhelming product innovation through 2019:

> But the key takeaway I'd tell you in terms of the consumer is the consumer has evolved and invited us to evolve with them.
>
> So what does this mean, though, when we then turn and talk about product and how are we doing to refocus product? In footwear, we've talked in the

24

past about heritage and progression, right? Heritage is essentially our core canvas product that you're familiar with, progression is everything else. I left the brand in 2017 and in 2018, '19, **we definitely rode a wave a bit around our core canvas classics product, no doubt to that**. But in recent years, product is one of the key attributes affecting our performance. Because in many ways, **I believe we overextended our reliance on those core canvas products. And we didn't evolve enough inside of those products**, and I'm going to talk about that.

73.    Bailey also discussed Vans' lack of product innovation around comfort and functional versatility, which consumers demanded, and the lack of investment in Vans' marketing, stating in relevant part that:

[W]e did become too dependent on our classics. This is important because **we also made some strategic missteps inside of classics**, and we left opportunities on the table. Consumers choose classics for specific reasons, because they're casual, they're stylistically versatile and trendy. That's really important to what this consumer wants, but they have gaps. **The gaps are around comfort and functional versatility**. Also, classics tend to age younger. **We haven't done enough in product creation and communication about what classics can mean in your life**.

74.    Bailey also confirmed that Vans had been too restrictive and narrow-minded in chasing consumer insights related to Vans' five core shoe designs—or "icons"—explaining that:

Second issue I saw here, our icon management strategy. You may have heard us talk about this in the past. It was too restrictive. In an effort to mitigate, becoming too reliant on any one of our five core icons, we intentionally curbed growth in that icon and inhibited trending styles from growing further, and we've refocused that strategy. I do believe it was too Americas-led. So it's the slip-on style that we all know was trending in North America, we tended to try and make that a global trending style. That doesn't work. If our high top Sk8-Hi is trending in Europe, we have to let Europe run with that and see that opportunity to see what can come next.

25

So that's a key attribute of what we need to do. That strategy failed us in terms of optimizing the trends regionally.

75.    VFC assured investors that Vans was taking actions and would be more responsive. Indeed, at the 2022 Investor Day, Bailey announced a plan to "refresh, refocus, and reaccelerate" the Vans brand by obsessing over the customer and product innovation:

> We'll do four key things to restore Vans's growth story. First, we'll be consumer-led. **We will monitor above the consumer to remain always relevant**. Second, **we will obsess over product to meet the consumers' needs** from both a trend style and a performance style, and in a head-to toe fashion to make sure that we're also driving aspiration through our Pinnacle at the same time. Third, we will reshape the marketplace to be D2C led, digital first and specifically sharpened assortments for each of our wholesale accounts. And then finally, we'll evolve the operating model to be fit for future and better meet the needs of the ever-evolving consumer and marketplace.

76.    Bailey also discussed steps Vans was taking to accelerate brand's go-to-market cycle, stating in relevant part:

> I believe we missed an opportunity to accelerate in terms of product evolution, where do we go from here? How do we extend beyond that? **Now for us, footwear is about an 18-month creation cycle, so it takes a little time to get that engine roaring again. We're taking steps to accelerate this** where possible, leveraging our strong supply chain base that Cameron referenced, and even some speed lanes that they've helped us create so that we can try and move a little faster to get products faster to the market.

77.    Analysts credited statements from VFC's 2022 Analyst Day, expecting corrective measures at Vans were already happening and heightening the focus on Vans brand performance.

26

78.     For example, a September 28, 2022 Wells Fargo report noted that "[p]lans to fix the Vans model **are underway**" and "[n]ew management **is focused on fixing execution issues in brand heat, product innovation and the operating model**[.]"

79.     A September 29, 2022 Citi report observed that the "key brand discussion was Vans" and management is "confident it can reaccelerate growth."

80.     Thus, the beginning of the Class Period constituted a crucial inflection point for VFC, particularly regarding the Vans brand, consistently one of the Company's top brands. Analysts put Defendants on notice that they would eagerly scrutinize any new information concerning Vans brand performance. Defendants' assurances that they would "obsess over product to meet the consumers' needs," identification of specific product innovation issues, as well as purported corrective actions undertaken, demonstrate they understood as much.

**E. Despite Defendants' Assurances, Vans Product Innovation and Revenue Issues Persisted Throughout the Class Period**

1. <u>Vans' Limited New Product Innovations Were Inconsequential</u>

81.     During the Class Period, Defendants highlighted certain new Vans products, including under the high-end Pinnacle line (which included their entrants at the Paris Fashion Week, to be sold in boutique stores or through limited channels), and the UltraRange and MTE (which were athleisure products), but these products did not materially improve Vans' revenue or the Active segment's profitability because they represented only *de minimus* portions of Vans' business.

82.     Indeed, CW3 stated that with respect to the Pinnacle line, Vans was focused less on innovation, and more on trying to market to audiences that were not Vans' core

27

market. As CW3 elaborated, the Vans core consumer "isn't the people in Paris with Hermes bags," and CW3 recalled that when Vans held a Pinnacle launch event at Paris Fashion Week in June 2023, the products announced were "not our market." Notably, CW4 stated that product sold through "boutique-level channels" represented only "1% of the business" for Vans. CW4 also recalled that, even in the face of new trend reports, Vans did not meaningfully diversify its product portfolio. For example, Vans invested in technical lifestyle and performance products (including "athleisure"), but this accounted for only about 10% of Vans' total business and "would not offset losses" from the diminished popularity of icons and classic styles.

83. Moreover, despite Defendants' assurances, CWs confirm that Vans continued to lack product innovation, meaningful product investment, and was still unable to keep pace with consumer trends with respect to the largest franchises for Vans.

84. Throughout CW3's tenure at Vans, CW3 was "very, very involved with every part of the company," and attended "every product meeting" with the Product and Merchandising teams to advise from a profitability perspective. CW3 "helped a lot of the VF costing side understand what it's costing, how do you boost the numbers."

85. According to CW3, Vans was "1000%" impeded from generating higher sales throughout CW3's tenure because of a lack of innovation beyond the Knu Skool style, and overreliance on the Old Skool style. CW3 noted that Vans did not focus on constantly innovating its products as needed in the fashion industry, and did not have an answer for "what's next?" after the release of the Knu School, recalling that "there's never anything ready for what's next." CW3 added that by not innovating, "you just focus on Old

28

Skool. It's not working. Eras, for sure it's not working. Slip-Ons? Not working. Sk8-Hi?
Definitely not working. So where's the innovation?"

86.     As a consequence, throughout CW3's tenure Vans' merchandising teams
relied heavily on strategies like "doubling down" on the core classics, such as "taking an
Old Skool and putting another color on it." CW3 stated this was "not innovation," but "living
in the past."

87.     CW4 corroborated CW3, explaining that Vans' sales were falling during the
Class Period through the end of CW4's tenure ended March 2025 because "all of the
eggs were in one basket"—specifically, that Vans was riding the trend of when its Old
Skool shoes were once "massive. One of the biggest icons in shoes" when Vans was still
a majority of VFC's revenues prior to the Class Period. Prior to 2021, CW4 recalled that
Vans had been "heavily reliant on the classics, the icons" such as the Old Skool. However,
CW4 explained that during the COVID-19 pandemic, the trend started to shift more
towards athleisure and comfort, and away from all of Vans' icons, including the Slip-Ons
and Old Skool, which sat in the "canvas footwear" or "canvas, vulcanized shoes" trend.
During and after the pandemic, CW4 recalled, footwear trends became more diversified,
with "a lot more people wearing athletic footwear" and athleisure.

88.     CWs also recounted that Vans could not keep pace with the latest consumer
trends. For instance, while Defendant Bailey signaled that the Company was "taking steps
to accelerate" Vans' 18-month new product development cycle, CW4 confirmed that this
18-month cadence existed throughout the entirety of CW4's tenure at the Company.

89.     The Company's failure to keep pace with the latest consumer trends for Vans was particularly acute after the COVID-19 pandemic. According to CW4, even prior to the pandemic there were "a lot of people internally" at Vans "saying, 'hey, we see a shift potentially happening here,'" and "there were signs out there before the pandemic" on the shift to athleisure. CW4 explained that Vans paid third-party agencies that specialized in providing trends analysis, to analyze the brands. Those agencies told Vans "here's what we think is going to happen over the next two years." CW4 stated that such trend analysis data was used at seasonal kickoff meetings, where Vans leadership including representatives from the brand, merchandising, and product design groups would get together to discuss new products and innovation. These kickoff meetings, CW4 recalled, also involved major discussion of where Vans was at financially, and that things needed to be done to hit the plan set by VFC management.

90.     CW4 explained that during the Class Period Vans lacked a diversified portfolio of products in order to take advantage of new trends, and confirmed that Vans did not make sufficient investment into new product innovation. As a result, "when the trend shifted" away from Vans' icons, sales dropped "off a cliff" and "there wasn't enough types of products in the pipeline to make up for … losses in classics." Vans simply "didn't have any other product in the pipeline that was leaning into that trend that would have replaced the loss of business at that point" from Vans core styles.

91.     During all of 2024 through CW4's departure from Vans in March 2025, CW4 supported Vans' CFO and Van's VP of Strategy at the time, Morgan Hawley Ford, in organizing the quarterly results and reports on behalf of the Global Products team, as well

as helping to map the long-range financial plan based on Vans' current product pipeline, for VFC's C-suite in advance of earnings calls. During this time, CW4 stated that Vans didn't have product in the pipeline that could hit the market in time to help advance Vans' turnaround.

92.    CW2 corroborated CW4's and CW3's statements, explaining that Vans' continual sales decline in the UK and Ireland since the COVID-19 pandemic was because "a lot of factors in regard to the product innovation wasn't really there," and "we'd seen that demise since even before COVID." According to CW2, during the pandemic through the end of CW2's tenure in November 2024, "we were just going back" to customer accounts saying "here's the Old Skool in this color that is new," which was "kind of embarrassing" because merely a new colorway of an existing style was not the kind of new product that was needed, and meanwhile competitors like New Balance were outperforming Vans with "great product and great marketing."

93.    CW2 added that Vans was "doing nothing" materially in the way of new products during CW2's tenure, and yet asking CW2 to go back with "not good" product. As CW2 put it, it was obvious within Vans that this was not sustainable: "at some point, you've got to step up when everybody is doing it."

94.    CW2 confirmed that customer accounts "100%" gave regular feedback each fashion season on Vans' lack of new products and innovations, describing it as a "key subject" discussed early before going to sell in the next season of styles to customers. CW2 recalled that with customers, "one of the biggest concerns was to do with the innovation," or lack thereof, with customers stating that Vans was not really

31

bringing anything new to the table, nor doing enough with the brand's marketing, relative to competitors who were.

95.    CWs also recounted that Vans underinvested in product development and marketing, further hampering the brand's product innovation and competitive position.

96.    CW2 stated that customers complained that Vans kept selling the "same product" season-over-season, and was not in line with what competitors like New Balance and Adidas were doing, who were increasing marketing spend and introducing new products.

97.    CW1 corroborated CW2's statements, stating that Vans is "very trends driven" and that "the heat is running out of the brand so there is no consumer demand, or very little consumer demand above the core." CW1 added that at Vans, there wasn't the "overinvestment that's required," including in marketing and product innovation that was necessary to fulfill Vans' ambition of competing with Nike and Adidas as a "Top 3" player in the footwear lifestyle marketplace. CW1 explained that to do so, Vans needed to make a "disproportional amount of investment of revenue" to increase consumer brand awareness and support retailers.

98.    Regarding investment in product innovation, CW1 stated that Vans needed to develop new products and product categories to widen the product mix and create channel specific segmentation. However, CW1 recalled that, upon joining Vans in August 2022, sales of the Old Skool style shoe constituted 80% of Vans' revenue which "created a significant amount of risk" when sales of that icon declined. Specifically, CW1 explained that, for the JD Sports account, sales of the Vans Old Skool black and white style declined

32

from 1,500 units per week in August 2022 to 300 units per week when CW1 left. Thus, throughout the Class Period CW1 stated Vans was "losing shelf space" and "we're losing revenue and the brand didn't seem to want to do anything about reigniting them."

99.    CW1 also recalled that Vans' new product innovation and marketing were further hampered by lack of investment, stating that "[t]here wasn't an increase in 2024 for sure" in either.

100.    Moreover, for much of the Class Period, Vans failed to monitor and assess style performance, falling further behind consumer trends and oversaturating the market.

101.    Thus, CW3 confirmed that Vans produced "way too many SKUs," or stock keeping units ("SKUs"), "way too much product." Indeed, prior to 2024 when CW3 personally implemented changes, "there was no SKU rationalization" meaning that merchandising teams had "no guard rails" or "red tape" to prevent a proliferation of non-performing styles and SKUs.

102.    According to CW3, SKU Rationalization was not implemented until 2024, meaning that, starting in 2024, Vans' Product and Merchandising teams would be required to contemplate margin floor, margin threshold, and minimum order quantity as metrics to determine which SKU to merchandise. According to CW3, there were no other metrics that Merchandising used to base decision making off of other than these three metrics—which CW3 personally introduced. CW3 explained that VFC did not see the impact of SKU rationalization until "late 2024" or "early 2025."

33

2.  Defendants Routinely Inflated Vans EMEA's Forecasts through Baseless
    Top-Down Forecasting, and Wholesale Customers' Orderbooks through
    "Ghost Orders"

103.  To combat Vans' lack of product innovation as described above, multiple CWs recounted that Defendants routinely inflated Vans EMEA's forecasts and orderbooks to provide a more optimistic financial outlook of the Vans brand.

104.  According to CW2, Vans' EMEA leadership allotted their overall sales target for the EMEA region down to the individual countries, exposing gaps between the targets given from the top down and the forecasts generated from the bottom up by individuals like CW2. Explaining the top-down targets, CW2 stated that "obviously the expectations" from VFC management "were quite high … because they needed to get to a specific number, what would move the needle" for shareholders.

105.  According to CW2, Vans' revenues in the UK and Ireland peaked pre-COVID and then steadily declined through the end of CW2's tenure in November 2024. As a result, CW2 recalled that from the beginning of the Class Period up until CW2's departure in November 2024, Welton— CW2's manager and European Commercial Director—always increased the bottom-up forecasts that CW2 submitted, saying "here's your forecast that you're going to have to hit." CW2 noted that Welton altering forecasts upwards became "prevalent in the last few years"—*i.e.*, 2022–2024.

106.  Specifically, CW2 recalled submitting bottom-up forecasts in the range of $30 to $40 million per account in a given year, and that Welton always raised the sales targets in the forecasts "about 20 to 40 percent" beyond what CW2 had originally submitted. CW2 stated that "obviously, we'd go, 'we didn't give you that number, that's a

sandbag.'" CW2 also recalled asking superiors "what is it you think I can do to bridge that gap?" but would only be told "it is what it is."

107.    CW2 explained that because the European Commercial Director inflated forecasts so dramatically, there were large gaps between actual order book volumes from customers made in advance of each fashion season and the "unrealistic forecast" targets that were set by higher ups. These gaps became worse as Vans' sales continually declined, CW2 stated, because while Vans had some "monster years" in sales pre-COVID, "there was no way to anniversary the numbers" (meaning achieve the same sales) and yet leadership would keep giving CW2 higher forecasts, thus compounding the problem. CW2 stated, "we all saw this" issue, "we all spoke out about it" but in response, "we were told 'that's just your job, it's what you've got to do.'"

108.    To make matters worse, CW2 would then be criticized by superiors for the forecasts being off or "not correct." CW2 recalled that the reason the forecasts were "not correct" was because Vans' leadership would not accept CW2's initial, realistic forecasts based on historical sales.

109.    Several CWs were also instructed to submit "ghost orders" in Vans' orderbooks to make up for gaps between actual customer orders and the inflated forecasts.

110.    According to CW2, Welton instructed CW2 that CW2X's sales team should submit "ghost orders," or fake orders with fake purchase numbers assigned to a particular

35

client, into Vans' sales management software, Mobi,[6] to "bridge that gap between actual orders and the unrealistic forecast." CW2 stated that "when the numbers didn't start coming in" from actual customer orders, Welton would state "you need to do the inevitable," the ghost ordering, to make up the difference. As CW2 explained, ghost orders were not actually placed by customers, but were nevertheless assigned real invoice numbers by Vans that were entered in the Mobi system. CW2 stated that despite not being real orders, the Company would procure materials and manufacture inventory based on the ghost orders booked in Mobi.

111.    CW1 corroborated CW2's statements, explaining that ghost orders were "fake orders" to "make the order book look better." According to CW1, the inventory associated with ghost orders was not put into free stock to avoid an auditor or the SEC asking why the Company was "holding excess inventory." Rather, CW1 explained that ghost orders were entered into the Company's Cognos and SAP systems for specific customer accounts "with a fake purchase order number so to an external auditor, it looks like those are orders that have been received from a customer." CW1 stated that the mechanics of this ghost order system were deliberate because while an external auditor might question an increase in free stock by asking, "Why do you have all of this? You don't need this because your order book is going backward," the auditor was unlikely to ask "for a paper trail of physical orders" that were assigned to a customer.

---

[6] Mobisoft is a business-to-business commerce software that is typically integrated with accounting and Enterprise Resource Planning ("ERP") systems, including SAP. Mobisoft, *Solutions Overview*, https://mobisoft.co/solutions-by-capability/capture-sales-orders-in-the-field-2/ (last visited Feb. 19, 2026).

112.    According to CW1, starting in the fall/winter 2023 season and across brands, the Company "manipulated the books to mislead investors and show the brands are performing better than they actually are." Corroborating CW2's statements, CW1 stated that, when the brands or the Company overall were not performing well, Account Managers such as CW1 were "leaned on quite hard" and "coerced" to place "ghost orders." CW1 stated that sales account managers received an order target and if pre-bookings were insufficient to hit the target, sales personnel were instructed to "put the ghost orders [in] to make up" the difference.

113.    According to CW1, VFC's ghost order practice is longstanding, and was utilized in the wake of the Great Recession in 2009, and in 2010 when CW1 worked at VFC's The North Face brand. The ghost orders also had secret nomenclature. Indeed, Line Managers, Directors, and General Managers each told CW1 "not to divulge" ghost orders to customers and that customers were "kept in the dark about it." CW1 stated that leadership gave directives to "specifically never to refer to them internally or externally as ghost orders" and were instead to be referred to as "gap orders, bulk orders, risk orders, risk-share orders, or contract orders."

114.    CW2 confirmed that Vans EMEA's leadership would keep changing the story on why ghost orders had to be entered into the system, including claiming that "well, we just want to make sure the account has enough stock allocation, I know they're not asking for it," or that leadership "expected the business to turn around" and thus "we won't have enough stock," which CW2 described was "complete rubbish."

115.    CW2 stated that "I'm sure the decision" to create ghost orders "came much higher" than Welton because "it became quite obvious the other brands" were recording ghost orders as well, "so it was a pretty well-known thing. It wasn't just Vans." Indeed, CW2 recounted that, around 2022 or 2023, there was an outside investigation into VFC's ghost orders.

116.    According to CW2, PricewaterhouseCoopers ("PwC") and representatives of VFC's Human Resources ("HR") division interviewed people including CW2 as part of the investigation. Following the investigation, the practice of entering ghost orders continued, only under different names. Specifically, Welton instructed CW2 that "they could no longer call them ghost orders" and instead to refer to them as "at-risk," "backup," or "reserve" orders; and that CW2's team still needed to actually record the ghost orders under the new names in Mobi, except with a new code.

117.    In total, CW1 provided that the total order value of the ghost orders for JD Sports alone, by season, was as follows: $1.1 million for Fall/Winter 2023; $930,000 for Spring/Summer 2024; $360,000 for Fall/Winter 2024; $406,000 for Spring/Summer 2025; and $547,000 for Fall/Winter 2025. CW1 stated these figures represented three to ten percent *on top* of pre-book orders to align sales targets with VFC's internal forecast.

118.    CW2 stated that from late 2022 through the end of CW2's tenure in November 2024, CW2's territory alone recorded ghost orders of "at least $1 to $2 million" annually and "bigger accounts" had even larger numbers.

38

3. Vans Consistently Experienced Mass Order Cancellations and Discounts Due to Ghost Orders and Unwanted Products

119.    CWs recalled that, throughout the Class Period, Vans experienced mass order cancellations of ghost orders and pre-book orders which resulted in Vans flushing out its glut of off-trend and undesirable inventory through promotions and discounts.

120.    According to CW1, late during each season (typically around 30 days before a season concluded), the ghost orders would be cancelled in the Cognos and SAP systems and the inventory previously allocated to such orders "would go into free stock" and "a vast amount would have to be cleared out, reduced and cleared."

121.    CW2 corroborated CW1's statements, noting that near the end of each six-month fashion season, CW2 would start cancelling the ghost orders, explaining to superiors that CW2 was doing so "because they're just not going to be needed" by customers. CW2 stated that inventory for the season would be "sitting there and not leaving our warehouse" but in response, superiors would push back on cancelling, saying "just leave it for a month" or, as the end of the season approached and the inventory still didn't ship, "let's reduce the price"—*i.e.* promotional discounts and markdowns—and "then a bit more." Leadership would "always push it to the final hour" before letting CW2 cancel ghost orders.

122.    Cancellations by customers also decimated Vans' actual order book (*i.e.*, pre-order books that were agreed to *before* ghost orders were added to reach leadership's top-down forecasts). CW1 stated throughout CW1's tenure at Vans, all of Vans—including Vans EMEA, and Vans' UK operations—never achieved its sales forecast, due in significant part to customers' "high cancellation rate." Indeed, throughout

39

CW1's tenure at Vans, CW1 stated that customer order cancellation rates at JD Sports and across EMEA as a whole were around 20–25%—far in excess of the Company's 10% allowance.

123.    High cancellations had a "knock on" effect, where customers made fewer pre-book orders in subsequent seasons because the future pre-bookings were based on a lower invoiced number (caused by cancellations) and because the canceled inventory would enter the market and present "sell through" competition. CW1 recalled that Vans' sales were on "a dramatic decline" during CW1's entire tenure at Vans, which began in August 2022. CW1 confirmed that customers were always drastically canceling their pre-bookings by around twenty to twenty-five percent.

124.    Additionally, CW1 added that CW1 would regularly look up cancellation numbers for JD Sports in Vans' systems (first on Cognos, and later in the Class Period, on SAP), and at least quarterly, would review sales figures, including cancellations for the UK and EMEA as a whole. CW1 confirmed that the Company's Cognos and SAP systems contained "all of the historical and current data for historical and current cancelations, historical reorders, and historical prebook orders." CW1 added that "the UK is one of the significant markets in EMEA and I'd look at the UK numbers and they were just terrible all the time. Just sliding and sliding."

125.    CW1 stated that cancellations occurred at high levels because market-wide demand was so low that Vans was "not in a position of strength" to enforce the 10% contractual customer order cancellation allowance. CW1 recalled that customers would respond to contract enforcement attempts by stating "we'll cancel our pre-book orders

40

that we have coming with you or we'll reduce our order with you exponentially." CW1 added that, when offered additional stock from the free stock pool, customers responded "Well, no. We're going to cancel the last 20 percent [of their pre-book orders] anyway so we don't need additional stock."

126. CWs recounted that, based on Vans' past product cancellation practices (whether canceled by Vans in connection with ghost orders, or by customers with respect to pre-book orders), customer accounts adjusted their behavior throughout the Class Period by reducing pre-book orders and waiting for discounts.

127. Consistent with CW1, CW2 stated that "there was a point where we'd just do" ghost orders and "not tell the account." In fact, "we had a couple of issues where the account didn't know about it and product just turned up." However, CW2 noted that "in the latter years the account was informed but told, 'If you're not in a position where you're going to use this stock, we will take it back.'" According to CW2, these conversations eventually turned to CW2 being instructed by leadership to negotiate selling to customers at a discount, in order to move inventory.

128. CW2 explained this was unsustainable because Vans was "selling them a lot of core product cheap, and then in the next few months, we're going to sell to them again" in the next fashion season, and as a result, customers would give "reduced prebook orders, they would take less core product as a result." CW2 would analyze how the market was saturated with core styles, and then report the repercussions up to Vans EMEA leadership. Although CW2 could not recall the exact sales value lost through this process, it was "quite a substantial number[,]" which CW2 would then try to use in defense

41

of the realistic, bottom-up forecast for the next season, which were rejected by Vans'

leadership.

129.    CW1 also recalled that low market-wide demand meant customers could

exert pricing pressure on Vans. For instance, CW1 stated that "a lot of the time what

would happen on the pre-book orders, if we knew we'd have a cancellation, we wrote off

a 40 percent discount to take those Purchase Orders." CW1 added that customers "know

the timeline" and "know if they hold off" actually placing orders that were pre-booked until

later in the season that "they'll get a discount," "because the brand is not in a position of

strength to say, 'Just take the orders.'" CW1 confirmed that throughout CW1's tenure,

these discounts hit the Company's gross profits "significantly." CW1 stated that excess

inventory at the end of each season would either be discounted or "it would be moved to

DTC or our outlets' internal clearance across EMEA."

130.    CW2 recalled that Vans' excess inventory "had been building up for a long,

long time" and thus "even clearing it with TK Maxx, it still wasn't covering because the

numbers were so vast over the years." CW2 added that there was so much product in the

marketplace that at one point, Vans also bought back inventory to clean up the

marketplace.

131.    According to CW4, Vans' excess inventory issues stemmed from the sales

decline that began in 2021, which in turn was caused by the lack of a meaningful new

product pipeline. CW4 explained that both Vans' DTC and wholesale groups forecasted

based on historical sales data, so when the trends shifted, Vans was stuck with that

season's inventory even though it was not selling at the same trajectory as it had

42

historically. Thus, CW4 recalled, wholesalers like Foot Locker got stuck with excess inventory, part of a "glut of inventory that took most of the wholesale partners a year or two to move through."

132. CW2 stated that Vans also dealt with excess inventory by selling it to "jobbers" and TK Maxx—which CW2 did for all of Europe, beyond just the UK and Ireland. According to CW2, jobbers are "wealthy people that were buying old stock from brands." CW2 stated that jobbers would "buy a ton of stock for Vans, then they would become the warehouse for that product and they would sell it to places like Costco," acting like a secondary distributor of Vans product. This was unsustainable because, according to CW2, as Vans product was sold to jobbers and TK Maxx, and then resold into the marketplace, it created a knockdown effect on Vans' wholesale business which was also selling Vans product. As CW2 summarized, "it's like the snake eating its tail. You're killing yourself." Moreover, CW2 knew that TK Maxx for example was buying Vans product at a stark 66% average discount to what it would normally be sold to wholesalers for, and jobbers in Italy and France would get similar discounts (approximately 60%), making it harder for wholesalers to compete in selling the product.

133. CW3 confirmed that until 2024, having too much unwanted product meant it was "not moving" and as a result "there has to be discounting" which worked "against profitability."

134. Moreover, CW4 confirmed that during the period from late 2022 through early 2024, and particularly heavily throughout 2023, Vans' sales teams were tasked with

43

clearing inventory out, including through sales to discount retailers as was customary in the apparel and footwear market.

### 4. VFC's "Reinvent" Turnaround Plan Did Not Return Vans to Growth

135. "Accelerating" the Vans turnaround was a critical component of VFC's "Reinvent" plan, which Defendants Bailey and Darrell were instrumental in leading.

136. After market close, on October 30, 2023, when the company announced its financial and operating results for its 2Q2024, VFC issued a press release (the "2Q2024 Press Release") announcing "Reinvent" as a "transformation program to enhance focus on brand-building and to improve operating performance and to allow us to achieve our full potential. Our first announced steps in this transformation cover **four key priorities**: Improve North America results, **Deliver the Vans turnaround**, Reduce costs, Strengthen the balance sheet."

137. The 2Q2024 Press Release also announced that "Kevin Bailey will be stepping down from the position of Global Brand President, Vans. **Kevin will remain on the Executive Leadership Team** reporting to Bracken Darrell, **and will transition to lead Reinvent**, the company's business transformation plan, and the project teams driving the work. An external search is underway for a new brand president for Vans and **in the interim, Bracken Darrell will take a more active role in leading the brand and delivering its turnaround strategies**."

138. During the earnings call for VFC's second fiscal quarter of 2024 (the "2Q2024 Earnings Call"), held after the 2Q2024 Press Release was issued, Defendant

Puckett stated that "[o]ur transformation plan Reinvent **directly addresses our biggest performance issues, Vans** and the U.S ...."

140. According to CW3, Project Reinvent's reset was layoffs and "you can't lay off into revenue growth." CW3 confirmed that the Vans product, development, and merchandising teams were affected by layoffs and that there was a new layoff "every month."

140. CW1 stated that "there was a lot of talk about reset, but if you were to go to my customer, they'd say, 'You're just doing the same thing over and over again and expecting a different outcome." CW1 added, "from on the ground you didn't see that and definitely for sure my customer never saw that because the presentations we always did to them were similar." CW1 could not recall "actually seeing any strategy being implemented toward the consumer facing side of things."

141. CW4 noted that Vans' product cycle was reset *twice* during the Class Period, impeding Vans' ability to introduce new products in furtherance of a brand turnaround. Specifically, CW4 explained that the brand's first turnaround-related product strategy was put into place by Defendant Bailey, when Defendant Rendle brought Bailey back in as Vans President in March 2022. Following that, CW4 recalled, the "reset that started in 2022" under Bailey "got flushed down the toilet[,]" adding that the new product strategy from 2022 was "unwound when the Board got rid of all the brand leadership and brought in Bracken [Darrell], and he brought in new leaders so the groups started over at that point."

45

142.   Specifically, Defendant Darrell stepped in for Bailey as temporary President of Vans in October 2023, and got rid of executive leaders at Vans. CW4 stated: "So there were two resets of the business that happened" during the Class Period. As CW4 recalled, "there wasn't a strong enough product strategy in place long enough to have a real North Star … because of the changeover in leaders that kept happening" during the Class Period. According to CW4, Defendants spoke to investors about the Vans turnaround "in a much rosier fashion that what was going on behind the scenes" because "when you bring in all new leadership you're not going to see impact from those leaders for two years in the marketplace" due to Vans' lengthy, 18-month new product go-to-market cycle.

143.   CW4 also stated that the multiple, significant turnovers in VFC's and Vans' leadership reset Vans' plans. As CW4 noted, "there wasn't a leadership team in place long enough to put together a solid three-year strategic financial plan, it just kept turning over every year when they kept turning over leadership." CW4 stated that even when CW4 left the Company in March 2025, there "still wasn't a clear roadmap" for Vans, and Vans leadership was still talking about "reinvesting in innovation" for products, but as CW4 explained, such things take time. "If you're starting to do things, let's say, this past summer [2025], you're not even going to see those things in-market until early 2027."

144.   In reality, CW4 stated, Project Reinvent was "mostly cost cutting at that point" and through the end of CW4's tenure, CW4 never saw an increase in product and marketing investment—"they were still trimming costs."

**F. During the Class Period, Vans' Revenue and the Active Segment's Profitability Plummet**

145.   Contrary to Defendants' assurances that VFC's deployment of Reinvent and other initiatives would return Vans to growth, the exact opposite happened.

146.   Indeed, during the Class Period Vans' revenue declined precipitously, as shown below:



147.   Moreover, the Active Segment's profitability, of which Vans is a significant contributor, cratered, as shown below:



148.    Thus, despite Defendants' assurances throughout the Class Period that the Company was addressing and correcting Vans' revenue and profitability trajectories, both decreased during the Class Period due to a lack of innovation and an inability to keep pace with customer trends.

## V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD, AS THE TRUTH WAS PARTIALLY REVEALED THROUGH FOUR SETS OF PARTIAL DISCLOSURES

149.    Throughout the Class Period, Defendants made materially misleading statements and omissions relating to VFC's design of new Vans products, investments into Vans' product innovation and marketing, health of the Company's inventory, and Vans' turnaround progress. These material misstatements and omissions created a false impression that: (i) VFC was innovating new Vans product designs for its core consumer necessary to drive revenue growth and support a turnaround; (ii) the Company was

48

materially investing in new product innovation and marketing; (iii) Vans' inventory levels were healthy and did not require additional discounts or promotions to offload; and (iv) Vans' turnaround was on track.

150.    All of the statements in this Section (V) that are alleged to be false and/or misleading are bolded and underlined. All other statements are included for context.

## A. False and Misleading Statements at the September 28, 2022 Investor Day

151.    During market trading hours on September 28, 2022, VFC held its 2022 Investor Day—its first Investor Day since 2019—to share with analysts and investors, *inter alia*, management's turnaround strategy to return the Company to revenue growth.

152.    During his prepared remarks as Vans President at the 2022 Investor Day, Defendant Bailey stated that Vans' regional teams each had "**responsibility to make sure that they don't become overly reliant**" on the brand's core icon shoe designs, and that he and Vans leadership had "**worked**" with the teams "**to make sure that we balance this correctly.**"

153.    The statements in ¶152 were misleading when made, because they gave investors a false impression that Vans product creation teams had already "balance[d]" its product offerings "correctly" and that it presently did not over-rely on Vans' five core icons. Rather, Defendant Bailey misleadingly presented such situation as a possible future that Vans did not want to "become" reality, when in fact, such over-reliance had already materialized.

154.    Also, during his prepared remarks, Defendant Bailey stated that Vans was then "**listening to the consumer and responding to the opportunities**" to grow Vans' "TAMs"—*i.e.,* Total Addressable Markets via new product offerings.

155.    The statement in ¶154 was misleading when made, because it gave investors a false impression that Vans was developing new product offerings based on what the brand's core consumer wanted, which would then drive desperately-needed growth in furtherance of turning around Vans.

156.    The misleading nature of the statements in ¶¶152 and 154 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons that were not in demand (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iii) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part because the brand's "innovation engine" had "drifted down over the past few years" and what little new products *had* been introduced had only "limited impact in offsetting the declines in classic products" (¶235, 239); (iv) as Defendant Darrell admitted on February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" (¶258); (v) as Defendant

50

Darrell admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products (¶320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process[,]" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

## B. False and Misleading Statements during the October 26, 2022 2Q2023 Earnings Call

157.    After market hours on October 26, 2022, VFC held an earnings call for investors and analysts to report the Company's financial and operational results for its second fiscal quarter of 2023 (the "2Q2023 Earnings Call").

158.    In his prepared remarks on the 2Q2023 Earnings Call, Defendant Puckett discussed the Company's inventory position and stated, in pertinent part:

> Inventory levels are up 88% versus last year, including an increase of about $510 million in in-transit inventories relating to the supply chain financing program.

* * *

> Roughly 75% of the increase versus last year was to rightsize the inventory levels from their unusually low levels and to support this year's growth plans. The balance of the increase largely represents higher-than-planned levels of inventory at Vans and Dickies, primarily in core products.
>
> **Actions are underway to mitigate this and ensure we are well positioned at our fiscal year-end** and importantly, as we manage the overall health and levels of inventory towards spring and summer of 2023. These include adjustments to forward purchases where possible[,] **controlled sell-down of excess and distressed inventory and in some cases**, where the stock is largely replenishment, plans to carry a higher

level of inventory in the near term, such as in the case of core Dickies Workwear product.

159.    When asked by an analyst on the 2Q2023 Earnings Call which metrics VFC management was looking to in order to drive the Vans turnaround, Defendant Puckett stated that the brand was "**in a pretty good place overall from an inventory standpoint**," a focus area that management was handling with urgency:

**Michael Charles Binetti**
*Crédit Suisse AG, Research Division – Research Analyst*

\* \* \*

What -- when we look on a multiyear basis, pre-COVID, it looks like the revenues for Vans will need to accelerate a little bit in the back half to get to the down mid-single from where it was in the second quarter. Is there any numericals you can give us to help us get the building blocks to what rolls off or what comes online that should help for a better trend on a multiyear basis?

**Matt H. Puckett**
*V.F. Corporation, Executive VP & CFO*

\* \* \*

So we see opportunity to be more efficient in how we're deploying some of the tactics and some of the spend in certain parts of our business, and we're aggressively and fast after that. Yes, we're going to work really hard to kind of leverage the channels at our disposal, first and foremost, our own channels, to sell off some of the excess inventories that we see building.

**We're in a pretty good place overall from an inventory standpoint, relative to where we plan to be**. We're higher in certain areas, and I think I mentioned that in the comments, on a couple of brands in particular. But as we look across all of our brands, we're going to take opportunity to kind of peel back inventory a little bit, leveraging our own channels and doing this ultimately to drive some additional profitability.

160.    The statements in ¶¶158-59 were false and misleading when made, because they misrepresented that Vans' excess inventory was already in a "good place" and that the Company's rampant discounting of "excess" inventory was "controlled."

161.    The misleading nature of the statements in ¶¶158-59 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans procured excess inventory that wholesalers and consumers did not want, because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we

53

reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

### C. Misleading Risk Statements in the November 2, 2022 2Q2023 Report

162.    After markets closed on November 2, 2022, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its second fiscal quarter of 2023 ended October 1, 2022 (the "2Q2023 Report"). The 2Q2023 Report was signed by Defendant Puckett, and was accompanied by certifications signed by Defendants Rendle and Puckett pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX certifications"), stating that each had reviewed the 2Q2023 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

163.    The 2Q2023 Report contained a "Cautionary Statement on Forward-looking Statements[,]" which posed VFC's inability to keep pace with consumer preferences and demand forecasting as a mere hypothetical, stating in relevant part:

> **Potential risks and uncertainties that could cause the actual results of operations or financial condition of VF to differ materially from those expressed or implied by forward-looking statements include**, but are not limited to:
>
> **\* \* \***
>
> **VF's response to changing fashion trends, evolving consumer preferences and changing patterns of consumer behavior**;
>
> **\* \* \***
>
> third-party manufacturing and **product innovation**[.]

54

164.    The 2Q2023 Report also instructed investors to review the risk warnings contained in the Company's Form 10-K annual report for the fourth quarter and fiscal year 2022 ended April 2, 2022, filed May 26, 2022 (the "FY2022 Report"), stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2022 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the risk factors listed at Item 1A in the FY2022 Report (the "FY2022 Risk Factors") were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 2Q2023 Report.

165.    The FY2022 Risk Factors posed VFC's inability to keep pace with consumer preferences and product trends as a mere hypothetical, stating in relevant part:

> **Failure to compete effectively or to keep pace with rapidly changing consumer preferences**, markets, technology, business model **and product trends could have a material adverse effect on VF's business, financial condition and results of operations**.

166.    The FY2022 Risk Factors also framed VFC's inability to adapt to changing consumer demand as only hypothetical, stating in relevant part:

> **If we are unable to timely and appropriately respond to changing consumer demand, the names and images of our brands may be impaired**.

167.    The statements in ¶¶163-66 were materially false, misleading, and lacked a reasonable basis when made because they claimed the risks concerning VFC's response to "changing consumer demand" and product innovation were merely "[p]otential" and "could" cause the Company's "actual results" to "differ materially" from projections or "could" have a "material adverse effect" on VFC's business, when in reality,

55

those risks were not mere hypotheticals, but had actualized by the time these statements were made.

168. The materialization of these risks and the misleading nature of the statements in ¶¶163-66 are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133); (iii) as Defendants admitted on October 30, 2023, Vans' "innovation engine" had "drifted down over the past few years" and what little new products *had* been introduced had only "limited impact in offsetting the declines in classic products" (¶239); (iv) as Defendant Darrell admitted on February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" (¶258); (v) as Defendant Darrell admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products (¶320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

169.    The FY2022 Risk Factors framed increased customer markdowns and incentives adversely affecting VFC's profitability as merely hypothetical, stating in relevant part:

**VF's profitability may decline as a result of increasing pressure on margins**.

* * *

**Customers may increasingly seek markdown allowances, incentives and other forms of economic support. If these factors cause us to reduce our sales prices to retailers and consumers**, and we fail to sufficiently reduce our product costs or operating expenses, **VF's profitability will decline. This could have a material adverse effect on VF's results of operations, liquidity and financial condition.**

170.    The statements in ¶169 were materially false, misleading, and lacked a reasonable basis when made because they claimed that "*if*" the listed risks and uncertainties occurred VF's probability would decline, when in reality those risks were not mere hypotheticals, and had actualized at the time the statements were made. The materialization of these risks and the misleading nature of these statements are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) Vans' sales had dropped off a cliff during the Class Period and did not recover, because Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans consistently inflated seasonal sales forecasts through top-down budgeting that was not calculated using what historical sales data indicated could be achieved, leading to excess inventory that wholesalers and

57

consumers did not want (¶¶104-08, 120-34), and through fictitious ghost orders that generated excess inventory and made Vans' order books appear stronger than they were (¶¶110-18, 120-34); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

### D. False and Misleading Statements during the February 7, 2023 3Q2023 Earnings Call

171.    On February 7, 2023, after market close, VFC held an earnings call for analysts and investors to report the financial and operational results for the third quarter of its fiscal year 2023 (the "3Q2023 Earnings Call").

172.    On the 3Q2023 Earnings Call, VFC's interim CEO, Defendant Dorer discussed Vans' excess inventory stating, in pertinent part:

> The second near-term priority at VF is to return to the company's hallmark standard of excellence in the supply chain arena. We are working through a variety of external and internal issues that impacted revenues and profits in a high-volume quarter like Q3. Length manufacturing and freight lead times, larger upfront product buys, unpredicted demand spikes from elevated promotional activity in the quarter, plus higher than normal

customer order cancellations add up to unsatisfactory customer service, elevated inventory and significantly higher costs. **So we're taking aggressive actions to address these issues**. We expect to be able to work excess seasonal inventory down to more normalized levels by the end of Q4 of this fiscal year.

173.    During the 3Q2023 Earnings Call, Defendant Puckett also discussed Vans' inventory, including as related to VFC's FY2024, stating:

There are tailwinds. We do expect an overall lower promotional environment through the year. We'll come into the year with a bit heavier inventory. But remember, **most of that inventory is core carryover replenishment product that won't necessarily need to be marked down or discounted in a significant way next year.**

**We're biting the bullet pretty aggressively here in Q4 to move through that seasonal excess** which is a bit heavy at the end of December, we're going to be back at the end of March, kind of at a normal level of seasonal excess coming out of our fiscal year, maybe a little elevated, but something pretty manageable.

174.    Similarly, Puckett stated that while Vans' "inventory position, while heavy, will create some cost pressures in the short term, **we don't think it's a huge overhang from a promotional standpoint throughout next year**."

175.    The statements in ¶¶172-73 were false and misleading when made, because Vans was not reducing its excess inventory as needed, let alone "aggressively[,]" in part because the core icons that made up "most" of the excess inventory were stale, not driving revenue growth, and proliferating in cumulative and undesirable colors and styles. The statements also falsely represented that "core carryover replenishment" inventories did not require promotional pricing and were not the target of the "bullet" when, in reality, Vans' inventory *including* non-seasonal icons did, in fact, need to be marked

59

down or discounted in a significant way, thus keeping promotional levels high, in order to clean up and reset Vans' marketplace.

176. The misleading nature of the statements in ¶¶172-73 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans procured excess inventory that wholesalers and consumers did not want because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

60

177.    When asked by an analyst what gave him confidence in Vans' turnaround, Defendant Dorer referred to new product innovation and marketing, stating:

**Laurent Andre Vasilescu**
*BNP Paribas Exane, Research Division*

Benno, I'd love to ask about Vans. What gives you the confidence that changes you're implementing at the brand are the right strategies and will make a difference in turning this business around? …

**Benno O. Dorer**
*V.F. Corporation Interim President, CEO & Director*

\* \* \*

And then to add on top, the **increased spending that we're planning to put in place behind product innovation**. Those are all very tangible things. Those are things that have worked for Vans in the past. Those are working elsewhere in the portfolio, and those are all on us.

178.    The statement in ¶177 was false and misleading when made, because it gave reasonable investors the false impression that Company management was then already planning tangibly increased spending in new product innovation.

179.    The misleading nature of the statement in ¶177 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing and laid off masses of product, development, and merchandising personnel (¶¶96-99, 139); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iii) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part because the brand's

"innovation engine" had "drifted down over the past few years"—indicating underinvestment and "limited impact in offsetting the declines in classic products" (¶¶235, 239); (iv) as Defendant Darrell and the Company's Chief Strategy, Transformation & Digital Officer ("CSTDO") admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products, and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (v) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

### E. Misleading Risk Statements in the February 8, 2023 3Q2023 Report

180.  Before markets closed on February 8, 2023, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its third fiscal quarter of 2023 ended December 31, 2022 (the "3Q2023 Report"). The 3Q2023 Report was signed by Defendant Puckett, and was accompanied by SOX certifications signed by Defendants Dorer and Puckett stating that they had reviewed the 3Q2023 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

181.  The 3Q2023 Report repeated verbatim the identical cautionary statement that had been stated in the 2Q2023 Report (*see* ¶163), which, for the reasons stated in

¶¶167-68, was materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

182.    The 3Q2023 Report also instructed investors to review the risk warnings contained in the FY2022 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2022 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2022 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 3Q2023 Report. For the reasons stated in ¶¶167-68, and 170, the FY2022 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

**F.  False and Misleading Statements in the May 23, 2023 FY2023 Press Release**

183.    On May 23, 2023, after market hours that day, VFC issued a press release reporting the Company's financial and operational results for the fourth quarter and fiscal year 2023 ended April 1, 2023 (the "FY2023 Press Release"), which was attached as an exhibit to a Form 8-K filed with the SEC that same day.

184.    The FY2023 Press Release quoted Defendant Dorer as stating that:

> …**the work to turn around Vans® is progressing according to plan**, as we navigate the known near-term challenges. Looking ahead to FY24, I am confident that we have the right plan to deliver improved operating performance and financial results, while we thoughtfully invest to deliver strong and consistent shareholder returns over the long term.

185.    The statement in ¶184 was misleading when made, because it gave investors the misimpression that Vans' turnaround was progressing adequately, including

the aforementioned inventory reduction actions in core styles, and increased investment into new products and marketing, all to drive an inflection in the brand's downward revenues.

186. The misleading nature of the statement in ¶184 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iv) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part because the brand's "innovation engine" had "drifted down over the past few years"—indicating underinvestment and "limited impact in offsetting the declines in classic products" (¶¶235, 239); (v) as Defendant Darrell admitted on the February 6, 2024, Vans had actually *lowered* its marketing investments, including by "largely withdr[awing] marketing to the core youth" consumer (¶258); (vi) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new

64

products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vii) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, revealing that Vans' new product pipeline was empty the entire Class Period, and further elongating the timeline for the brand's turnaround (¶338).

### G. False and Misleading Statements during the May 23, 2023 FY2023 Earnings Call and in the FY2023 Investor Presentation

187.    After market hours on May 23, 2023, the Company held its FY2023 Earnings Call, wherein Defendants Dorer and Puckett made statements misrepresenting that Vans was investing in new product innovation and marketing. During the call, Defendants also showed to investors a slideshow (the "FY2023 Investor Presentation").

188.    In prepared remarks on the FY2023 Earnings Call, Defendant Dorer discussed Vans' present "**plan**" regarding "**product and marketing investments**":

> We believe that this is a solid long-term investment thesis, **especially when combined with our clear plan to accelerate** a return to profitable growth with strong operational discipline, **an increase in product and marketing investments** and an expansion in margins through cost savings and more differential portfolio management.

189.    The FY2023 Investor Presentation similarly stated, in slides concerning Vans' turnaround execution, that the Company was "[l]eaning into **growing product platforms**, while **increasing investment in newness**[.]"

190.    Defendant Puckett similarly stated that Vans had "**continued to invest in … innovation and demand creation**":

Operating margin will expand, reflecting the higher gross margin supporting targeted investments in our largest value-creating opportunities, namely The North Face and the Vans turnaround. **We have continued to invest in key capabilities and support momentum within the portfolio, particularly in the areas of innovation and demand creation**, while exercising careful cost management in light of the ongoing challenged macro environment.

191.    Defendant Dorer on the FY2023 Earnings Call also stated that Vans' marketing investment was increasing, stating in relevant part that the marketing for new products involved "**bigger stories backed with more money over a longer period of time** in order to make them more sticky."

192.    The statements in ¶¶188-91 were false and misleading when made, because they collectively gave investors a set of false impressions that Vans was investing more in new product innovation, development, and marketing, and that these strategies were working well for the brand.

193.    The misleading nature of the statements in ¶¶188-91 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iii) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part

66

because the brand's "innovation engine" had "drifted down over the past few years"—indicating underinvestment and "limited impact in offsetting the declines in classic products" (¶¶235, 239); (iv) as Defendant Darrell admitted on the February 6, 2024, Vans had actually *lowered* its marketing investments, including by "largely withdr[awing] marketing to the core youth" consumer (¶258); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

194.    On the FY2023 Earnings Call, Defendant Puckett was asked by Citigroup analyst Paul Lawrence Lejuez to "talk about what you're seeing in your DTC channel for each brand[.]" With respect to Vans, Puckett touted the brand's purported "**newness**" in product offerings:

> As it relates to wholesale and sell-through, I mean, we're continually seeing consistently good results in the businesses that are consistently performing. Vans has been challenged. And I think we -- continues to be that way in its classic products in many cases. But **buoyed and strengthened, obviously, by newness** and some of the things that we've put into place.

195.    The statement in ¶194 was false and misleading when made, because it gave investors a false impression that Vans was developing new product offerings based

67

on what the brand's core consumer wanted, which would then drive badly needed growth in furtherance of turning around Vans.

196.   The misleading nature of the statement in ¶194 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133); (iii) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part because the brand's "innovation engine" had "drifted down over the past few years" and what little new products *had* been introduced had only "limited impact in offsetting the declines in classic products" (¶¶235, 239); (iv) as Defendant Darrell admitted on February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" (¶258); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because

68

the brand remained "constrained by … the old product creation process[,]" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

197.   Defendants on the FY2023 Earnings Call also told investors that Vans' excess inventory was under control. For example, Defendant Dorer stated during his prepared remarks that Vans' return to growth was being "aided by" already implemented "SKU simplification" —*i.e.,* SKU rationalization efforts, stating in relevant part:

> On Vans, we continue to expect the brand to return to growth during the course of the second half of the fiscal year. Importantly, Vans will return to profit growth for the full fiscal year and even ahead of its return to revenue growth, **aided by** cost savings and **SKU simplification**. **The Vans team is operating with a great sense of urgency and projects are on track**.

198.   With respect to Vans, Dorer further touted that "we are improving our shopping experience with **a significantly reduced SKU count throughout 2023**."

199.   When asked by an analyst about Vans' testing of "reduced SKUs," Defendant Dorer claimed "SKU simplification" work was "on track":

> **Janine Marie Hoffman Stichter**
> *BTIG, LLC, Research Division – MD & Consumer Retail and Lifestyle Brands Analyst*
>
> On Vans returning to growth in the back half of the year, I want to know how we should think about the pacing in terms of DTC versus wholesale? And then I know you tested some changes to the stores business for Vans in terms of reduced SKUs and some of the in-store merchandising. I want to get an update on what you were seeing there in terms of early reads?
>
> **Benno O. Dorer**
> *V.F. Corporation – Interim President, CEO & Director*
>
> … As you think about DTC versus wholesale, we certainly expect DTC to grow quite a bit ahead of wholesale, given the issues that Matt reported on, which affect Vans, but frankly affect our whole industry. But in DTC, you

69

should see the movement earliest, and you should see growth in the channel for the fiscal year. **Everything else, all the work, including SKU simplification, is on track.** We are rolling out a new store layout with improved merchandising, and we will be done with that by the end of 2023.

200.    In prepared remarks during the FY2023 Earnings Call, Defendant Puckett stated, "we are returning to a more rigorous approach to planning and coordination between brand operations, sales and finance leaders, **which is benefiting our inventory management** and forecast accuracy as we progress through future seasons."

201.    Defendant Puckett was asked directly about inventory by a Stifel analyst and misrepresented that Vans "core *and* carryover" inventory was not a problem, stating:

**James Vincent Duffy**
*Stifel, Nicolaus & Company, Incorporated, Research Division – Managing Director*

I'm hoping you can speak more on the inventory posture. What's the carryover seasonal inventory composition? Can you give some directional commentary on how inventories mix between brands and regions? And then maybe if you could give us a sense for purchase orders for new receipts? I presume that down meaningfully versus a year ago. Can you perhaps give us an order of magnitude on that?

**Matthew H. Puckett**
*V.F. Corporation, Executive VP & CFO*

Jim, inventory, we said we're going to reduce inventory in Q4, and we did that. So we feel good about kind of having our arms around what we're going to get done here. **We continue to carry higher levels of core and carryover in excess, much of which is in The North Face and Dickies, to a much lesser degree, honestly, in** Timberland and **Vans**.

202.    Mirroring Defendants' remarks, the FY2023 Investor Presentation reported that for Vans, the Company had an "**[i]mproving inventory position**[.]"

70

203. The statements in ¶¶197-202 were false and misleading when made, because they gave investors a misleading impression of Vans' inventory, particularly that SKUs of its core styles were being streamlined and controlled, and that elevated promotional levels were unnecessary going forward because they had only been higher in FY2023 due to since-ended supply chain delays. In reality, SKUs of Vans' core styles were proliferating due to a lack of SKU rationalization, and thus inventories were being stranded by chronic customer and ghost order cancellations.

204. The misleading nature of the statements in ¶¶197-202 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024 and did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans procured excess inventory that wholesalers and consumers did not want because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on

71

February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

205.    Speaking to whether wholesalers for VFC's brands, including Vans, were seeking pricing changes, Defendant Puckett answered in the negative, stating:

> **Adrienne Eugenia Yih-Tennant**
> *Barclays Bank PLC, Research Division – MD, Senior eCommerce & Brand Retailing Analyst*
>
> Okay. And then the second part of that was just the confidence in promos. Is that coming from the DTC business and evidence there? Or are you actually giving fewer kind of pricing concessions on the fall/back-to-school kind of orders?
>
> **Matthew H. Puckett**
> *V.F. Corporation, Executive VP & CFO*
>
> Yes, yes. Well, I think it's both, right? We are giving fewer concessions at this stage. I mean, **we're seeing the order books stick**. And our expectation **moving into the fall season is that we won't have the issues**. Remember, **our issues were exaggerated last year**. We were late. We were – honestly, we were late on delivering product and particularly in the Outdoor segment.

206.    The statements in ¶205 were false and misleading when made because rampant cancellations of pre-order bookings and ghost orders were causing forecast deviations and a glut of unwanted inventory that was forced to be disposed through promotional price cuts.

207.    The misleading nature of the statements in ¶205 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions,

72

confirming that: (i) Vans customers cancelled and sought significant discounts (*i.e.*, promotions) on orders consisting primarily of core icons that were unwanted by consumers (¶¶122-28), and once cancelled would be disposed of by Vans through promotions (¶¶129-34); (ii) Vans' order books contained fictitious ghost orders that were cancelled at the end of every season and disposed of by Vans through promotions (¶¶120-21); (iii) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (iv) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", implying that order books had not been sticking, and leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels" (¶¶254, 256, and 258).

### H. Misleading Risk Statements in the May 25, 2023 FY2023 Report

208.    Before markets closed on May 25, 2023, VFC filed its Form 10-K annual report with the SEC, reporting the Company's financial and operational results for its fiscal year 2023 ended April 1, 2023 (the "FY2023 Report"). The FY2023 Report was signed by Defendant Dorer and Puckett, and was accompanied by SOX certifications signed by Defendants Dorer and Puckett stating that they had reviewed the FY2023 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

73

209. The risk factors listed at Item 1A in the FY2023 Report (the "FY2023 Risk Factors") posed VFC's inability to keep pace with consumer preferences and product trends as merely hypothetical, stating in relevant part:

**Failure to compete effectively or to keep pace with rapidly changing consumer preferences**, markets, technology, business model **and product trends could have a material adverse effect on VF's business, financial condition and results of operations**.

210. The FY2023 Risk Factors also framed VFC's inability to adapt to changing consumer demand as only hypothetical, stating in relevant part:

**If we are unable to timely and appropriately respond to changing consumer demand, the names and images of our brands may be impaired**.

211. The statements in ¶¶209-10 were materially false and misleading when made because they posed that VFC's inability to compete and keep pace with "changing consumer demand" and product trends "*could*" have a "material adverse effect" on VFC's business and image, when in reality, those risks had already materialized.

212. The materialization of these risks and the misleading nature of these statements in ¶¶209-10 are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-95); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133); (iii) as Defendants

74

admitted on October 30, 2023, Vans' "innovation engine" had "drifted down over the past few years" and what little new products *had* been introduced had only "limited impact in offsetting the declines in classic products" (¶239); (iv) as Defendant Darrell admitted on February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" (¶258); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

213.    The FY2023 Risk Factors represented increased customer markdowns and incentives adversely affecting VFC's profitability as merely hypothetical, stating in relevant part:

> **VF's profitability may decline as a result of increasing pressure on margins**.
>
> * * *
>
> **Customers may increasingly seek markdown allowances, incentives and other forms of economic support. If these factors cause us to reduce our sales prices to retailers and consumers**, and we fail to sufficiently reduce our product costs or operating expenses, **VF's profitability will decline. This could have a material adverse effect on VF's results of operations, liquidity and financial condition**.

214.     The statements in ¶213 were materially false, misleading, and lacked a reasonable basis when made because it framed the listed risks and uncertainties to VFC's profitability as mere hypotheticals when those risks had already materialized. The materialization of these risks and the misleading nature of these statements are evidenced by statements from various CWs and Defendants' admissions, confirming: (i) Vans' sales had dropped off a cliff during the Class Period and did not recover, because Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans consistently inflated seasonal sales forecasts through top-down budgeting that was not calculated using what historical sales data indicated could be achieved, leading to excess inventory unwanted by wholesalers and consumers (¶¶104-08, 120-34), and through fictitious ghost orders that generated excess inventory and made Vans' order books appear stronger than they were (¶¶110-18, 120-134); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results

this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

**I.    False and Misleading Statements in the June 12, 2023 Proxy Statement**

215.    Before markets opened on June 12, 2023, VFC filed with the SEC a proxy statement to investors on Form 14A (the "June 2023 Proxy Statement"). In soliciting investors to vote in favor of the proposed plan for compensation of VFC's named executive officers—which then included Defendants Dorer, Puckett, Rendle, and Bailey—the June 2023 Proxy Statement stated, in relevant part:

> **Actions that we took and continue to initiate to turn around Vans® and improve profitability include** the appointment of Kevin Bailey as its Global Brand President, seeking deeper consumer insights to improve consumer engagement, **investing in product innovation**, **eliminating unnecessary Stock Keeping Unit ("SKU") complexity to simplify and amplify the shopping experience**, and right-sizing the cost structure.

216.    The statement in ¶215 was false and misleading when made, because it gave investors a misleading impression that VFC was already investing in Vans product innovation and rationalizing the brand's SKUs, when in reality the Company had not meaningfully been doing either sufficiently to turn around Vans, as evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) Vans' sales had dropped off a cliff during the Class Period

and did not recover, because Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (iii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iv) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (v) Vans consistently inflated seasonal sales forecasts through top-down budgeting that was not calculated using what historical sales data indicated could be achieved, leading to excess inventory that wholesalers and consumers did not want (¶¶104-108, 120-34), and through fictitious ghost orders that generated excess inventory and made Vans' order books appear stronger than they were (¶¶110-18, 120-34); (vi) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive promotions to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); (vii) as Defendants admitted on October 30, 2023, Vans was "not making the anticipated progress" in its turnaround, in large part because the brand's "innovation engine" had "drifted down over the past few years"— indicating underinvestment and "limited impact in offsetting the declines in classic products" (¶¶235, 239); (viii) as Defendant Darrell admitted on the February 6, 2024, Vans had actually *lowered* its marketing investments, including by "largely withdr[awing] marketing to the core youth" consumer and Vans' inventory consisted of "more and more

78

color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower (¶¶254, 256-58); (ix) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (x) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

### J. False and Misleading Statements during the August 1, 2023 1Q2024 Earnings Call

217.    After market hours on August 1, 2023, Defendants Puckett, Bailey, and Darrell jointly presented VFC's earnings call for investors and analysts to report the Company's financial and operational results for its first quarter of fiscal year 2024 (the "1Q2024 Earnings Call").

218.    During the 1Q2024 Earnings Call, Defendant Puckett discussed the Company's overall inventory health, including Vans, stating:

> And **as we look at where we sit from an inventory standpoint, we're making really good progress, a little bit ahead of schedule in reducing our inventories**. **And I look at the overall health of our inventory, feel good about where we're positioned relative to where we've been, certainly. And so we'll see a moderating promotional environment** is our view moving forward. We know we're going to see that in our own

channels. And in the wholesale business, inventories are going to be down a lot. And the fact that we're actually moderating our assumptions in wholesale means we're going to sell in less, and that probably even helps that picture to some degree. So feel good about where we're heading there, and we'll see – we'll begin to see benefits in terms of favorability on the promotional line, I think, as we move even over the next couple of quarters.

219.    When pressed by analysts on Vans' inventory in particular, Puckett stated:

**Simeon Avram Siegel**
*BMO Capital Markets Equity Research – MD and Senior Retail & Services Analyst*

So just maybe elaborate a little bit more on how you're viewing the promotional landscape. I know you're talking about what you can control and not. But any color there that you can dig into? And then sorry if I missed it, did you say what Vans DTC, how that performed? That would be helpful.

**Matthew H. Puckett**
*V.F. Corporation – Executive VP & CFO*

\* \* \*

And remember, too, for us, our promotions last year and our level of discounts were impacted by some of our own self-inflicted wounds, right, where we were late in shipping and we had to offer additional discounting to secure some of those volumes. And so **we're up against that, and we're not going to repeat any of that given where we sit today from an inventory standpoint** and really where the supply chain sits in their ability to service the business and deliver on time.

Certainly, the wholesale marketplace is taking a more prudent and cautious approach. **Our internal view of inventories will be – position us to be a lot cleaner**.

220.    The statements in ¶¶218-219 were false and misleading when made, because Vans' inventory was bloated, and the statements gave investors a false impression that VFC management's current inventory practices were enabling Vans to

80

clean up excess inventory, and that the higher promotional levels the Company had employed in FY2022 were no longer needed because they were prompted by exogenous supply chain delays that had long since ended. In reality, Vans' excess inventory was comprised heavily in non-seasonal, core icon products that could not be cleaned from the marketplace so easily or quickly, requiring continued elevated promotional levels.

221.    The misleading nature of the statements in ¶¶218-219 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans procured excess inventory that wholesalers and consumers did not want because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to

right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

222.    Additionally, during the 1Q2024 Earnings Call, Defendants falsely assured investors that they were investing in Vans' product innovation. For example, during prepared remarks Puckett noted that Vans was one of management's "two most important near-term priorities" at the time, and falsely stated:

> Now an update on the key focus areas of product, consumer and go-to-market. First and foremost, product. **We're increasing our level of investments to create new relevant products that excite consumers while developing existing franchises that are working well.** UltraRange and MTE silhouettes continue to outperform, growing 13% and 39% in the quarter, respectively, with newer lines, including Knu Skool and Lowland all generating strong sell-throughs. The soft launch of the Pinnacle range, OTW, during Paris Fashion Week in June created excitement and energy, laying the groundwork for the full launch in early 2024.

223.    Elaborating in the vein of Puckett's comments, Defendant Bailey stated that Vans was already "**seeing success with our wholesale partners and our consumers who want newness**" in iterations to Vans' Classics styles (one of the brand's icon designs), assuring investors that the only reason Vans had not "**yet**" seen stabilization-related benefits was merely because of Vans' excess inventory, when in reality, Vans had not even implemented SKU rationalization/stabilization:

> So **our focus really is**, to your point, **on stabilization is just that: stabilize our Classics business; bring style iterations to the market around Classics, which is where we're seeing success with our wholesale partners and our consumers who want newness, but build more and more the product propositions around Classics that are adjacent but relevant and give us a greater opportunity to diversify our product**

82

**pipeline to the consumers.** So **stabilization of Classics is absolutely critical**. As far as seeing it yet, **not really yet because of the amount of product that was in the marketplace**.

224.    Similarly, Bailey discussed a purported return to growth for Vans focusing on new product innovation and "**getting the newer product in [consumers'] hands**":

> **We've been focused on marketplace cleanup**, marketplace execution, **getting the newer product in their hands because that's what consumers are asking for**.

225.    The statements in ¶¶222-224 were misleading when made, because they gave investors false impressions that inventory in Vans' icons, including its Classics, was being stabilized, and that wholesalers and consumers alike wanted new products to take the form of new styles of Classics, when in reality, Defendants were not meaningfully stabilizing Classics—which required rationalizing, *i.e.* reducing Vans' SKUs in icon products—and Defendants were not investing in new product development or marketing, nor developing products that the brand's core consumers were "asking for."

226.    The misleading nature of the statements in ¶¶222-224 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-395); (ii) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, and laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles (¶¶96-99, 139-44); (iii) Vans' sales had dropped off a cliff during the Class Period and did not recover, because Vans had over-relied on its core icons creating

a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (iv) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133); (v) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (vi) Vans procured excess inventory that wholesalers and consumers did not want because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (vii) Vans' excess inventory had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); (viii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (ix) as Defendants admitted on October 30, 2023, Vans' "innovation engine" had "drifted down over the past few years" indicating underinvestment and "limited impact in offsetting the declines in classic products" (¶239); (x) as Defendant Darrell admitted on February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" and Vans had actually *lowered* its marketing investments, including by "largely withdr[awing] marketing to the core youth" consumer and leading Defendants to take "deliberate actions to right-size inventories"

and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower (¶¶254, 256-58); (xi) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (xii) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

**K.  Misleading Risk Statements in the August 3, 2023 1Q2024 Report**

227.    Before markets closed on August 3, 2023, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its first fiscal quarter of 2024 ended July 1, 2023 (the "1Q2024 Report"). The 1Q2024 Report was signed by Defendant Puckett, and was accompanied by SOX certifications signed by Defendants Darrell and Puckett stating that they had reviewed the 1Q2024 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

228.    The 1Q2024 Report contained a "Cautionary Statement on Forward-looking Statements[,]" which posed VFC's inability to keep pace with consumer preferences and demand forecasting as a mere hypothetical, stating in relevant part:

85

**Potential risks and uncertainties that could cause the actual results of operations or financial condition of VF to differ materially from those expressed or implied by forward-looking statements include**, but are not limited to:

\* \* \*

**VF's response to changing fashion trends, evolving consumer preferences and changing patterns of consumer behavior**;

\* \* \*

third-party manufacturing and **product innovation**[.]

229.   The statements in ¶228 were materially false and misleading when made because they claimed that the risks and uncertainties were only "*[p]otential*" and "*could*" cause the Company's "actual results" to "differ materially" from projection when in reality, those risks had already materialized.

230.   The materialization of these risks and the misleading nature of these statements are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133); (iii) as Defendants admitted on October 30, 2023, Vans' "innovation engine" had "drifted down over the past few years" and what little new products *had* been introduced had only "limited impact in offsetting the declines in classic products" (¶239); (iv) as Defendant Darrell admitted on

86

February 6, 2024, Vans' new products were merely "more and more color waves of the same old things" (¶258); (v) as Defendant Darrell admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

231.    The 1Q2024 Report also instructed investors to review the risk warnings contained in the FY2023 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2023 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2023 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 1Q2024 Report. For the reasons stated in ¶¶211-212, and 214, the FY2023 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

**L.  Defendants Partially Disclosed the Truth on October 30, 2023 in VFC's 2Q2024 Press Release and During the 2Q2024 Earnings Call**

232.    VFC partially revealed the truth to investors on October 30, 2023, when the company announced its financial and operating results for its 2Q2024. After market close that day, VFC issued the 2Q2024 Press Release, a copy of which was included as an

exhibit to a Form 8-K filing with the SEC, and the Company also held its 2Q2024 Earnings Call. Through these disclosures, Defendants announced poor 2Q2024 results for VFC, revealing ongoing issues with Vans, and announced a new phase of turnaround plans dubbed "Reinvent."

233.    The 2Q2024 Press Release reported, *inter alia*, unfavorable results for the quarter, including that: 1) VFC's revenue was down 2% (down 4% in Constant Currency ("CC"))[7] to $3.034 billion; 2) losses per share had more than tripled to $1.16 versus the $0.31 loss per share in 2Q2023; 3) profitability shrunk, with gross margin down 10 basis points to 51.3%, and adjusted gross margin down 20 basis points to 51.3%; 4) Vans' revenue was down 21% (down 23% in CC) to $0.7 billion; and 5) VFC's Americas region revenues were down 11%, and would have only been down 3% if not for Vans. In addition, VFC announced a much lower dividend of $0.09 per share, down 70% from the $0.30 per share dividend for the prior quarter. The 2Q2024 Press Release also announced that the Company was withdrawing its previously issued guidance and earnings outlook for its FY2024, that VFC would not be issuing new revenue and earnings guidance for the fiscal year, and that Vans' performance was not anticipated to improve in the second half of FY2024. The 2Q2024 Press Release quoted Defendant Puckett as admitting: "Despite

---

[7] Given that VFC has global operations, the Company reports revenues and certain other metrics in both U.S. dollars and "constant currency." In the FY2023 Press Release, the Company defines its constant currency exchange rate as "a non-GAAP financial measure that excludes the impact of translating foreign currencies into U.S. dollars." During a given fiscal year, VFC uses the foreign exchanges rates as of the time when the Talent and Compensation Committee of the Company's board of directors sets executive targets for that year's financial plan.

pockets of continued strong performance throughout the first half and solid profit margins in the second quarter, it's not enough and **we are not making sufficient progress at Vans** or in the US[,]" the latter of which Vans was a large portion.

234.    The 2Q2024 Press Release also announced a new phase of turnaround plans for VFC, including its Vans brand, to which Defendant Darrell stated: "Our transformation plan, Reinvent, will improve our brand-building and execution while addressing with urgency our top priorities of improving North America, accelerating the Vans turnaround, significantly reducing our fixed costs and reducing leverage." Speaking to the lack of sufficient progress in Vans and in VFC's Americas region, Defendant Puckett stated in the 2Q2024 Press Release that "[o]ur transformation plan, Reinvent, directly addresses these areas in particular and importantly, commits to lowering our cost structure by $300 million."

235.    During the 2Q2024 Earnings Call, Defendants provided color to investors regarding the primary driver of the quarter's unfavorable results: Vans. Defendant Darrell explained that "[o]ur biggest business is declining" and that VFC's "biggest issues" impacting results were "the U.S. and Vans[,]" with Defendant Puckett elaborating that the Vans turnaround had not been progressing as investors had been led to expect:

> Q2 remained weak overall as bright spots in The North Face and international markets continued to be outweighed by declines in Vans and in our Americas business.

> * * *

> Revenue for the quarter was down 4% overall, in line with our near-term expectations, but disappointingly, reflecting **continued weakness** in the

89

U.S. business and in **Vans globally**, two areas where **we're not making the anticipated progress**.

236.    Defendant Puckett also tied VFC's underperformance in its Americas region in large part to Vans, stating in relevant part that:

> By region, the Americas was down 11% in the quarter as results continued to be pressured by wholesale as expected. DTC saw an outsized impact from Vans underperformance. Excluding Vans, Americas DTC was up 5% in the quarter, with all brands except Vans and Timberland recording positive performances.

237.    Critically, Defendant Darrell acknowledged that the timeline for the Vans turnaround was being pushed out, such that "**[w]e will not see a turnaround this year**" (FY2024), and thus Defendants needed to "move faster" on the Vans turnaround:

> [W]e'll be making a change in brand presence at Vans. Trends today for Vans aren't getting any better, and in fact, could even be viewed as getting worse. **We will not see a turnaround this year**. The good news is that the brand continues to be loved by so many consumers. There are many good steps that we've made, but we now have to make some changes and move faster.

238.    Further, Darrell stated that he was temporarily taking over for Defendant Bailey as President of Vans, in order to "personally take a very active role in delivering the turnaround strategies of the brand" while a replacement Vans President was found, characterizing the issue with Vans' turnaround as speed and timing rather than any defects with the turnaround plan:

> So my game plan is really to step in until we bring in a new Brand President and really accelerate and then make some select changes. I don't plan to undo a whole bunch of things. I think the steps we put in place are the right ones. I'd just like to see it happen faster.

239.    Defendants on the 2Q2024 Earnings Call also revealed detail regarding why Vans' performance was deteriorating – specifically, that new product development until that point had not been working. First, Darrell stated that at VFC, "**[t]he innovation engine** that has historically been strong … **has drifted down over the past few years**." Then, during his prepared remarks on the 2Q2024 Earnings Call, Puckett revealed for the first time that Vans' new products, in particular, had not materially helped revenues in order to inflect the direction of the brand's turnaround, admitting that Defendants had to "do more to generate demand"—*i.e.*, drive more product innovation and marketing:

> Vans had another disappointing quarter with revenue down 23%. Slow sell-through rates continued to put pressure on wholesale across all regions, while traffic remained challenged and weighed on DTC. As Bracken mentioned earlier, the brand remains loved by consumers, but **we must and will do more to generate demand**. Newness and innovation continued to outperform in silhouettes like the Knu Skool, Lowland, UltraRange and MTE, which all saw strong growth during the quarter, though **the volumes in these styles continue to have limited impact in offsetting the declines in classic products**.

240.    Additionally, during his prepared remarks, Defendant Puckett was unequivocal in tying Defendants' decision to withdraw FY2024 guidance in large part to Vans' turnaround not progressing fast enough:

> Our decision to retract revenue and profit guidance today centers mainly on 4 key changes to our assumptions. First, the timing of the Vans turnaround is taking longer than we thought. And specifically, we are now no longer expecting any discernible improvement in half 2 results relative to half 1. Through today's announced actions, we are addressing with urgency the work needed to stabilize the business. Bracken and I plan to share our expectations with the market on the timing of the turnaround when we see a tangible impact from the initiatives underway.

91

241.    Contrary to prior representations downplaying Vans' inventory position, Puckett on the 2Q2024 Earnings Call also revealed that the Company needed to continue reducing its inventories, and thus the VFC would not achieve its previously stated guidance of reducing inventory levels at least 10% by the end of FY2024:

> We continue to focus on reducing inventory and now expect to end the year down mid- to high single digits compared to previous guidance of at least down 10%, reflecting the more challenged Vans and U.S. wholesale outlook. Fiscal '24 free cash flow is now expected to be approximately $600 million, a decrease from previous guidance of approximately $900 million, flowing through the more muted operating results.

242.    Upon the news of October 30, 2023, VFC's stock price dropped from a closing price at $17.12 per share on October 30, 2023 to a closing price of $14.73 per share on October 31, 2023, representing an approximately 13.96% one-day drop, on higher-than-usual trading volume.

## M. Continued False and Misleading Statements during the October 30, 2023 2Q2024 Earnings Call

243.    The 2Q2024 Earnings Call was held after market hours on October 30, 2023.

244.    In Defendant Puckett's first substantive remarks on a VFC earnings call, he expressed that the Company's "**inventory composition remains healthy overall and is concentrated** in core **and carryover product**."

245.    Similarly, Defendant Puckett on the 2Q2024 Earnings Call spoke to VFC's inventory levels, stating: "So I think overall, **inventories are in a pretty good place**, and **we're making progress on our own inventories** as we look at where our partner inventories sit. **We're pretty good**."

246.    The statements in ¶¶244-245 were false and misleading when made, because Vans' inventory was not in a "good place," and the statements gave investors misimpressions that management was making sufficient progress in reducing excess inventory and that remaining excess could simply be carried over to the next fashion season, when in reality Vans' excess inventory was comprised heavily in core icon products that could not be cleaned from the marketplace so easily or quickly.

247.    The misleading nature of these statements is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) Vans' sales had dropped off a cliff during the Class Period and did not recover, because Vans had over-relied on its core icons creating a glut of unwanted inventory of stale styles (¶¶85-87, 94, 96, 98, 120-27); (ii) Vans did not rationalize its products (SKUs) to stop the buildup of non-performing styles until 2024, and thus did not see the impacts until "late 2024" or "early 2025" (¶¶101-02); (iii) Vans procured excess inventory that wholesalers and consumers did not want because Vans' inventory planning was based on seasonal sales forecasts that were inflated through ghost orders and top-down budgeting that was not calculated using what historical sales data indicated could be achieved (¶¶104-18); (iv) Vans' excess inventory consisted heavily of variations of core icons that were not in demand, which could not be simply carried over to the next fashion season and instead had to be sold with massive discounts and markdowns (*i.e.* promotions) to wholesalers and jobbers and to consumers via Vans' own DTC stores, or eventually bought back by Vans, which also meant the that customers would place lower pre-book orders for the following season (¶¶127-34); and (v) as Defendants admitted on

93

February 6, 2024, Vans' inventory consisted of "more and more color waves of the same old things", leading Defendants to take "deliberate actions to right-size inventories" and make "results this quarter … worse by cleaning up Vans as we reset our channels[,]" including by keeping elevated promotional levels "flat" rather than lower. (¶¶254, 256-58).

248.   Analysts continued to rely on Defendants' false and misleading statements about VFC's inventory position and implications for the Company's profitability. For example, J.P. Morgan published an October 31, 2023 analyst report citing Defendants' commentary that "[i]nventories finished 2Q -9.8% y/y (relative to 1Q +19% Y/Y) with mgmt citing that composition remains mostly core and replenishment inventory (**= higher likelihood of being sold at full price or with a minimal markdown**)."

249.   An October 30, 2023 report issued by Wells Fargo analysts similarly stated that "**[p]rofitability meanwhile is set to improve as inventory levels get more aligned**, the company manages costs, and freight flips to a tailwind."

### N. Continued Misleading Risk Statements in the November 3, 2023 2Q2024 Report

250.   Before markets closed on November 3, 2023, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its second fiscal quarter of 2024 ended September 30, 2023 (the "2Q2024 Report"). The 2Q2024 Report was signed by Defendant Puckett, and was accompanied by SOX certifications signed by Defendants Darrell and Puckett stating that they had reviewed the 2Q2024 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

94

251.   The 2Q2024 Report repeated verbatim the identical cautionary statement that had been stated in the 1Q2024 Report (*see* ¶228), which, for the reasons stated in ¶¶229–30, was materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

252.   The 2Q2024 Report also instructed investors to review the risk warnings contained in the FY2023 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2023 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2023 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 2Q2024 Report. For the reasons stated in ¶¶211-212, and 214, the FY2023 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

**O. Defendants Partially Disclosed the Truth on February 6, 2024 in VFC's 3Q2024 Press Release and During the 3Q2024 Earnings Call**

253.   VFC partially disclosed the truth to investors on February 6, 2024, when the Company announced its financial and operating results for its 3Q2024. After market hours on February 6, 2024, Defendants Puckett and Darrell jointly presented VFC's earnings call for investors and analysts to report the Company's financial and operational results for its first quarter of fiscal year 2024 (the "3Q2024 Earnings Call") and VFC issued a press release (the "3Q2024 Press Release"), a copy of which was included as an exhibit to a Form 8-K filing with the SEC. Through these disclosures, Defendants announced that Vans had continued to perform poorly in 3Q2024, and that the brand's inventory was

95

glutted with unpopular, out-of-trend styles that needed to be liquidated with margin-eroding pricing.

254.    The 3Q2024 Press Release reported unfavorable results for the quarter, including, *inter alia*, that: 1) VFC's revenue was down a whopping 16% (down 17% in CC) to $2.960 billion; 2) Vans' revenue was down 28% (down 29% in CC), "**inclusive of deliberate actions taken to right-size inventories in the Wholesale channel**"; and 3) losses per share of $0.11, compared to earnings per share of $1.31 in the prior year quarter. The 3Q2024 Press released quoted Defendant Darrell as summarizing that "[o]ur third quarter top-line performance was disappointing."

255.    During the 3Q2024 Earnings Call, Defendants provided details surrounding Vans' poor performance in the quarter. Defendant Puckett explained that "both global Vans and the Americas results remained pressured" and that "while DTC was down 9%[, e]xcluding Vans, DTC was down 3%."

256.    Additionally, during the 3Q2024 Earnings Call, Defendant Darrell acknowledged that "Q3 was a particularly disappointing quarter," revealing that one of the primary drivers of the poor results had been Defendants' *own doing*: "**we also made our results this quarter a little worse by cleaning up Vans as we reset our channels**." Puckett echoed this, revealing that management had needed "**to accelerate the Vans turnaround** by introducing several reset actions at the brand in Q3, which impacted total VF revenue about 1.5% in the quarter, and may have a further impact into Q4." Elaborating further, Pucket explained that the "intentional reset actions we took in the quarter to clean up the marketplace and reposition our wholesale channel … negatively

96

impacted global revenue by about 5 points in Q3 and may have a further impact in Q4 as we complete the work."

257.  Describing Defendants' newly-disclosed, more aggressive Vans cleanup actions, Puckett also revealed that "**promotions were about flat versus last year**, **reflecting the continued elevated levels of promotional activity across our markets**, **our ongoing efforts to reduce inventory**, in particular, leveraging our own outlets as well as the impact of the Vans marketplace reset actions." In summary, Puckett stated, "[t]he turnaround work remains in progress at Vans."

258.  Speaking more broadly to Vans' lack of turnaround to date, Defendant Darrell also admitted that the brand's focus had been to feed "the trend that grew" prior to the pandemic by offering "more and more color waves of the same old things" and abandoning marketing to its core youth demographic after the "trend moved on":

> During the period from 2015 to 2020, the brand really took off. It got energized and accepted by new groups, thanks to cultural trend makers. More celebrities started to wear them. Moms bought them for their kids, and we actually took our eye off to the core youth audience that had been the lifeblood of Vans.

> The brand had to evolve. But rather than continue to respect and serve the youth audience that have built the brand, **we only fed the trend that grew it rapidly. We largely withdrew marketing to the core youth** and instead focused on everyone else. We extended our lineup to lower price points and value stores, **and we offered more and more color waves of the same old things to pour more fuel into a fire built on a trend**. The trend fuel burned out 18 months ago. The trend moved on.

259.  As a result of needing to pivot what was essentially the core brand strategy to save Vans, Darrell explained that Vans needed to rationalize its SKUs, stating in

97

relevant part: "[w]e're resetting the marketplace in Q3 and Q4, changing our marketing and beginning to launch *relevant* new products in the coming seasons."

260.    Defendant Darrell's notable revelation that VFC had simply focused on "more and more color waves" of trends that had "burned out 18 months ago" corrected investors' misimpressions from *countless* of Defendants' prior statements regarding Vans' new product development and innovation and the brand's turnaround.

261.    On February 7, 2024, just before market close, the Company filed with the SEC its quarterly report for 3Q2024 on Form 10-Q (the "3Q2024 Report"), which added color to the disclosures of the prior day. Specifically, the 3Q2024 Report stated that VFC management had been "reducing elevated inventory levels, **primarily in core** and replenishment products."

262.    Upon the news of February 6, 2024, the Company's stock price dropped from a closing price of $16.95 per share that day, to a close at $15.31 on February 7, 2024, representing an approximately 9.68% drop on higher-than-usual trading volume.

### P. Continued Misleading Risk Statements in the February 7, 2024 3Q2024 Report

263.    Before markets closed on February 7, 2024, VFC filed the 3Q2024 Report. The 3Q2024 Report was signed by Defendant Puckett, and was accompanied by SOX certifications signed by Defendants Darrell and Puckett stating that they had reviewed the 3Q2024 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

98

264.    The 3Q2024 Report contained the identical cautionary statement as ¶228 of the 1Q2024 Report, which, for the reasons stated in ¶¶229-30, was materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

265.    The 3Q2024 Report also instructed investors to review the risk warnings contained in the FY2023 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2023 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2023 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 3Q2024 Report. For the reasons stated in ¶¶211-12, and 214, the FY2023 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

### Q. Continued False and Misleading Statements during the May 22, 2024 FY2024 Earnings Call

266.    On May 22, 2024, VFC held an earnings call before market close to report results for the fourth quarter and fiscal year ended March 30, 2024 (the "FY2024 Earnings Call"). During the call, Defendants made a series of statements regarding Vans' new product innovation in attempts to turn the brand around.

267.    In prepared remarks, Defendant Darrell stated that Vans' product design and innovation was "**occurring in parallel**" with cost-cutting:

> Reinvent, which we introduced back in Q2, is fundamentally how we get back to strong growth. Some perceive this as a simple restructuring plan or tactical steps. It wasn't, and it isn't. Reinvent is a blueprint for transforming

a company from declining to growing. It has 3 key phases running in parallel: reset, ignite and accelerate.

Reset is focused on a reset of the U.S. business, Vans, the cost base and the balance sheet. Ignite is about elevating how we show up in front of the customer. Here, **our focus is on product design, innovation and merchandising, on commercial excellence and brand building**. **Our reset and ignite phases are occurring in parallel** and, together, will set the stage for the third phase, which will be accelerating growth.

268.    Moreover, Darrell touted Vans' supposedly then-present investments in design and innovation and new product performance, stating:

**We're** simplifying our product lineup and **introducing a sustained level of investment in design and innovation**. UltraRange Neo is performing well in the U.S. The Knu Skool, which launched when I first got here, is gaining strength behind enhanced marketing, has now become our second largest style globally. And the AVE 2.0, our newest and best skate shoe, has performed very well in the early months of its launch. You can expect more news here soon, too. This is part of our icon management strategy, which will also reduce reliance on core icons.

While the core remains in decline, **we're seeing strong performance in our new products**, and we have a cascaded product launches coming.

269.    The statements in ¶¶267-68 were misleading when made, because they gave investors a false impression that Vans finally had investments in place to ensure consistent new product innovation, and a misimpression that such investment was already working, when in reality Vans was not materially increasing investment into new product, and was in fact developing new products that did not resonate with the brand's core consumer.

270.    The misleading nature of the statements in ¶¶267-68 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own

100

admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-395); (ii) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (iii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iv) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" and the Company had not materially invested in innovation, revealing that Vans' new product pipeline was empty the entire Class Period and further elongating the timeline for the brand's turnaround (¶¶338-39).

**R.  Continued Misleading Risk Statements in the May 23, 2024 FY2024 Report**

271.   Before markets closed on May 23, 2024, VFC filed its Form 10-K annual report with the SEC, reporting the Company's financial and operational results for its fiscal year 2023 ended March 30, 2024 (the "FY2024 Report"). The FY2024 Report was signed by Defendants Darrell and Puckett, and was accompanied by SOX certifications signed by Darrell and Puckett stating that they had reviewed the FY2024 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

272.   The risk factors listed at Item 1A in the FY2024 Report (the "FY2024 Risk Factors") posed VFC's inability to keep pace with consumer preferences and product trends as a mere hypothetical, stating in relevant part:

> **Failure to compete effectively or to keep pace with rapidly changing consumer preferences**, markets, technology, business model **and product trends could have a material adverse effect on VF's business, financial condition and results of operations**.

273.   The FY2024 Risk Factors also framed VFC's inability to adapt to changing consumer demand as only hypothetical, stating in relevant part:

> **If we are unable to timely and appropriately respond to changing consumer demand, the names and images of our brands may be impaired.**

274.   The statements in ¶¶272-73 were materially false, misleading, and lacked a reasonable basis when made because they claimed the listed risks and uncertainties "*could*" have a "material adverse effect" on VFC's business or "*may*" impair Vans' brand

image, when, in reality, those risks were not mere hypotheticals, but had actualized by the time this statement was made.

275.     The materialization of these risks and the misleading nature of these statements are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iii) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (iv) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

276.     The FY2024 Risk Factors framed VFC's inability to make effective brand investments to drive growth as hypothetical, specifically stating that:

**VF may not succeed in its business strategy, including its Reinvent turnaround strategy**.

**\* \* \***

However, **we may not be able to grow our business**. For example:

**\* \* \***

• **We may not** be able to successfully generate savings to invest in brand building and product innovation, or **effectively deploy such savings towards investments in our brands and product innovation**.

**\* \* \***

**Failure to implement** our strategic objectives, including **the Reinvent turnaround strategy, may have a material adverse effect on VF's business**.

277. The statements in ¶276 were materially false, misleading, and lacked a reasonable basis when made because they claimed that VFC "*may not*" grow the Company's business, due to certain risks including ineffective brand investments, when, in reality, those risks were not merely hypothetical, but had actualized by the time the statements were made.

278. The materialization of these risks and the misleading nature of these statements are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99,

and 376-95); (iii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iv) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (vi) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

### S. Continued False and Misleading Statements during the August 6, 2024 1Q2025 Earnings Call

279.    After market hours on August 6, 2024, VFC held an earnings call for investors and analysts to report the Company's financial and operational results for its first quarter of fiscal year 2025 (the "1Q2025 Earnings Call"). On the call, Defendant Darrell continued to make statements regarding Vans' new product innovation and marketing.

280.    Speaking to the performance of Vans' new product innovation to date, Defendant Darrell stated to investors: "**our new products … are performing well across regions**."

281.    Further, Darrell stated that Vans' "**new products and marketing efforts**

**are resonating with consumers**[.]"

282.    As a result of Vans' new product and marketing initiatives, Defendant Darrell

also stated:

> **I feel good about the progress we're making on Vans. I feel great about**
> **the marketing and product initiatives**. So I'd just say stay tuned. We said
> we expect sequential improvement, slight sequential improvement. We do.
> And that's the kind of progress I want to see on Vans all the way through
> the year.

283.    When asked by an analyst what the biggest opportunities for Vans were,

Defendant Darrell answered by referring to new product innovation, stating that Vans was

already "**innovating by bringing out new styles**":

> **John David Kernan**
> *TD Cowen, Research Division – MD & Research Analyst*
>
> Now just to go back to Vans one more time. Obviously, Sun is going to have
> a lot to say on Vans in the coming months. What do you think the biggest
> opportunities for Vans are from a category level? And is there anything to
> do in terms of rightsizing distribution, whether it be in wholesale or DTC at
> this point?
>
> **Bracken P. Darrell**
> *V.F. Corporation – President, CEO & Director*
>
> * * *
>
> So what are we doing? So **we're innovating and we're also putting in**
> **franchise management**. So **innovating by bringing out new styles**. So
> you've seen -- you're starting to see them come one at a time now, AVE 2.0,
> a Knu Skool, 3 new styles this quarter. And we'll have more coming and
> then some really key collaborations to give energy.

106

284.   The statements in ¶¶280-283 were misleading when made, because they gave investors a false impression that Vans was reigning in the proliferation of its core franchises, and finally had new product innovation and marketing in place to drive a turnaround in the brand, when in reality Vans continued to over-rely on its core product franchises, and what limited product innovation that had been accomplished in fact was not resonating with the brand's core consumer meaningfully enough to drive the Vans turnaround.

285.   The misleading nature of the statements in ¶¶280-283 is evidenced by the facts alleged herein, including: including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-395); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iv) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing

107

(¶¶317, 320); and (v) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period and further elongating the timeline for the brand's turnaround (¶¶338-39).

**T.  Continued Misleading Risk Statements in the August 7, 2024 1Q2025 Report**

286.   After markets closed on August 7, 2024, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its first fiscal quarter of 2024 ended June 29, 2024 (the "1Q2025 Report"). The 1Q2025 Report was signed by Defendant Vogel, and was accompanied by SOX certifications signed by Defendants Darrell and Vogel stating that they had reviewed the 1Q2025 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

287.   The 1Q2025 Report contained a "Cautionary Statement on Forward-looking Statements," which posed VFC's inability to keep pace with consumer preferences, to accurately forecast demand, and to execute transformation and business strategies, as a mere hypothetical, stating in relevant part:

> **Potential risks and uncertainties that could cause the actual results of operations or financial condition of VF to differ materially from those expressed or implied by forward-looking statements include**, but are not limited to:
>
> * * *

**VF's response to changing fashion trends, evolving consumer preferences and changing patterns of consumer behavior**[.]

288.  The statement in ¶287 was materially false, misleading, and lacked a reasonable basis when made because it claimed the risks concerning VFC's response to changing fashion trends were merely "*[p]otential*" and "*could*" cause the Company's "actual results" to "differ materially" from projections, when in reality, those risks were not mere hypotheticals, but had actualized by the time the statement was made.

289.  The materialization of these risks and the misleading nature of this statement are evidenced by statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-95); (ii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iii) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (iv) as late as July 30, 2025 Vans, still did not "have enough new products in the premium or the mainline yet" because the brand remained "constrained

by … the old product creation process" revealing that Vans' new product pipeline was empty the entire Class Period (¶¶338-39).

290.    The 1Q2025 Report also instructed investors to review the risk warnings contained in the FY2024 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2024 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2024 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 1Q2025 Report. For the reasons stated in ¶¶274-75 and 277-78, the FY2024 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

## U. Continued False and Misleading Statements during the October 28, 2024 2Q2025 Earnings Call

291.    After market hours on October 28, 2024, VFC held an earnings call for investors and analysts to report the Company's financial and operational results for its second quarter of fiscal year 2025 (the "2Q2025 Earnings Call"). On the call, Defendant Darrell continued to make statements regarding Vans' new product innovation and marketing, including that Reinvent cost savings were being reinvested into these areas.

292.    Speaking to Reinvent's cost-cutting, Darrell stated that **"[w]e're … continuing to reinvest some of that back into the business, as you know, focused on the key areas of product** and brand building."

293.    CFO Vogel similarly represented that Vans was investing more Reinvent cost savings into new product and marketing, stating in relevant part that: "…**on the**

110

**investment side, it's really 2 things. It's really on product and marketing. We'll continue to make sure that we can invest in those areas as we reinvest the savings from Reinvent**."

294. The statements in ¶¶292-293 were false and misleading when made, because they gave investors the misimpressions that Vans was then investing into new product development and marketing to grow the Vans brand, and that Reinvent was not primarily a cost-cutting exercise, when in reality it was, and there was no meaningful investment into either product or marketing.

295. The misleading nature of the statements in ¶¶292-93 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iii) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (iv) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because

111

the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

## V. Continued False and Misleading Statements at the October 30, 2024 Investor Day

296.    During market hours on October 30, 2024, VFC held an extensive call with analysts and investors, which was framed as Part 1 of the Company's 2-Part Fiscal Year 2025 Investor Event (the "2024 Investor Day").

297.    When asked directly by an analyst what level of money saved from the Reinvent turnaround plan needed to be reinvested into VFC's brands, including Vans, as necessary to "inflect sales growth[,]" Defendant Darrell stated, in pertinent part:

> **What we've done -- we have a model for ourselves.** We said, what's the right level of spending on marketing? What's the right level spending on product development? How far away are we from that? Are we on that? And we -- that's kind of a frame for us. And so I think the reinvestment going forward is kind of within that model. And we might, at times, decide, we might even decide we're going to increase the amount of the rate of spending on marketing relative to what we where we are today. We might increase that over time. And we'll do that, and it will probably be gradual.
>
> We're certainly -- **we've taken some steps already and increased the amount of spending using the reinvestment we talked about to increase the amount of product development expense in a couple of our different places. And we've done some in marketing.** We may do more.

298.    The statements in ¶297 were false and misleading when made, because they gave investors the misimpression that Vans was then investing into new product development and marketing to grow the Vans brand, and that Reinvent was not primarily

112

a cost-cutting exercise, when in reality it was, and there was no meaningful investment into either product development or marketing.

299.    The misleading nature of the statements in ¶297 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iii) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (iv) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

**W. Continued Misleading Risk Statements in the October 30, 2024 2Q2025 Report**

300.    Before markets closed on October 30, 2024, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its second fiscal quarter of 2025 ended September 28, 2024 (the "2Q2025 Report").

113

The 2Q2025 Report was signed by Defendant Vogel, and was accompanied by SOX certifications signed by Defendants Darrell and Vogel stating that they had reviewed the 2Q2025 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

301.   The 2Q2025 Report contained the identical cautionary statement as ¶287 of the 1Q2025 Report, which, for the reasons stated in ¶¶288-289, was materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

302.   The 2Q2025 Report also instructed investors to review the risk warnings contained in the FY2024 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2024 Form 10-K, which could materially affect our business, financial condition and future results." Thus, the FY2024 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 2Q2025 Report. For the reasons stated in ¶¶274-75 and 277-78, the FY2024 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

### X. Continued False and Misleading Statements in the October 31, 2024 Yahoo! Finance Interview

303.   On October 31, 2024, Defendant Darrell was interviewed by Yahoo! Finance (the "Yahoo! Finance Interview"), and claimed that for Vans, "**we've really been investing in new products and new marketing**, new positioning, great team."

114

304.    The statement in ¶303 was false and misleading when made, because it gave investors the misimpression that Vans was investing into new products and marketing to grow the Vans brand and further the turnaround, when in reality there was no meaningful investment into either product or marketing.

305.    The misleading nature of the statement in ¶303 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (iii) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through innovation and marketing (¶¶317, 320); and (iv) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

**Y. Continued False and Misleading Statements during the January 29, 2025 3Q2025 Earnings Call**

306.    On January 29, 2025, before markets opened for trading, VFC held an earnings call for analysts and investors to report the financial and operational results for the third quarter of its fiscal year 2025 (the "3Q2025 Earnings Call").

307.    With respect to Vans, Defendant Darrell stated that: "**We are making progress and are more confident than ever of the brand's growth potential**. We have a lot of pistons to fire on at Vans: **Product, marketing**, distribution, brand elevation and more, and **we're putting each one in place**."

308.    When asked how Vans' core consumer was responding, Darrell stated that management was "**not starving Vans demand creation**"—*i.e.*, marketing investment. Moreover, as Vans continued to cut costs as part of the Reinvent turnaround plan, Darrell represented that "**[w]e also continue to reinvest some of those savings back into product creation and brand building**."

309.    Darrell also represented that Vans' turnaround was on track based on the brand's purportedly ongoing increased investment product and marketing, stating in relevant part: "…I think so far, **everything is really on track from a product development standpoint** as we go forward, and **you'll see us continue to ramp that up and marketing**."

310.    The statements in ¶¶307-309 were false and misleading when made, because they gave investors the misimpression that Vans was investing into new product development and marketing to grow the Vans brand including by reinvesting Reinvent savings, and that Reinvent was not primarily a cost-cutting exercise, when in reality it

116

was, and there was no meaningful investment into either product or marketing. Moreover, the statement in ¶307 was additionally misleading in that it gave investors a false impression that Vans' new product development was going well and resulting in products that the brand's core consumer wanted, which could then drive badly-needed growth in furtherance of a Vans turnaround.

311.    The misleading nature of the statements in ¶¶307-09 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, and laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles (¶¶96-99, 139-44); (ii) throughout the Class Period, it was known at all levels within the Company that Vans lacked product innovation necessary to drive revenue growth and support a turnaround (¶¶88-93, 97-99, and 376-95); (iii) new product development throughout the Class Period was overly reliant on minor style variations of Vans' core icons (¶¶85-87, 92), or on products for off-trend use cases that its core consumer did not want (¶¶81-82), which reduced wholesale demand (¶¶93-94, 96, 98, 122-26, 128-29, 133) and therefore impeded the Vans turnaround (¶¶139-44); (iv) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); (v) as Defendant Darrell and the Company's CSTDO admitted on March 6, 2025, Vans relied on its core "franchises" (which were synonymous with icons) "way too long" rather than innovate and market new products and Vans' transformation plan had in fact been focused on cost-cutting rather than driving growth through

117

innovation and marketing (¶¶ 317, 320); and (vi) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested and the brand remained "constrained by … the old product creation process[,]" revealing that Vans' new product pipeline was empty the entire Class Period, further elongating the timeline for the brand's turnaround (¶¶338-39).

**Z. Continued Misleading Risk Statements in the January 29, 2025 3Q2025 Report**

312.    Before markets closed on January 29, 2025, VFC filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its second fiscal quarter of 2025 ended December 28, 2024 (the "3Q2025 Report"). The 3Q2025 Report was signed by Defendant Vogel, and was accompanied by SOX certifications signed by Defendants Darrell and Vogel stating that they had reviewed the 3Q2025 Report and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

313.    The 3Q2025 Report contained the identical cautionary statement as ¶287 of the 1Q2025 Report, which, for the reasons stated in ¶¶288-289, was materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

314.    The 3Q2025 Report also instructed investors to review the risk warnings contained in the FY2024 Report, stating in relevant part that: "You should carefully consider the risk factors set forth under Part I, 'Item 1A. Risk Factors' in the Fiscal 2024 Form 10-K, which could materially affect our business, financial condition and future

118

results." Thus, the FY2024 Risk Factors were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 3Q2025 Report. For the reasons stated in ¶¶274-75 and 277-78, the FY2024 Risk Factors were materially false and misleading when made, lacked any reasonable basis in fact, and/or omitted material facts so as not to be misleading.

### AA. Defendants Partially Disclosed the Truth on March 6, 2025 at VFC's 2025 Investor Day

315.   VFC partially disclosed the truth to investors on March 6, 2025, when the Company held its 2025 Investor Day during market hours, including candid details concerning the reasons that Vans' turnaround had not yet materialized. Defendants revealed that, contrary to prior misrepresentations, they had not been developing new products and marketing for Vans' core consumer, further delaying Vans' turnaround.

316.   During the 2025 Investor Day, Defendants revealed that VFC and Vans management never deployed new product development and marketing needed to drive Vans' turnaround (*i.e.*, revenue growth), and therefore, the timeline on the brand's turnaround was extended once again.

317.   During his prepared remarks, Abhishek Dalmia ("Dalmia"), VFC's CSTDO, acknowledged that the cost-cutting side of VFC's Reinvent turnaround plan had been prioritized over the new product and marketing investment needed to drive growth in brands like Vans, stating that:

> One thing that I've learned for sure is that **you can't just cut your way to strong, sustainable long-term growth.** You need to also focus on building capabilities. Growth is at the center of our transformation. It's about

elevating our products through bold design, innovation and creative marketing.

318.    Dalmia also explained that VFC's barrier to growing Vans had been that the Company's approach to new product design and marketing had not been rooted in consumer insights:

So **what was the problem with VF before? How we positioned our brands and our approach to consumer insights** has been a challenge in the past. Every brand and regions within the brands had different approaches, which led to significantly high spend confused positioning and suboptimal outcomes.

Worse, none of these processes followed industry best practice. Over the last 12 months, as part of our transformation, we have taken a different approach. Instead of a fragmented practice, we adopted one unified methodology across geographies. We focused on a methodology that is rooted in drivers of purchase behavior, understood our consumer needs, evaluated competitors and identified where each brand has a right to win.

It allowed us to understand the market size and our potential headroom in each segment. These insights helped our brands develop a unified global brand positioning with regional nuances. **This is now fueling design, innovation, marketing and channel strategies**. You will hear more about it from our brand presidents soon. **Today, this capability supports existing brands**.

319.    Defendant Darrell further disclosed that in order to drive growth, the Company needed to become a "design company" in which product and marketing are designed based on consumer insights. However, Darrell explained, the "design company" he described was yet still a "mythical company[,]" summarizing that "**[t]hat design company does not exist today**" in VFC.

320.    As Defendant Darrell elaborated, in comparison to competitors like Nike and New Balance, "**what we did with Vans was anything but masterful**. It was -- **we rode**

120

**that thing way too long** and expanding distribution at the same time into more and more value channels."

321.   The disclosures made by VFC and Vans management at the 2025 Investor Day corrected investors' misimpressions left by numerous of Defendants' prior statements, including the successful deployment of its previously touted new product development and marketing.

322.   VFC's stock price dropped over two consecutive days as the markets digested the news of the midday March 6, 2025 Investor Day. First, VFC common stock fell from a closing price of $23.45 per share on March 5, 2025 to close at $20.56 per share on March 6, 2025, representing an approximately 12.32% drop, on higher than usual trading volume. Then, VFC fell further to a closing price of $19.13 on March 7, 2025, representing an approximately 6.96% drop, on even higher trading volume. Collectively, VFC's stock price dropped approximately 18.42% over the two-day period.

**BB. Continued False and Misleading Statements during the March 6, 2025 Investor Day**

323.   During market trading hours on March 6, 2025, VFC hosted the largely qualitative 2025 Investor Day to discuss the Company and its ongoing turnaround efforts.

324.   Joining Defendant Darrell on stage at the Company's 2025 Investor Day, Defendant Vogel reassured investors that "**we will continue to reinvest back into the areas that will drive profitable and sustainable growth, primarily in product design, innovation and brand-building activities**."

325.   The statement in ¶324 was false and misleading when made, because it gave investors a false impression that VFC's Reinvent transformation plan had had

121

management focused on growing Vans' revenues through new product innovation and marketing, when in reality Reinvent was primarily a cost-cutting exercise, and the Company had not meaningfully been investing in those areas to drive the Vans turnaround.

326.   The misleading nature of the statement in ¶324 is evidenced by the facts alleged herein, including statements from various CWs and Defendants' own admissions, confirming that: (i) throughout the Class Period, Vans did not materially invest into new product innovation and marketing, laid off masses of product, development, and merchandising personnel thus resetting the product innovation cycles, and merely produced variations of core icons or introducing off-trend products that Vans' core consumers did not want (¶¶81-82, 85-94 96-99, 122-25, and 139-44); (ii) because Vans' turnaround plans were pure cost-cutting exercises, Vans was not reinvesting cost savings into product innovation and marketing (¶¶139-44); and (iii) as Defendant Darrell admitted on July 30, 2025, Vans still did not "have enough new products" because the Company had not materially invested in innovation, further elongating the timeline for the brand's turnaround (¶338).

**CC.  Defendants Partially Disclosed the Truth on May 21, 2025 in VFC's FY2025 Investor Presentation and During the FY2025 Earnings Call**

327.   VFC issued the final partial corrective disclosures to investors on May 21, 2025, when the Company, before market open that day, issued a press release (the "FY2025 Press Release) and a copy of a slideshow presentation as an exhibit to a Form 8-K filed with the SEC (the "FY2025 Investor Presentation"), and held the FY2025 Earnings Call to announce its financial and operating results for its 4Q2025 and FY2025

122

ended March 29, 2025. Through these channels, particularly the FY2025 Earnings Call, Defendants announced that they had taken more aggressive actions during 4Q2025 to reset Vans, revealing that the brand's turnaround was once again elongated.

328.    The FY2025 Investor Presentation, which was disclosed prior to the FY2025 Earnings Call, reported metrics and trends for the Company's 4Q2025 and FY2025, including that: 1) VFC's revenue for the quarter was down 5% year-over-year to $2.1 billion as Vans had continued to decline 22% (20% in CC), and would have been up versus the prior year "excluding Vans"; 2) operating losses for the quarter were $73 million, contributing to a loss per VFC share of $0.39; 3) there had been "revenue impact to Vans® from deliberate strategic actions" management had taken during the quarter, which had included "[d]eliberate rationalization of channel distribution…"; 4) new Vans products were not "[d]eliver[ing] the Vans turnaround" as they were "more than offset by declines in the icons"; and 5) based on the foregoing, the Company was guiding revenues would continue to shrink by 3–5% in the first quarter of 2026 ("1Q2026").

329.    During the FY2025 Earnings Call, Defendants revealed that Vans revenue had continued to shrink at a significantly accelerated pace, and surprised investors by revealing a slew of intentional actions they had taken regarding Vans' distribution, collectively indicating that the turnaround in the Vans business was not progressing as investors had been led to believe for over two years.

330.    Specifically, Darrell revealed that the drastic revenue decline in Vans was due to new, more aggressive actions management had taken, explaining that "**60% of the decline this quarter is a direct effect of deliberately reduced revenue** to eliminate

123

unprofitable or unproductive business[,]" elaborating that "[o]f the total Q4 decline in Vans

sales, almost 25% of it was driven by reduced storefronts and reduced channel inventory

in China." Further, Darrell revealed that "40% of the decline was all driven by DTC, which

is primarily due to soft traffic."

331. With respect to the newly-announced "deliberate actions," Darrell

explained:

> Another 35% of the total decline was driven by additional -- an additional
> set of deliberate actions, which were also in place last quarter but had a
> lower impact. These include the closure of value doors, mainly in the U.S.
> that were margin eroding, the reduction of distressed sales that were
> unprofitable and the closure of our own stores, also mainly in the U.S. that
> were unprofitable.

332. During his prepared remarks on the FY2025 Earnings Call, Darrell indicated

that, in tandem with Vans' sharp decline in the quarter, the timeline for benefit from any

new product innovation was being further elongated, stating that "[o]n product, we

continue to focus on footwear by bringing in newness that **will roll out over back-to-**

**school, holiday and next spring and beyond**, while reigniting the existing core icons."

333. Echoing Darrell's remarks, Defendant Vogel summarized that "Vans

revenue in the quarter was down 20%, driven by our intentional actions that Bracken

mentioned earlier and continued softness in DTC." Moreover, Vogel revealed that the

newly-disclosed "intentional actions" would continue occurring and having negative

effects for the next two fiscal quarters, adding:

> We stated in late January that we expected the first half of the year to be
> similar in growth rate to the second half of the last fiscal year. **We expect**
> **Vans in Q1 [FY2026] to be similar to the Q4 [FY2025] trend due to the**
> **additional actions we've executed on stores and wholesale value**

**channels**. **As a result of these actions, the revenue trend in the first half of fiscal '26 is expected to be slightly below the second half of fiscal '25**.

334.    Analysts were curious for details regarding the disclosure that management had taken intentional, deliberate, and more aggressive reset actions for Vans over two years into the brand's supposed turnaround, and when a Goldman Sachs analyst probed Defendants to elaborate, Darrell candidly acknowledged the nature of the surprise to the market, stating, "Thanks for the question. We expected that[,]" stating regarding the actions that "the impact of these will continue kind of proportionately right through Q1 and Q2 and then in Q3, they come down and then come all the way down in Q4." Darrell elaborated that "[i]n terms of end consumer demand, we're still not getting enough traffic into our stores and our websites. And I referred to that in my script, and this is fundamental brand heat." Playing damage control, Darrell characterized the intentional, but previously undisclosed reset actions begun in 4Q2025 as necessary, stating that "**the key now for us is to take the medicine that we've talked about and then get the traffic up**."

335.    The disclosures made by VFC and Vans management during the FY2025 Earnings Call and in the FY2025 Investor Presentation corrected investors' misimpressions left by numerous of Defendants' prior statements across over *two and a half years*, in which they had represented to investors, *inter alia*, that the Company was investing in new product development and marketing for that core consumer, including by reinvesting Reinvent savings from cost-cutting, that new product offerings were resonating with the core consumer and showing positive signs in furtherance of a Vans

125

turnaround, and, collectively based on the foregoing, that Vans turnaround from negative revenue growth to positive was near.

336.    Upon the news of May 21, 2025, VFC's stock price fell from a closing price of $14.43 per share on May 20, 2025, to close at $12.15 per share on May 21, 2025, representing a drop of $2.28, or approximately 15.8%, per share.

## VI.    POST-CLASS PERIOD EVENTS

### A.  July 30, 2025 Admissions during VFC's 1Q2026 Earnings Call

337.    On July 30, 2025, VFC held an earnings call with investors and analysts to report the Company's financial and operating results for the first quarter of its fiscal year 2026 (the "1Q2026 Earnings Call").

338.    During the call, Defendant Darrell admitted that only then, after the Class Period, were he and fellow Company management "*dramatically … transforming the* processes, teams, *product engine and marketing approach*, even the culture, *almost everything*." Darrell explained that these changes, as they related to Vans, were necessitated in large part by the fact that the brand's new product innovation pipeline had not been driving a brand turnaround, further admitting: "*We don't have enough new products in the premium or the mainline yet*," adding that "[n]ew products" were still "*coming*."

339.    Further, Darrell admitted for the first time on the 1Q2026 Earnings Call that Vans' new product go-to-market process *itself* during the Class Period had actually "constrained" Vans' ability to introduce new product offerings, stating that Vans President

126

Sun Choe's team's "freedom to innovate *will be less and less constrained by the practicalities of the old product creation process* as each quarter passes."

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

340.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding VFC, and their control over and/or receipt and/or modification of VFC's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### A. Defendants Admittedly Knew Vans Continued to Lack Product Innovation and an Ability to Keep Pace with Consumer Trends

341.    From the very beginning of the Class Period, Defendants knew that Vans had become over-reliant on its core designs, lacked adequate product innovation and investments, and faced an 18-month product creation cycle.

342.    At the 2022 Investor Day, Vans President Bailey described "a major study to really understand the consumer in a big way" that VFC completed around three quarters of the way through the Company's FY2021. Bailey explained that VFC would "be less reliant on those large-scale studies and moving to be more agile and responsive to a constantly-changing consumer landscape."

127

343.    At the same investor day, VFC also highlighted lack of product innovation and inability to keep pace with consumer trends as issues that led to the Vans brand's pre-CP underperformance. Specifically, Bailey explained that:

First, **we became over-reliant on our core canvas classic styles and needed to innovate more than we did**. Next, we overlooked some of the early signs that were telling us that we needed to evolve, and **we had bigger consumer opportunities that we really weren't paying attention to and taking advantage of**. That affected our product, that affected our marketing, that affected our brand heat, and ultimately led to impacting the traffic in our own brick-and-mortar D2C fleet.

344.    Bailey expanded on Vans' lack of product innovation, specifying comfort and functional versatility issues, as well as the lack of investment in Vans' marketing, stating in relevant part that:

[W]e did become too dependent on our classics. This is important because we also made some strategic missteps inside of classics, and we left opportunities on the table. **Consumers choose classics for specific reasons, because they're casual, they're stylistically versatile and trendy**. That's really important to what this consumer wants, **but they have gaps. The gaps are around comfort and functional versatility**. Also, classics tend to age younger. **We haven't done enough in product creation and communication about what classics can mean in your life**.

345.    Bailey also confirmed that Vans had been too restrictive and narrow-minded in chasing consumer insights related to Vans' five core shoe designs or "icons." Indeed, Defendant Rendle summarized Bailey's work as identifying the "root causes" of why Vans' growth had been declining. Thus, Defendants were well-aware of the exact issues at Vans that persisted throughout the Class Period.

128

346.    During the Class Period, Defendants made several admissions concerning Vans' lack of product innovation and inability to keep pace with consumer trends, including in connection with Defendants' corrective disclosures.

347.    For instance, in the 2Q2024 Press Release, Defendant Puckett admitted that "[d]espite pockets of continued strong performance throughout the first half and solid profit margins in the second quarter, **it's not enough and we are not making sufficient progress at Vans or in the US[,]**" where Vans was a large portion of VFC's business.

348.    During the 2Q2024 Earnings Call, Defendants Darrell and Puckett respectively admitted that Vans would "not see a turnaround this year" because "we're not making the anticipated progress[,]", due in large part, according to Defendant Darrell, to the fact that the Company's new product "innovation engine … has drifted down over the past few years."

349.    During the 3Q2024 Earnings Call, Defendant Darrell admitted, for the first time, that Vans until that point had been marketing and developing products for "everyone else" *but* its core customers, and that only then—in February 2024—did the brand purportedly have a proper understanding of its brand purpose and consumer segmentation, and both marketing and product development plans to support it, explaining that Vans' more aggressive market reset in the quarter had been to eliminate product produced under the prior brand approach that the Company was now abandoning:

> During the period from 2015 to 2020, the brand really took off. It got energized and accepted by new groups, thanks to cultural trend makers. More celebrities started to wear them. Moms bought them for their kids, and

**we actually took our eye off to the core youth audience that had been the lifeblood of Vans**.

The brand had to evolve. But rather than continue to respect and serve the youth audience that have built the brand, we only fed the trend that grew it rapidly. We largely withdrew marketing to the core youth and instead focused on everyone else. We extended our lineup to lower price points and value stores, and **we offered more and more color waves of the same old things to pour more fuel into a fire built on a trend**. The trend fuel burned out 18 months ago. The trend moved on.

350. As a result of needing to pivot what was essentially the core brand strategy to save Vans, Darrell explained, "we're resetting the marketplace in Q3 and Q4, changing our marketing, and **beginning to launch** relevant new products in the coming seasons."

351. At VFC's 2025 Investor Day, Defendant Darrell admitted that, contrary to prior representations that Vans was attuned to its consumers and had a strong product pipeline, "**now** we understand who our consumer is for these brands, what products they need and want and how to position our brands to meet those needs." Darrell further explained, the "design company" he described was yet still a "mythical company[,]" summarizing that "**[t]hat design company does not exist today**" in VFC.

352. Moreover, Darrell introduced the "VF Way" to adopt "best-in-class processes" throughout the Company. Darrell admitted, for the first time, deficiencies in VFC's product creation processes, describing that "there were over 30 processes for creating products across our regions and brands, **none of which were the best-in-class**."

353. Indeed, Darrell admitted that "**what we did with Vans was anything but masterful**." Referring to Vans' existing assortment of icon designs, Darrell admitted: "**we**

130

**rode that thing way too long** and expanding distribution at the same time into more and more value channels[,]" thereby conceding that VFC had over-relied on stale products.

354. Thus, Defendants' admissions of deficient product innovation and consumer understanding support an inference that they knew that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, and the brand's turnaround would be delayed.

**B. Defendants Reviewed and Discussed Vans' Consumer and Product Data, Including Conducting Comprehensive Consumer Insight Assessments and Closely Monitoring Consumer, Inventory, and Product KPIs in Real-Time**

1. Defendants Closely Tracked Vans' Brand Health and Consumer Trends via Several Metrics, Including "Brand Heat," Google Search Trends, Pricing, and Customer Loyalty Numbers

355. Before and during the Class Period, VFC touted the wealth of consumer and brand performance data that was readily available, including Google search trends, pricing, awareness, and customer loyalty numbers, and thus were purportedly able to monitor and predict in real time when Vans' product offerings were no longer resonating with consumers.

356. For example, during the FY2022 Earnings Call, Defendant Bailey—speaking collectively for all joint presenters—explained how Defendants were integrating VFC's consumer data capabilities, including dashboards, into their decisions:

> Lastly, digital capabilities are rapidly advancing how we plan and operate our business at Vans. Leveraging our VF capability teams, **we are using data from consumers to influence both our go-to-market and our daily business decisions**.

357. Similarly, at the 2022 Investor Day, in her prepared remarks, EVP & Chief Digital & Technology Officer Carboni touted the "robustness" and "breadth" of consumer

131

data VFC possessed by "we", "us", and other terms referring to all of the presenters, which

included Defendants Bailey, Puckett, and Rendle. Carboni stated in relevant part that:

> When you think about the diversity of brands that we have and the amount of data, the robustness of that data and the breadth of that data that we have, we've got a pretty big data warehouse here at VF that really **gives us a lot of great insights** on what's going on with our consumers.

358.    Carboni also described a "control tower" report and Consumer Pulse that

provided Defendants real-time consumer data and detailed dashboards by brand:

> [N]ow we're getting into the real cool stuff of how do we empower the brands to actually use the data. One great example, recently, we launched a new commerce platform for our 2 largest digital businesses. And in the old days, you'd hear people talk about tagging, and it was like 6 weeks before you got to report out. We deployed a really sophisticated approach to tagging. And then with that, **we call this report a control tower, where, real time, we can see how are the consumers engaging, do we have opportunities to adjust things or how is it going and very quickly be able to treat us with that opportunity**.
>
> The second thing I'd mention that I'm really excited about is we worked very closely with Steve [Rendle] and the brands to put together something we call Consumer Pulse. Think of this as **dashboards by brand, by region, where they can very quickly come in and see a whole host of how is your business health doing, its sales numbers, its consumer data**, its loyalty versus nonloyal consumers in a very cohesive way for them to kind of gauge what's going on with the business aside from the financial metric. So really exciting.

359.    Carboni also explained that the Company also incorporated third-party data

into a "cohesive platform" that enable VFC to assess customer sentiment by brand:

> The second part of that is we brought – we ingested a lot of third-party data. I mean we always want to look outside also to understand what's going on, bringing that all into one cohesive platform. And with that, I want to highlight we like recently **launched a brand health tracker, which allows our**

132

**brands to see very quickly how are we doing compared to other competitors** in the marketplace, what is that consumer sentiment.

360.    Carboni also boasted of Defendants' direct access to real-time pricing information:

And then the third bucket I'd mention is **real-time optimization of data**. This is what I get to take my really brilliant, super smart data scientists, machine learning experts and really start to deploy them against business processes. As an example, in Europe recently, we've got a very large partnership with one of the marketplaces there. We set a very manual process on how you optimize pricing, and it would take weeks to do the job. We grew the scientists in there, and they created a very automated model that allows us to be more efficient in how we're doing it and, most importantly, more competitive so **we can do real-time pricing opportunities**. So just some really excited work. I get very excited about the opportunities. This is a competitive differentiator for VF.

361.    Defendant Rendle also attended the 2022 Investor Day and emphasized that Defendants' "understanding" of customer "needs" and wants, gleaned from VFC's data science and analytic capabilities, allowed VFC to optimize its product offerings:

Our brands complement each other and appeal to consumers with similar demographics.

And this is an important point that goes back to our consumer data and analytics capability. It's because this consistency that we can now have a view of a very large segment of consumers that engage with our brands, allowing us to leverage this portfolio structure to drive and optimize our connections, our actions as **we have a deeper understanding of the needs and wants of this broad consumer base**.

362.    During the same 2022 Investor Day, Defendant Bailey expanded on the brand health tracker for Vans, demonstrating acute awareness of the tracker and associated metrics:

133

Velia referenced our brand health tracker. When we look at January to June, we do see a decline in brand heat, but we are ahead of our major competitors in both 13 to 24 and 13 to 39 in many of the attributes we look at. Our brand perception scores remain high, and our advocacy is up. We have -- are spontaneous and our **aided awareness** is up slightly, both globally and here in North America, so we have **high awareness** and our **perceptions** remain stable over time.

363.    Also at the 2022 Investor Day, Bailey explained that consumer data and analytics were critical components of Vans' product and marketing efforts:

So consumer data and analytics, that values team helps us with, as well as our consumer insights team **helps pull all the information we need to have about the consumer**. They then brief both product and marketing, who then focus on the opportunities together inside of these pods, inside of these strategic consumer category teams, to think about how best to serve that consumer, and then they brief their teams on the work needs to be done. So it's a much more integrated and cohesive manner of working.

364.    Defendants also described Google search trends for Vans products across geographies and time, including on a quarterly basis. For instance, in response to a Goldman Sachs analyst about trends in Vans classics trends and new product lines on the 1Q2024 Earnings Call, Defendant Bailey stated that "[c]anvas is still not on trend from the search trends, but we're feeling good about where China is and how it's growing." At the FY2024 Earnings Call, in his prepared remarks on Vans, Defendant Darrell stated that changes to the marketing mix "are starting to show positive results. Now we're cutting through. **Search is a good leading indicator. We're seeing Google Search trends** move in the right direction for the first time in years. **The last 3 months have improved compared to the previous 12**."

134

365.    CW2 explained that Vans executives focused heavily on Google search trends when various metrics were discussed at meetings. CW2 recalled telling General Manager Andreas Olsson that "we were constantly looking at that as one of the figures of hope – yes, the increase is quite dramatic on searching for Vans. It's the most searched."

366.    CWs also provided specific examples of Vans' data and analytics capabilities. For instance, CW3 confirmed that Vans' data analytics team also tracked data from the Company's e-commerce sites. CW3 also recounted that the data analytics team could identify which sport was searched the most on the Company's e-commerce website search bar and provide specific data—such as that "golf" was searched on the Company's website 10,000 times in a given month.

367.    CW3 stated that SKU performance metrics were also tracked via Excel and everything "flows through SAP." CW3 also built a margin tool so teams could see what margins were at a moment in time.

368.    Thus, based on their ongoing access to, review of, and tracking of consumer trends, product data, pricing, and margins as well as their integration of consumer data into the product innovation process, Defendants knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

135

2.  Defendants Conducted Ongoing Comprehensive Consumer Insight Assessments

369.    During the Class Period, Defendants continued to conduct comprehensive consumer assessments as a part of their strategies to purportedly better understand Vans' consumers and thereby improve the brand's product offerings to be more responsive to consumer trends.

370.    During the 3Q2023 Earnings Call, in his prepared remarks, Defendant Dorer described actions to drive Vans growth, which included an ongoing customer segmentation project to be more responsive to consumer trends:

> While there are differences in EMEA compared to the North American market, the relatively stronger performance of Vans in EMEA also reflects the benefits of a clear growth strategy and stronger marketplace execution. We must do better with Vans in its home markets, and we will.
>
> Our action plan follows the four growth drivers laid out in our Investor Day last September; consumer, products, marketplace and operating model. Here are a few specific examples of actions. **We will sharpen our view of the changing consumer landscape through a new consumer segmentation, which is underway and will inform the business' overall growth strategy** and begin to influence our direct-to-consumer plans as of summer this year. We need to delight consumers in ways that are relevant to their specific needs. And to do so, we must be more intimately familiar with them.

371.    During the FY2023 Earnings Call, Dorer stated that, over the last 6 months, VFC had analyzed "where we stand with the consumer."

372.    During the 1Q2024 Earnings Call, in his prepared remarks, Defendant Puckett provided an update on Vans' consumer understanding efforts:

> Another key focus area we've shared previously is an opportunity **to better understand and integrate the consumer into our decision-making**. Our

136

significant global segmentation refresh is on track, and in the meantime our Vans Family membership keeps growing, now approaching 29 million members, adding 1 million members in Q1 and more than doubling in two years.

373.    At the same earnings call, Defendant Darrell emphasized the ongoing nature of Vans' consumer understanding work and integration into the brand's decision-making:

> And then we have been continuing to work on consumer and **getting really deep into understanding our segmentation study**, integrating consumer data and analytics into everything we do, et cetera. So those are really our big priorities. However, we still believe execution is the opportunity, and what we're doing with SKU reduction of 20% to 30% that will be completed in August in our US stores. That changes store layouts, simplifies the shopping experience for consumers, but still delivers on the business we want to see.

374.    Accordingly, based on their ongoing comprehensive consumer assessments and detailed identification of Vans' issues, Defendants knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, and the brand's turnaround would be delayed.

## C. CWs Confirmed That Defendants and Senior Management Frequently Attended Meetings and Received Reports Regarding Vans' Product Innovation, Inventory and SKU Performance, Brand Performance, and Sales Forecasts

375.    CWs confirmed that Defendants and Senior Management frequently attended meetings and received reports regarding Vans product innovation and brand performance.

376.    CW4 provided that VFC's C-suite, including the Individual Defendants, was well aware of Vans' falling sales trend, because "even a single digit decline" in sales revenue for Vans, given its size within VFC, prompted an "all hands on deck" response to fix the problem. According to CW4, because VFC's other brands like The North Face were doing comparatively better than Vans during the Class Period, "that kind of hides the fact that the other brands"—like Vans—"aren't doing well," allowing Defendants on earnings calls to "kind of tiptoe around" the poorly performing brands.

377.    According to CW4, all of the sales data for all of Vans' geographic regions, as well as all forecasting bookings, were rolled up into a centralized sales or "ERP" system (*i.e.,* Enterprise Resource Planning), referred to as "SAP" after the software provider, that was updated "multiple times a day" with real-time information. Specifically, CW4 stated that each of VFC's big brands, including Vans, had a "PLM" system, named Flex, into which Vans would enter their global forecasts and sales data, and which was directly plugged into VFC's ERP system. The Company's ERP system was set up such that "everyone could see" the data, including each of the Company's brands, analysts, and finance personnel, with no information hidden. Moreover, CW4 stated, "everyone" within each of VFC's brands had access to both Power BI and Tableau software, in order to export sales data and forecasts and put it into a report or visual graph.

378.    Confirming Carboni's statement that VFC incorporated third-party data, CW4 explained that Vans would pay third-party agencies that specialized in providing

138

trends analysis, who would then give their analyses to the brands and say, "here's what we think is going to happen over the next two years."

379.    **Quarterly Business Review (QBR) Meetings**: CW4 stated that reports for future bookings were reported up to VFC's C-suite by Vans leadership—either the Vans President or the Strategy and Transformation Officer—"at least on a quarterly basis" for QBRs in advance of the Company's earnings calls, including both the "highlights" and "lowlights" for the quarter, with Vans brand leadership more regularly looking at the out of sync reports. CW4 stated that QBRs were attended by VFC leadership, as well as Vans brand leadership, including Chief Merchandising Officer Marissa Pardini[8], and the VP of Strategy. CW4 confirmed that at the QBRs leadership would review sales volumes and margins, update the brand's three-year plan based on the trajectories of historical sales, future bookings, and forecasts, and give back to the brands the "number"—*i.e.* sales revenue target—they needed to hit for a given quarter. According to CW4, from 2022 through when CW4 left the Company in March 2025, Vans always fell short of the brand's revenue target that was set at QBR meetings.

380.    CW4 stated that Vans' inventory issues were discussed every month at the Vans level starting when the business began to slip in 2021, and then were "absolutely"

---

[8] CW4 also explained that, originally within Vans' product creation group, there were three groups: the Merchandising team, the Product Development team, and the Product Design team, all of which overseen by Marissa Pardini as Chief Merchandising Officer. Then, CW4 stated, when Pardini was laid off, VFC leadership changed the structure to bring in a Chief Design Officer, having Merchandising and Product Development sit under one leader.

bubbled up to VFC leadership via the reports for QBRs, including by looking at the brand's future sales bookings.

381.  **Quarterly Town Halls**: CW2 attended quarterly town halls led by Defendants Rendle and then Darrell, respective of their tenures, who would "go over the financial performance of each of the brands, brand by brand," which included financial metrics showing that Vans had been declining in the UK and Ireland steadily pre-COVID. CW2 described the town halls as a "global summit" wherein VFC employees could listen in via Zoom.

382.  CW2 and CW1 recalled that VFC management at quarterly town halls did not seriously address Vans' lack of new product innovation and lower marketing spend relative to competitors, other than being vague. CW1 stated that these were VFC Global Town Halls hosted by Defendant Darrell. CW2 stated that "they'd acknowledge there's a problem there, but there wouldn't be anything substantial to go 'what are you doing about it' other than 'we're addressing it, something's coming.'" Moreover, CW2 recalled, there was essentially "no budget" for new Vans marketing.

383.  CW1 explained that Vans senior management also discussed marketing and product investment at quarterly Vans Global town halls, hosted by Defendant Bailey and later Sun Choe, as well as Vans EMEA town halls hosted by Andreas Olsson, Vans VP of Marketing EMEA Gwilym Williams, and Vans Head of Merchandising EMEA Marleigh Blake. CW1 recalled that Vans senior management acknowledged the need for "overinvestment" in Vans' new product innovation and marketing during Vans Global and Vans EMEA town halls, but it never occurred during CW1's tenure.

140

384.    **Profitability Presentation to Defendant Puckett**: Additionally, CW3 directly provided Defendant Puckett with a presentation concerning these issues early during the Class Period. Specifically, CW3 and CW3's manager met with Puckett in approximately the third quarter of VFC's fiscal year 2022 ("3Q2022") to get "buy in" and "sign off" on certain profitability initiatives. During this meeting, CW3 told Puckett that there were too many SKUs, and advocated for the implementation of "SKU Rationalization."

385.    **Meetings with Senior Management**: CW1 prepared information for quarterly or biannual "pitchback" presentations, which were given by sales leaders to Guerrini and the rest of the brand's senior leadership team ("SLT"), including representatives from Product, Marketing, and Operations, following which the SLT would give a pitchback presentation to VFC's ELT. CW1 explained that pitchback meetings concerning "a full analysis by the top strategic accounts" in VFC's EMEA region, which included JD Sports, and where each VFC brand had to present their pre-book orders and sell-in strategy for such accounts.

386.    CW1 also interacted "frequently" with General Manager Andreas Olsson, including discussing "cancellations for sure." CW1recounted that, because of the importance of CW1's account, Olsson "would want to have an overview and know what's going on with the account." CW1's meetings with Olsson were frequent and on all levels including one-on-one meetings, team meetings, in-person meetings, or direct calls placed by CW1.

387. CW4 stated that trend analysis data was used at seasonal kickoff meetings, where the Vans leadership including representatives from the brand, merchandising, and product design groups would get together to discuss new products and innovation. These kickoff meetings, CW4 recalled, also involved major discussion of where Vans was at financially, and that things needed to be done to hit the plan set by VFC management.

388. **Finance & Sales Meetings**: CW2 recalled attending two types of frequent finance and sales meetings in the EMEA region. As CW2 explained, Vans' go-to-market process for each six-month fashion season had at least three phases: "Go-to-Market 1," "Go-to-Market 2," and "Go-to-Market 3." During the Go-to-Market 2 phase, Vans EMEA would hold monthly Sales Lead Team Meetings, or "SLTMs," at VFC's EMEA headquarters in Stabio, Switzerland, attended by the country leads for all of the European countries in which Vans operated including CW2, as well as "key people" including CW2's manager Nick Welton, Dominic Jahn, and Massimo Martini. During the Go-to-Market 3 phase, larger meetings including all of the sales teams from the EMEA region ("GTM3 meetings") would be held at various locations, including in Spain.

389. CW1 confirmed that Vans EMEA hosted a seasonal sales conference every six months and that Olsson as well as other members of the SLT hosted weekly or bi-weekly Vans EMEA open mic sessions.

390. According to CW2, Vans EMEA leadership's practice of marking up the country leads' bottom-up forecasts was "absolutely" discussed at both the SLTMs and GTM3 meetings, as "it'd be a big topic of conversation," but "a lot of the time, we were politely told to stop discussing it." Moreover, though leadership would quiet discussions

142

of ghost ordering practices during SLTMs, CW2 knew that ghost orders were being used outside of the UK and Ireland because CW2 and fellow country leads would meet up after the SLTMs, where they'd more openly discuss the practice. "It was definitely going on in other countries," CW2 remarked.

391.    **Weekly Shipping Forecast Calls**: CW2 participated in "weekly shipping forecast calls" which were attended by Jahn. CW1 confirmed the weekly shipping calls, attended by Jahn and Martini, stating "we'd have a weekly shipping call so we could see where we were invoicing." CW1 added that customer cancellations were discussed at these meetings "all the time" and that information from the meetings was bubbled up to the SLT. CW1 also explained that each commercial team, including Strategic Accounts, Territory Accounts, and Direct-to-Consumer, held a shipping call.

392.    **Sales Forecast Reports**: Throughout CW4's tenure during the Class Period, CW4 would receive Excel spreadsheets of Vans' quarterly sales data and forecasts from the ERP system. Additionally, CW4 stated that VFC leadership—including Defendant Darrell, the CFOs (Defendants Puckett and Vogel), and the Company's board of directors—would have someone extract data for whatever period in time they wanted to look at, whether it was weekly, monthly, or quarterly snapshots. CW4 noted that there was also an "out-of-sync" report on forecasts and bookings every fifteen days, so twice per month.

393.    **Inventory Reports**: CW4 stated that Vans' inventory was also accessible in VFC's SAP system, and information about inventory levels—as well as the impacts of

discounting the inventory on operating margin—was also bubbled up to the Company's ELT as part of the pre-QBR reports.

394. **SKU Performance Reports**: CW3 confirmed that Vans' lack of innovation and continued introduction of underperforming SKUs was "very well known" inside the Company. Indeed, CW3 confirmed holding meetings before product development milestones with the merchandising and product teams.[9] CW3 provided every merchandiser with a report of top performing and bottom performing SKUs by margins and unit count. CW3 provided the reports "for sure three times for each season." On an ad hoc basis, CW3 also sent the product team summaries of finance reports with month over month and year over year SKU performance. CW3 added that "everyone's on the emails" regarding low margin and low SKU productivity. Thus, CW3 explained that the product team as well as Global President of Vans, Sun Choe, former Vans VP of Merchandising, Ashley Ahwah, and former Vans Chief Merchandising Officer Marissa Pardini received a report or summary "every month."

395. **Retail Foot Traffic Reports**: CW2 recalled periodically reviewing "foot traffic reports for retail" as they were discussed at both quarterly VFC town halls and at the SLTM meetings.

396. Thus, based on the numerous reports and meetings, Defendants were personally involved with or had readily available, Defendants knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up

---

[9] Milestones included initial line review ("ILR"), final line review ("FLR"), pre-salesman sample stags, and salesman sample stage ("SMS").

144

with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

**D. Defendants Frequently Provided Detailed Updates on Vans' Purported Product Innovations and Alignment with Consumer Trends, Evidencing Their Knowledge of the Same**

397. Throughout the Class Period, during earnings calls, analysts regularly asked Defendants pointed questions concerning Vans' product innovation and performance, consumer understanding, and Vans' turnaround progress. Defendants did not demur or claim ignorance of these matters. Rather, the Individual Defendants repeatedly provided detailed updates and answers to these questions, indicating their personal knowledge and understanding of the subjects.

398. Some of the Individual Defendants' numerous, detailed statements given during prepared remarks and in response to analysts' questions on such issues include, but are not limited to, the following:

399. During the 3Q2023 Earnings Call, in his prepared remarks, Defendant Dorer similarly updated investors on the performance of specific Vans styles:

> We will also better turn data and insights into significant consumer opportunities available today. For example, a strong untapped opportunity exists with our **UltraRange product line. Here, awareness is very low at around 10% among all consumers and at below 30% even among Vans loyalists**. So we've started to boost awareness, and this is starting to yield results. UltraRange revenue grew 34% in Q3 with much more growth to be had.
>
> **The MTE and Half Cab product lines have similar potential**. And going forward, we will drive these and other promising platforms longer and more continuously. We will significantly increase our investment in product

145

innovation, funded by a reduction in costs in lower value areas with actions, including SG&A reduction and improving store profitability.

400.   Moreover, in response to a BNP Paribas analyst's question regarding what gave Defendants confidence that VFC was implementing the right strategies to turn Vans around, Defendant Dorer emphasized generating awareness of Vans products and new product performance:

> And then when we think about the specific plan in which we indeed have quite a bit of confidence, there are a number of actions that impact the business now. As I said in my remarks, **we're moving to ROI-based digital spending, and we're seeing really strong results behind that. We're boosting awareness of existing product platforms like UltraRange, and we're seeing good results behind that**. We have new products expanding now like a Lowland and our New Skool shoes and also UltraRange VR3, those are going out now, and we think that those are attractive new products.

401.   During the FY2023 Earnings Call, Defendant Dorer had a detailed exchange with an analyst on specific Vans styles:

> **Gabriella Carbone**
> *Analyst, Deutsche Bank Securities, Inc.*
>
> Hi, good afternoon. Thanks for taking my question. I just want to follow-up on Vans. You mentioned some big growth numbers for **UltraRange and MTE**. How do you view the opportunity to build those franchises? And what do you think is making them so successful?
>
> **\* \* \***
>
> **Benno O. Dorer**
> Interim President, CEO & Director
>
> Yes. So as we analyze where we stand with the consumer, which is what we've done a lot of over the last six months, we realized that there's a big opportunity taking franchises that are out there, but have a very low

146

awareness to the next level. And that's why we're so bullish on **MTE and on UltraRange**.

**Awareness generally on both platforms,** even though they've been around for several years, **hovers at around 10% and even loyalist at Vans show awareness of below 30% on those two.** So what we're focused on, in general, in Vans is to tell fewer bigger stories and dedicate ourselves more to platforms, and MTE and UltraRange are two. So we're building awareness, and we're backing it up with new product news, and we're reintroducing these platforms to consumers, and that's what's working.

UltraRange plus 51%, MTE plus 34%. And they're both part of what we call progression, and progression is about 30% of Vans. So these absolutely have the potential to be very meaningful for the brand in the future. And that's perhaps the model, this platform approach and building awareness over a longer period of time that we're also applying with Knu Skool, which we've seen in Q4, very successful, sold out within two weeks.

402.    During the 1Q2024 Earnings Call, Defendant Bailey had a thorough exchange with an analyst on specific Vans' products and loyalty program performance:

**Jay Sole**
*Analyst, UBS Securities LLC*

Great. Thank you so much. I guess if we can talk a little bit more about Vans. I think, Kevin Bailey, you're on the call. If you go back to January, maybe some of the opportunities that you're seeing, maybe some of the green shoots. Are those still happening? You talked about **some of the newer footwear styles** working better, but just give us an overall view of where things stand today with Vans with the brand and progress you're making turning around the brand. That would be very helpful. Thank you.

**\* \* \***

**Kevin D. Bailey**
*Global President of Vans, VF Corp.*

**\* \* \***

147

Overall, the indicators on the brand remain strong. I think I said at Investor Day consumers were really the piece that we needed to put at the front of our decision-making, and **we're still seeing stable considerations, strong sentiment scores**. Matt referenced **our loyalty program. It's two times the size of two years ago**. So that part of it is solid.

As you asked about specifically, **the green shoots in product**, that really is where I put my first attention because product in this footwear and apparel space is such a long lead time issue. **And the new intros** are working well. So things that we address around style, newness, versatility, comfort, which is what we had been hearing from our consumers but not responding adequately enough to, are starting to come to fruition with the product that **we're bringing out like the Knu Skool, like the Lowland, like the Mary Jane**. Those are nice green shoots. They're still small at this point and not enough to offset the decline we've seen in Classics. However, the work we're doing in the background to bring bigger stories for the market faster that will deliver more results we still feel really confident in.

And then as Matt referenced, really leaning into expanding our franchises. I think in the past our focus on Classics was so big that it distorted our opportunities, **and what we're doing with things like the UltraRange and the MTE** growing it double digits, UltraRange I think 13% for the quarter, MTE at 39% for the quarter, that's really where we believe there's a lot more opportunity to broaden our product meeting. So those are particularly important. Matt referenced launching Pinnacle, and you'll start to see that in spring when the line first really comes to market.

403.   At the FY2024 Earnings Call, Defendant Darrell had a detailed exchange

with an analyst on the timing of Vans' reset actions and product innovation:

**Matthew Robert Boss**
*JP Morgan Chase & Co, Research Division*

Bracken, I wanted to pick up maybe where you just left off. So on Vans, what actions do remain as part of the reset phase? Or where do you see us today versus the potential bottom at Vans? How do you feel about inventory on hand? And just what's the time line to scale some of the new product innovation that you cited in your remarks?

148

**Bracken P. Darrell**
*President, CEO & Director*

No, I'm really excited about the new product innovation that's happening. We -- going back into, what, my opening remarks, we launched the **Knu Skool** very early in my tenure at the company. And through really strong marketing and a great product, it's now the #2 style. So I think it shows that we can launch a new style and turn it into a strong franchise almost out of the gate.

**We just recently launched AVE 2.0**, which is the best skate shoes that's ever been made, I believe, certainly our best skate shoe ever, and it's done very, very well out of the gate. It's a niche product that's really focused on skaters. But stay tuned because we're going to have news on that for everybody soon.

So I feel good about the steps we're taking, but there's so much more ahead of us and so much more we can do. You asked, do I feel like we're at the bottom? I feel like we're either at the bottom or super close. I really do believe we're going to -- I can see the turn ahead through the tunnel. I'm not going to sit here and predict a quarter for you, but I can see it coming.

I love the fact that we're -- we -- DTC was positive in Europe this quarter. That's a great sign. **Google Search trends, much better now than they were in the last 3 months versus last 12 months**. Again, things can wobble when you're looking at external data, but that feels good. So I think there's some real green shoots here.

404.    At the 1Q2025 Earnings Call, Defendant Darrell assured an analyst that Vans was providing innovative products:

**Brooke Siler Roach**
*Goldman Sachs Group, Inc., Research Division*

Bracken, I was hoping you could provide additional color on your plans for the Vans brand going forward now that you have a permanent Brand President in place. You talked a little bit about some early green shoots that you're seeing in the brands. Can you elaborate a little bit more on **what you expect** the path to look like for the brand for the next couple of quarters,

both **in terms of new innovation**, scaling, changes in brand marketing? And maybe any types of marketing that you're pulling forward regarding SG&A for the next couple of quarters?

**Bracken P. Darrell**
*President, CEO & Director*

Yes, I'll save a little bit of that for the next quarter or 2. And of course, by the time we get to the end of the year when Sun has a chance to speak to it. But I'll give you what you're asking, I think. I expect you'll see more of the same. We just turned on a new marketing campaign for Vans, which is tied directly to a cascade of product launches. As I mentioned in the opening -- in my opening remarks, **the new franchises** are doing well. And we've now got 2 of our new franchises, I think, are in the top 5. **So UltraRange and Knu Skool, one is #2, one is #5**. I think it just shows you how responsive we are to new products when they're right. And so you're going to see more new products as we come through the year. **We will launch several new styles just this month**. Of course, they're not incorporated in what we've done so far this year.

405.    During the 2Q2025 Earnings Call, in his prepared remarks, Defendant

Darrell once again emphasized Vans' purported product innovation:

From a product standpoint, **Knu Skool** continues its strong momentum and further strengthened its position as the #2 franchise globally. **We're seeing** some encouraging results from other **new product franchises launched over the summer, particularly Upland and Hylane**. Our brand elevation is starting to resonate, too. Through the OTW, premium label and influencer program, Vans is targeting influencers and early adopters using cities and moments and product collaborations.

During New York City Fashion Week a few weeks ago, the brand engaged with fashion influencers who have made a significant cultural impact by spotlighting the Satoshi and pearlized OTW Classics, which we sold through at 100% levels. I'll be wearing the pearlized OTW Classics against Brent Hyder, our CHRO's better recommendation because I think you'll love them.

150

The Piet Parra collaboration was sold out in 5 minutes upon launch in September. And our consumer research -- **our consumer search interest was -- trended positive in Q2 in key markets**.

406.    Defendants' numerous, detailed discussions with analysts and investors regarding Vans' purported product innovations and alignment with consumer trends are probative of Defendants' knowledge of those subjects and support a strong inference of scienter.

### E.  Defendants' Evasive Answers to Analysts' Pointed Questions are Indicative of Scienter

407.    Throughout the Class Period, Defendants provided evasive answers to pointed analyst questions on the Vans turnaround and VFC revenue, demonstrating an attempt to conceal Vans' lack of product innovation and inability to keep pace with consumer trends.

408.    For instance, at the 2Q2023 Earnings Call, Defendant Rendle ignored an analyst's question about the timing of the Vans turnaround, only providing details on geographic divergences in Vans:

**Jonathan Robert Komp**
*Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst*

I just want to ask maybe another question on Vans. I'm curious, just your latest view, when you look at the geographic divergences. And Europe looks like it's holding up so much better. Curious what you currently think and make of that trend. **And as you think about Vans, just when would you expect to see signs of progress?** And what are you looking for in the Americas to know that you're on the right track here?

**Steven E. Rendle**
*V.F. Corporation – Executive Chairman, President & CEO*

I think the way you're looking at it is absolutely correct. Our European business, in general, continues to show exceptional performance. And within that is certainly the Vans business. We've talked pretty openly, and I think Kevin did a good job unpacking this for everybody in the Investor Day.

But the primary opportunity here is our North America business. And within the North America business, it's our direct-to-consumer channel. And this emphasis we're putting today around traffic and engagement, retention, all the way through to conversion, Vans is squarely in the middle of that.

We have a number of test-and-learn actions that have been taking place the last couple of weeks, taking those learnings now and we'll apply it to the balance of our portfolio, but really looking at what will be required to utilize this strong component of our go-to-market set of options, where we've got such strong conversion. How do we start pulling consumers across that lease line into engage with us on our footwear and apparel story.

So #1 is the Americas and within that, our North America DTC. China is a significant opportunity as well. We've been certainly impacted with the COVID environment there. But again, at the Investor Day, Kevin spoke a lot about really pushing decision-making into the regions and providing more and more latitude for local-for-local decision-makings around product, around storytelling, certainly staying within the confines or the framework of the brand strategy, but really giving more freedom and more empowerment to the regions.

And you see that taking place in Europe and taking those learnings and applying that now more effectively with our Asia team, specifically in Greater China.

409.    During the 2Q2024 Earnings Call, Defendant Darrell avoided answering an analyst's question about initial steps to stabilize and grow Vans, telling the analyst instead to "stay tuned":

**Lorraine Corrine Maikis Hutchinson**
*BofA Securities, Research Division*

Bracken, I'm interested in hearing the **initial steps that you're taking to first stabilize and then grow the Vans business**.

**Bracken P. Darrell**
*President, CEO & Director*

Well, first of all, **there's a turnaround plan in place, which I think you've been exposed to before**, and those steps continue. So my game plan is really to step in until we bring in a new Brand President and really accelerate and then make some select changes. I don't plan to undo a whole bunch of things. I think the steps we put in place are the right ones. I'd just like to see it happen faster.

**There are a few things we are changing**. This change in North America is a change in our approach to the Vans business and the biggest problem we've had, because the biggest part of the business for Vans is in the U.S., is to address that very directly and quickly. **And beyond that, I'll come back to you and tell you when I think I've got something to say. But right now, I'd say just stay tuned**.

410.    At the 3Q2024 Earnings Call, an analyst directly asked Darrell for more detail on the 18-month Vans plan, which Darrell dodged:

**Robert Scott Drbul**
*Guggenheim Securities, LLC, Research Division*

Just got a couple of quick questions. First on Vans, **is there anything more you can share with us on your 18-month plan** just around, I don't know, marketing? Are you planning to bring the Warped Tour back, pricing within the brand, anything along those lines would be helpful.

And second question is just around inventories. With the inventories down, I think it was at 17%, are there any pockets by brand geographically that you're concerned about, either both in your business or at the wholesale level?

153

**Bracken P. Darrell**
*President, CEO & Director*

Thanks, Bob. I'm going to let Matt take the second question, but I'll take the first one. **I'm not ready to be too specific on that yet**, probably because I know that I've got a new brand president coming in, so we'll have latitude to make some changes.

But what I would say is we've got a great -- I mean I think a strong kind of very punctuated plan that combine -- that integrates the marketing insights and then the marketing programs with the new products that are launching. And I've been through both sides of that equation, the 2 of them together, 2 or 3 times now, and I'm still not done, but I feel good about it, very good about it.

**\* \* \***

411.    At the FY2024 Earnings Call, Defendant Darrell admittedly "dodged"

answering an analyst's question about the timing of VFC revenue growth:

**Jonathan Robert Komp**
*Robert W. Baird & Co. Incorporated, Research Division*

If I could just follow up on the $600 million cash outlook for the year. I know you've talked about embedding sequential improvements in the top line. **Could I ask if that outlook implies getting back to growth at some point for total revenue during the year at some point?**

And then just separately, one follow-up, Bracken, I don't know if you and Paul have talked or have a view given the discussion about the improving predictability and forecasting ability. Is there a point in the near future you're thinking about as the right timing to reinstill broader financial targets?

**Bracken P. Darrell**
*President, CEO & Director*

Okay. Let me answer the first one first. **I'm going to effectively dodge your question about it**. This is how we go positive. We did see sequential improvements. I hope they're sequential and that they're consistent across the year. But I think, generally speaking, when you look across the year,

154

you're going to see us get better and better. **I will not answer your question about whether we're going to be -- that's going to show a positive number by the end of the year, but we'll come back to that**. I'm pretty optimistic about the business in general, and you can feel it. I hope you can feel it.

412.    At the 1Q2025 Earnings Call, an analyst specifically asked Darrell about

VFC's progress on Reinvent priorities, which Darrell dodged answering:

**Matthew Robert Boss**
*JPMorgan Chase & Co, Research Division*

So Bracken, as we think about your first year at the helm, larger picture, **maybe where do you stand on the priorities that you laid out initially?** Maybe first, on the management team, any key roles that you're looking to fill from here? **Second, I know you cited today sequential improvement, but any visibility to a return to top line growth as you see it today?** And then maybe just last, how do you feel about organic free cash flow and debt paydown priorities?

**Bracken P. Darrell**
*President, CEO & Director*

So I won't repeat the famous 4 that are probably not famous to you, but they feel like -- I feel like I told you so many times those 4 priorities that I think I said in my first full call. So I won't go through those, but you referenced kind of a summary of those. From a management team, I feel great. I mean I think we've really got an all-star team, and it's all I could have asked for. And everybody is on the floor, everybody is on the team now. We're about half of them are new in the last months, half of them are not. And it's really a terrific team. Now it's my job to make sure that we together work well as a team. So we're really going to be working on that.

In terms of the turn -- the Vans turn and the turn in general on the business, when do I forecast it happening? **I'm not going to give you a number today**, but I will tell you in October, we'll be ready to talk about that. So I feel very good about the progress we're making. It feels very similar to where I was when I was in my last company, and I feel like I can see it, and

155

I feel good about it. In terms of the debt paydown, we'll certainly talk about that in October when you can expect that leverage to come down.

413.    During the 2Q2025 Earnings Call, an analyst directly asked Darrell about the timing of Vans' revenue growth improvement, which Darrell also evaded answering:

**Matthew Robert Boss**
*JPMorgan Chase & Co, Research Division*

So Bracken, maybe just to dig in a bit more on Vans, so maybe just where you stand on some of the reset actions that you had outlined and then as we think about maybe **top priorities over the balance of this year and into next year**, how best to measure **sequential revenue growth improvement** and just a time line as we think about maybe some of the earlier wins relative to Sun's potential influence on product assortments and multiyear growth.

**Bracken P. Darrell**
*President, CEO & Director*

Yes. Thanks, Matthew. I think overall, in terms of the reset actions, we described the reset actions we took in the end of last year, we're coming up to lapping those, as Paul mentioned. So they're in the rearview mirror. I mean that's probably as good a summary as I could give you.

In terms of top priorities going forward for Vans, I think if you really laid them out, we've already started a program of introducing new products. It obviously came before Sun got here. But she's already touching everything, and she'll continue to touch everything, every new product, every marketing campaign. She's in the middle of the action. And those of you who know her know she would be, so she definitely is.

**In terms of a time line for -- in a level of improvement you could expect quarter-over-quarter, we're not really going to provide that**. But I'm really excited about it. And I think we're on the right path. And you can kind of see it, and I mentioned it in the opening. You see some excitement coming in search interest in some of the biggest markets around the world now. That's really a change.

414.    During 3Q2025 Earnings Call, Darrell avoided answering a question about

Vans customer feedback:

**Adrienne Eugenia Yih-Tennant**
*Barclays Bank PLC, Research Division*

Congratulations. Great quarter. Nice to see it. So Bracken, my question is going to focus on Vans. That was the only brand that missed sales relative to consensus expectations. **You're giving it time, what customer feedback are you getting from the core Vans customer?** You're broadening it out to more board and action sports. So just how are you targeting kind of a broader audience? And then when is the right time to put some demand creation investment behind that?

\* \* \*

**Bracken P. Darrell**
*President, CEO & Director*

Okay. **I'm going to dodge your question, not because I don't have an answer, but I'll give you a little bit of one**, but because I really want to let Sun to answer that. The feedback -- both the feedback from customers as we continue to think about who we're really targeting and also demand creation investment. What I will say is we're not starving Vans demand creation. We are experimenting with what kind of demand creation, where we're spending our money, especially during the holiday period, and we're learning. So I think you'll see us continue to change what we're doing there, although you can't really probably easily see what we did last quarter, we did the quarter before that.

But suffice to say, we're in deep learning mode and action mode. So you'll see us keep adjusting what we're doing on Vans from marketing perspective. And the target audience piece, I will absolutely refer and let Sun talk in March, but I feel very, very good about the decisions she's made. And as you said, we are going broader into action sports and beyond.

415.    Defendants' evasive answers to pointed analyst questions on the Vans'

turnaround and revenue growth, support an inference that they knew or recklessly

disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

### F. Several Defendants Were Intimately Involved in Vans, Including Product Development and the Purported Turnaround

416.    Several Defendants emphasized their intimate involvement with Vans, including spending significant time with VFC's product innovation teams and leading the brand's turnaround efforts. Taken together, they support an inference that Defendants knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, and the brand's turnaround would be delayed.

1.    Bracken P. Darrell

417.    Defendant Darrell highlighted his intimate knowledge of VFC and the Vans brand specifically, and was the President of Vans between October 30, 2023 and July 29, 2024. At the 2Q2024 Earnings Call, Darrell stated that "[h]aving now been here for over 100 days, I've had a chance to go **far and wide within the company and outside of it.** I've talked to **employees, customers, wholesalers, investors, analysts and more**." He added that "it was also important for me to **hear firsthand where the biggest issues are, including in** the U.S. and **Vans**."

418.    Moreover, during the same earnings call, Darrell stated that "my game plan is **really to step in** until we bring in a new Brand President and really accelerate and then

make some select changes." He added that "in the interim, **I will personally take a very active role** in delivering the turnaround strategies of the brand."

419.    During the 3Q2024 Earnings Call, Defendant Darrell updated investors that he was spending *more than half of his time* on Vans, including reviewing new products: "And Vans' decline look like it did last quarter by the numbers, but underneath, there's a lot changing. **I've been spending more than half my time with our team reviewing strategies, new products and marketing plans**."

420.    Darrell also touted his close and ongoing relationship with wholesalers. For instance, during the 2Q2024 Earnings Call, Darrell responded to a Telsey Advisory analyst's question about the balance between wholesale and DTC business that "as **I've met with several of the CEOs of our wholesale partners in the U.S. and in Europe**, I've been really impressed by their plans and by their capability."

421.    At the 1Q2025 Earnings Call, in response to a Wedbush Securities analyst's question about conversations with wholesale partners about Vans, Defendant Darrell reaffirmed ongoing conversations with wholesale partners about Vans, stating "I think all **the key partners I've talked to** are really want us to be successful in Vans because they need us to be successful Vans for them."

422.    During the 2Q2025 Earnings Call, in response to an Evercore Inc. analyst's question about conversations with wholesale partners about new Vans products, Darrell highlighted his close monitoring and relationships with wholesalers:

> Yes. First of all, we did not say that we thought DTC would turn **first at Vans**. We actually said they were reversed. I said I thought it would probably be -- it's a little counterintuitive. I said it will probably turn in

wholesale first. Wholesale is outperforming DTC right now, which isn't too big a shock when you consider the traffic issue. **The wholesalers continue to have plenty of traffic**. We're dependent on generating our own. So it's going to take a little longer to get there. As the products improve and the pipelines improve, you've got a really a clean set of products in the wholesale channel that people are coming in and discovering.

And to answer the second part of your question, **I think wholesalers overall have given us really positive feedback on the path we're on with Vans**. And I think we'll continue to see improvement. So I feel good about it.

423.    Defendant Darrell spending over half his time on Vans for an extended period, including on product development, along with his ongoing relationships with wholesalers support an inference that he knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

2.  <u>Kevin D. Bailey</u>

424.    Defendant Bailey, as Global Brand President of Vans from March 17, 2022 through October 30, 2023, emphasized spending significant time with product innovation teams and eventually took on a leadership position for "Reinvent," which a Vans turnaround was a key component of.

425.    For instance, at the 2022 Investor Day, Defendant Bailey highlighted working closely with regional and global product teams:

So we're looking at that very differently, and now each region owns that opportunity to optimize the trends across the five icons as they take off. **<u>And</u>**

160

**those regions also have the responsibility to make sure that they don't become overly reliant**. And they'll work closely with the global product engine. As Martino referenced, **we worked very closely with the regional creation engines and the global product engine to make sure that we balance this correctly**. So that's a key attribute in terms of the second issue, I believe, affecting core classics.

426.    Bailey also touted his personal involvement in Vans' consumer research efforts:

So it's a brand I have a very deep understanding of. **I was involved in a lot of the early consumer research.** I think the big things I'd say is, one, we have a much better understanding of the consumer. So I think that was a big part. And I think where we failed, and again, as I was trying to be fairly clear on is we didn't pay enough attention that didn't evolve enough.

427.    Indeed, Bailey referenced specific interactions with consumer segments, stating "[s]o in terms of the way this works, **our pro skaters have informed us** in terms of the technical needs around skateboarding shoes in the areas of board feel and cushioning, **and we've worked very closely with them to have the best shoes in the market**."

428.    Thus, Defendant Bailey performing comprehensive consumer research and working closely with Vans product teams and consumers supports an inference that he knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

3. Steven E. Rendle and Matthew H. Puckett

429.    During the 2Q2023 Earnings Call, then-President and CEO Rendle responded to a Credit Suisse analyst's question about Vans revenue projections by highlighting weekly meetings he attended with Defendant Puckett where they met with cross-functional teams to discuss and evaluate driving consumer conversion to sales:

> Michael, let me build a little bit here on the traffic and conversion piece. I think an important part here, and this really is leveraging the portfolio and the cross-functional teams and expertise that we have, not only in brands and functions, but we have assembled cross-functional teams organized in pods, working in very agile ways against **4 very specific areas of focus**.
>
> **One is around consumer acquisition**. How do we acquire that consumer? How do we move that consumer in and drive traffic to our environments? When we have that consumer, how do we retain them? Third would be how do we really enhance that consumer experience. So we have a higher likelihood of moving them through to the fourth point, which is conversion.
>
> So very, very specific sets of actions being worked on by these **cross-functional pods**. And probably, the last point here is this is something that we're taking so seriously, is that **Matt [Puckett] and I are meeting with these teams on a weekly basis to keep track of, understand and help take any kind of roadblocks out of their ways so that we can move very quickly and agilely through this process**.

430.    Thus, Defendants Rendle and Puckett having weekly meetings with cross-functional teams on consumer acquisition supports an inference that they knew or recklessly disregarded that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed.

162

**G. Defendants' False and Misleading Statements Were Made on the Heels of VFC's 2022 Investor Day Where Defendants Discussed Vans' Product Innovation, Consumer Understanding, and Turnaround in Detail, Demonstrating Defendants' Awareness of Those Issues and Their Importance to Investors**

431. Defendants were no strangers to Vans' product innovation, consumer understanding, and turnaround issues, having experienced significant declines in the Vans business immediately before the Class Period. Therefore, Defendants keenly understood that, throughout the Class Period, investors would be eager for any updates regarding VFC's ability to turnaround Vans by staying attuned to customer trends and developing new, responsive products and that such updates would be heavily scrutinized. This would have been obvious to Defendants given: (i) the importance of developing new products and tracking consumer trends for Vans, which relies on innovative products to drive the brand's and VFC's existing and future revenue; and (ii) analysts pressed Defendants during the 2022 Investor Day (and in their contemporaneous reports), and constantly inquired about Vans product innovation, consumer understanding, and turnaround timing throughout the Class Period.

432. Indeed, the Individual Defendants made statements to analysts throughout the Class Period insisting that they were listening to Vans' consumers, developing new, responsive products, and implementing the "Reinvent" turnaround plan, with Vans initiatives as a key component, for the intended purpose of reassuring the market. As such, Defendants were on high alert, and deeply knowledgeable of the importance of monitoring and identifying customer trends, responding to Vans product innovation

163

issues, and timely executing the Vans turnaround or were severely reckless in disregarding them.

## H. Suspiciously Timed Turnover of Defendants Supports Scienter

433.   Over a series of months, several VFC C-suite executives, including three Individual Defendants, suspiciously departed during the Class Period. The significant number of executive departures in such a short period and that they occurred at suspicious times and/or under suspicious circumstances, often with little explanation, supports a strong inference of Defendants' knowledge, recklessness and/or scienter with respect to the Vans consumer trend and product innovation issues facing VFC.

434.   On December 5, 2022, VFC issued a press release and filed a Form 8-K with the SEC announcing that President and CEO Steven E. Rendle "by mutual agreement with the Board" retired without the announcement of an immediate replacement, effective immediately. In the press release, the Company announced Brenno Dorer as Interim President and CEO and that VFC had "commenced a search for a permanent Chief Executive Officer and has retained a leading executive search firm to support its evaluation of internal and external candidates."

435.   Analysts were shocked by Rendle's abrupt departure. A December 5, 2022 Credit Suisse report downgraded VFC from "Outperform" to "Neutral" noting the "abrupt CEO transition." A December 5, 2022 Baird Research report reduced VFC's price target from $42 to $37 "following unexpected CEO change" and noting that "[w]e are surprised the Board is moving in another direction…" In a December 5, 2022 Wells Fargo report,

analysts lowered VFC's price target from $35 to $32 and questioned the timing of Rendle's departure:

> Where Do We Go From Here? CEO transition: another wrench thrown into the story, credibility lacking, estimates continue to come down. Following management's recent meetings, **an announcement of this magnitude certainly came as a negative surprise** given Rendle's tenure at the organization and among our softlines CEOs (joined VFC in 1999), his board Chairman position, yet another guidance cut (4th so far this FY), **and the timing of this announcement still early on in the holiday season**.

436.    On October 30, 2023—the same day as VFC's 2Q2024 Earnings Call and announcement of the "Reinvent" plan—the Company issued a press release announcing that Kevin Bailey, again without an immediate replacement, was "stepping down from the position of Global Brand President, Vans." Indeed, Bailey was demoted to a position within the "Reinvent" plan. VFC also announced that "[a]n external search is underway for a new brand president for Vans and in the interim, Bracken Darrell will take a more active role in leading the brand and delivering its turnaround strategies."

437.    On February 6, 2024—the same day as certain partially corrective disclosures—the Company issued a press release and filed a Form 8-K with the SEC announcing the Company and Defendant Puckett determined that Defendant Puckett would depart from the Company, again without an immediate replacement and on an unknown "date to be agreed upon by the Company and Mr. Puckett" and that Puckett would stay on as CFO until a replacement was found. On the 3Q2024 Earnings Call, Defendant Darrell characterized the news by stating that "[h]e and I have agreed that it's time to make a change as part of the overall transformation efforts we're introducing across the company."

438.    These Class Period C-suite departures occurring around the time of disappointing VFC and Vans results which stemmed from ongoing, unresolved product innovation, inventory, and customer trend issues within Vans. The suspicious timing of VFC's personnel changes, including abrupt departures of Defendants Rendle, Bailey, and Puckett during the Class Period, supports a strong inference of scienter.

## I.    Defendants' Statements Concerned Vans, a Core Operation of VFC, Further Supporting Scienter

439.    Vans is a core business of VFC. Leading up to and during the Class Period, Vans remained among the Company's top two brands by revenue. VFC disclosed the following annual "Top Brand Revenues":

|  | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| **Vans** | $3,465.7M | $4,161.9M | $3,682.9M | $2,785.7M | $2,349.4M |
| **The North Face** | $2,457.4M | $3,259.7M | $3,612.7M | $3,673.3M | $3,703.4M |
| **Timberland**[10] | $1,513.0M | $1,823.1M | $1,784.7M | $1,556.9M | $1,607.7M |
| **Dickies** | $701.5M | $837.7M | $725.2M | $618.4M | $542.1M |

440.    In the same documents, VFC disclosed that Vans remained over a quarter of the Company's total revenue throughout almost all of the Class Period:

|  | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 |
|---|---|---|---|---|---|
| **Vans Rev.** | $3,465.7M | $4,161.9M | $3,682.9M | $2,785.7M | $2,349.4M |
| **Total Rev.** | $9,238.8M | $11,841.8M | $11,612.5M | $9,915.7M | $9,504.7M |
| **% of Total Rev.** | 37.51% | 35.15% | 31.71% | 28.09% | 24.72% |

441.    Moreover, before and during the Class Period, Defendants emphasized the importance of the Vans brand to the Company's success.

---

[10] These figures include revenues from both the Timberland® and Timberland PRO® brands.

442.    At the 2022 Investor Day, Defendant Bailey noted that Vans had grown to be "V.F.'s **largest brand and our most profitable one**" by 2022. Defendant Rendle added that Vans was "one of our **key brands**" and that VFC had to "reset and reaccelerate **this important business**."

443.    In a September 29, 2022 report, Guggenheim analysts noted the same, observing that "[d]espite the ongoing challenges including the over-reliance on core classics, brand heat, Americas DTC and China, **Vans remains the largest and the most profitable brand in VF's portfolio**."

444.    Throughout the Class Period, Defendants reiterated the importance of the Vans brand to VFC. For instance, during the 2Q2023 Earnings Call, Defendant Rendle referred to Vans as "our largest brand." At the 1Q2024 Earnings Call, Defendant Puckett stated that Vans was one of two "most important near-term priorities." At the 1Q2025 Earnings Call, Defendant Darrell noted that Vans was one of the Company's two "biggest brands."

445.    Moreover, a key component of VFC's "Reinvent" plan focused on Vans, further demonstrating the brand's importance to the Company's success. The October 30, 2023 Press Release announcing "Reinvent" included "Deliver the Vans Turnaround" among the four key priorities, making Vans the only brand specifically mentioned.

446.    During the 2Q2024 Earnings Call after the October 30, 2023 Press Release, Defendant Puckett stated that "[o]ur transformation plan Reinvent **directly addresses** our biggest performance issues, **Vans** and the U.S…." Defendant Darrell referred to Vans

167

as "[o]ur biggest business" and identified Vans as one of the "biggest issues" affecting the Company's results.

447.    During the 2Q2024 Earnings Call, Darrell reaffirmed that "deliver[ing] the Vans turnaround" was among the four "key areas we're prioritizing aggressively." He repeated this nearly verbatim on the 3Q2024 Earnings Call, stating that the Reinvent plan which Defendants were leading "prioritizes aggressively four key areas"—including to "deliver the Vans turnaround[.]"

448.    Thus, Vans' crucial importance to VFC's core operations raises a strong inference that the Defendants made their false and misleading statements throughout the Class Period with scienter. Moreover, as senior officers and/or directors of VFC with readily available access to a wealth of consumer and band performance data and KPIs, it strains credulity to suggest that Defendants were unaware that Vans' product innovation remained sparse, Vans could still not keep up with consumer trends and remained reliant on Vans' core products, Vans had a glut of unwanted inventory that required discounts or promotions to offload, and the brand's turnaround would be delayed. *Supra* §§VII.B-C. Vans was also a frequent topic of analyst questions. *Supra* §§VII.D-E. In the alternative, they acted with reckless disregard for the truth when they failed to ascertain and disclose the readily available facts regarding the continued product innovation, consumer understanding, inventory, and turnaround issues affecting VFC's core Vans brand.

## VIII.    LOSS CAUSATION

449.    At all relevant times, the market for VFC securities was open, well-developed, and efficient. During the Class Period, as detailed herein, Defendants

168

materially misled the investing public, thereby inflating the price of VFC securities and/or maintaining the artificial inflation in VFC securities and, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein at Section V, *supra*, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the VFC's Vans business, operations, and prospects, as alleged herein.

450.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made, caused to be made, or failed to correct, a series of materially false and/or misleading statements concerning the Company's Vans business' prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

451.    Specifically, Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of Vans' product innovation, ability to keep pace with consumer trends, and the brand's turnaround, thus causing VFC's securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by Defendants during the Class Period

resulted in Plaintiffs and other members of the Class purchasing VFC's stock at artificially inflated prices, thus causing the damages complained of herein.

452.    As a result of their purchases of VFC's securities during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws, when the misrepresentations made to the market and the information alleged herein to have been concealed from the market were revealed. The timing and magnitude of the price declines in VFC's securities, the statements in the Company's corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Companies that were unrelated to Defendants' fraudulent conduct.

## A. October 30, 2023 Partially Corrective Disclosures

453.    Beginning on October 30, 2023, Defendants issued a set of partial corrective disclosures contained within the: (i) 2Q2024 Press Release; and (ii) 2Q2024 Earnings Call. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, (i) Vans' performance would not turn around in FY2024, with Vans' revenue down 21% (down 23% in CC) to $0.7 billion; (ii) Vans product innovation was lacking; (iii) VFC's inventory levels, including for Vans, remained elevated, forcing the Company to reduce inventory guidance; (iv) VFC was withdrawing its previously issued guidance and earnings outlook for its FY2024 and would not be issuing new revenue and earnings guidance for the fiscal year; and (v) the Company introduced the Reinvent turnaround plan, which included resetting the marketplace for Vans.

454.    Upon the news of October 30, 2023, VFC's stock price dropped from a closing price at $17.12 per share on October 30, 2023 to a closing price of $14.73 per share on October 31, 2023, representing an approximately one-day 13.96% drop, on exceptionally higher-than-usual trading volume.

455.    Analysts reacted negatively to VFC's October 30, 2023 disclosures, expressing new uncertainty over the timing of the Vans turnaround, concern over VFC's unfavorable change in inventory reduction guidance for FY2024, and concern that Vans' limited product innovation to that point had not impacted Vans' revenue trends.

456.    First, multiple analysts expressed new uncertainty over the timing of the Vans turnaround, including that the brand would not inflect to growth in the second half of FY2024:

a)    On October 30, 2023, Barclays lowered its price target for the stock from $19 to $17 (down ~11%), summarizing that "**fundamentals remain in decline as the Vans business remains disappointing** and is in search of new leadership, **making the timing of a turn still uncertain**."

b)    On October 30, 2023, Deutsche Bank analysts quoted Defendant Darrell directly for the news that "**Vans … trends 'aren't getting any better and in fact could be viewed as getting worse**[,]'" and lowered their price target from $23 to $20 (down ~13%).

c)    On October 30, 2023, Guggenheim lowered its earnings estimates for VFC "**[g]iven longer than anticipated turnaround at Vans (we no longer**

171

**contemplate an improvement in F2H24)** …" which was "critical to the shares recovering[.]"

d)      On October 30, 2023, Wells Fargo reported the "**Material Negative Surprise as Vans Won't Turn**[,]" cutting its price target from $20 per share to $17 per share (down ~15%) on the news that VFC was "withdrawing guidance, including **gutting expectations for Vans — now expected to decline ~20% in 2H24 (vs. plan for inflection to positive)**[.]" Later in its report, Wells Fargo elaborated that "**after indicating Vans would inflect positively in 2H, the brand is now expected to decline ~20% in 2H24**."

e)      On October 30, 2023, Seaport Research Partners ("Seaport") reacted to VFC's withdrawal of FY2024 guidance by writing that "we saw risk to the guidance, but **we weren't expecting it to be this bad**[,]" adding that "**Vans now not expected to improve in 2H24, vs. prior guidance of turning positive sometime before year-end**." One day later, Seaport noted that the delay in the Vans turnaround was the focus because "VFC's shares hinge on the performance of Vans[.]"

f)      On October 31, 2023, BTIG issued a report highlighting Vans' turnaround uncertainty, writing both that "Top-line Visibility is Diminished as Vans Timeline Pushed Out" and that "**as evident from the withdrawn outlook, the Vans turnaround is likely to take longer than previously anticipated**."

g)      On October 31, 2023, Goldman Sachs issued a report titled "Reinvent plan announced, **but longer-dated path to turnaround** and dividend

172

cut[,]" and lowered its price target from $24 per share to $19 per share (down ~21%) upon the "**disappointing update from VFC**", writing that "**VFC acknowledged that the Vans turnaround is taking longer than expected**[.]"

457.    Second, Analysts also reacted poorly to the news that Vans inventory remained elevated, thus contributing to VFC's unfavorable change in inventory reduction guidance for FY2024. Indeed, Barclays wrote in their October 30, 2023 report that VFC had revealed "**inventory guidance of down mid to-high single-digits compared to previous guidance of down 10% reflecting the more challenged Vans**[.]" Likewise, BMO analysts on October 30, 2023 lowered their price target for VFC stock from $22 per share to $18 per share (down ~18%), noting that VFC management was "now assuming a ~MSD-HSD [mid-single-digit to high-single-digit] % YoY [year-over-year] decline (**vs. previous guidance** of down >10% YoY), reflecting the more challenged Vans and U.S. wholesale outlook." Writing for Seeking Alpha, analyst Leo Nelissen wrote on October 31, 2023 that VFC management had "**initially set a goal of reducing inventory by at least 10%**, **but the new guidance suggests a more moderate decrease in the range of mid to high single digits, which isn't great news**."

458.    Third, analysts following the 2Q2024 Earnings Call also reacted negatively to news that Vans' limited product innovation to that point had not meaningfully impacted the course of Vans' downward revenue trends. Goldman Sachs in their October 31, 2023 report wrote that Vans' new product offerings had been "**insufficient to offset declines elsewhere**[,]" while Wells Fargo on October 30, 2023 wrote that, "Despite some wins with recent innovation, **the decline in Vans core classics is simply too steep**."

173

## B. February 6, 2024 Partially Corrective Disclosures

459.    On February 6, 2024, Defendants issued another set of partially corrective disclosures contained within the: (i) 3Q2024 Press Release; and (ii) 3Q2024 Earnings Call. These disclosures revealed, *inter alia*, that, contrary to Defendants' representations, (i) Vans' revenue declined 28% (down 29% in CC), primarily due to the Company's own actions, including elevated promotional activity, to "clean up" and "reset" Vans' inventory; (ii) Vans' turnaround remained underwhelming due in large part because the Company had not been targeting new Vans product innovation and styles on the brand's core customer; and (iii) VFC's revenue was down a whopping 16% (down 17% in CC) to $2.960 billion, due to deliberate actions associated with the Reinvent turnaround plan.

460.    Upon the news of February 6, 2024, the Company's stock price dropped from a closing price of $16.95 per share that day, to a close at $15.31 on February 7, 2024, representing an approximately 9.68% drop on higher-than-usual trading volume.

461.    Analysts reacted negatively to VFC's February 6, 2024 disclosures, expressing renewed uncertainty over the timing of the Vans turnaround, primarily citing the news of more aggressive actions being taken to reduce Vans' inventory or products created under the prior brand strategy, including flat promotional levels rather than the lower levels that had been represented:

a)    On February 6, 2024, Wells Fargo "slash[ed]" its estimates and lowered its price target for VFC stock from $17 to $14 per share, writing "Simply put, there was nothing good in today's print." Focusing on Vans, Wells Fargo added that the "Brand Remains Under Duress" and that "the brand posted its third straight

174

25%+ decline" on "[w]eakness … driven by wholesale & DTC as **mgmt continues to reset the marketplace**."

b)      On February 7, 2024, analysts from BTIG issued a report commenting the lack of progress in turning around Vans, titled "**Changes Underneath the Hood, But Not Yet Evident in Fundamentals** …" which noted "uncertainty around the timing of a rev[enue] re-acceleration[.]"

c)      On February 7, 2024, UBS analysts noted the "Rough Quarter" that indicated a longer timeline to turn Vans around, writing "We see … **the Vans turnaround takes longer than previously expected**. … Despite growth in [The North Face] and Dickies, **this is not enough to compensate for continued declines at Vans**." UBS also noted that "VFC's conference call commentary suggests to us its **wholesale channel revenues could continue declining for the next 3-4 quarters, longer than previously thought**." UBS on the news cut its price target from $18 to $15.50 per share.

d)      On February 7, 2024, Wedbush issued a report lowering its price target for VFC stock from $16.50 to $15.50 per share, in part because it was evident that there was "a lot of heavy lifting to do at Vans[.]" Wedbush reported that "Takeaway #1" was that "Vans revenue declined 29%" and noted that VFC managements was "**more aggressively 'resetting the market' in both Q3 and Q4, reducing inventory levels (via reduced sell-in)**[.]"

e)      On February 7, 2024, Telsey Advisory Group ("Telsey") reported that "Vans disappoints again" as VFC and Vans management "**cleaned up its**

175

**inventory and marketplace and repositioned its wholesale channel**," thus impacting revenues by 500 basis points in 3Q2024. Telsey also commented on VFC's and Vans' continued high-promotional environment needed to clear out excess inventory, writing "**VF continues to see a lot of promotional activity across its wholesale channels**[.]"

f)    On February 7, 2024, Evercore issued a report titled "F3Q Tougher Than Expected," highlighting that "**Vans turnaround still taking longer than expected** [which] is pushing out the increasingly fragile time frame for VFC." Evercore cut its price target from $17 to $16, adding "**[w]e're still surprised at the magnitude of the Vans declines** at -28% YOY (with **further wholesale clean-up expected to spill into FY25**)."

g)    On February 7, 2024, Citi reported "**Vans did not show any signs of life as mgmt is cleaning up inventory in the channel**, **causing sales results to decelerate** (and this is expected to continue into 4Q)[,]" noting that "**[p]romotions were flat vs [last year]**. Although the company cleared a significant amount of Vans product in 3Q, they were up against vs elevated promo levels in 3Q23."

h)    On February 7, 2024, BNP Paribas analysts issued a report describing the "Vans Focused Call[,]" noting that a "key topic[]" of the call was the "**Vans turnaround, albeit no stabilization** nor brand president announcement **yet**…" and lowering their price target for VFC shares from $19 to $18 per share.

176

i)      On February 7, 2024, Goldman Sachs issued an report reacting to VFC's and Vans' "**[l]onger-dated path to turnaround** as profit pressures persist[.]" Goldman's analysts explained that they was lowering their price target from $19 to $14 per share (down ~26%) and downgrading their rating of VFC stock from Buy to Neutral in large part because "**[w]e no longer have conviction in a catalyst to drive improved momentum in core brands**…" like Vans.

462.    On February 7, 2024, analyst Leo Nelissen wrote for Seeking Alpha that Vans' underperformance was "**reflecting intentional reset actions taken to clean up the marketplace**[,]" adding that the primary reason for the drop in VFC's stock price was the lack of a turnaround by that point: "…VFC is down 8% after reporting earnings, as cheap stocks can get cheaper when **the market has no faith in a fundamental rebound**[.]" Likewise, analyst firm JR Research wrote for Seeking Alpha on February 14, 2024 that "**VFC's recovery momentum topped out in December**" of 2023.

**C. March 6, 2025 Partially Corrective Disclosures**

463.    Defendants issued another set of partial corrective disclosures at the March 6, 2025 Investor Day. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, (i) Vans management had not previously developed new and innovative products or deployed marketing rooted in consumer insights or for Vans' core customer; (ii) VFC was adopting yet another flavor of turnaround called the "VF Way" in order to adopt "best in class process[es,]" including for creating products; and (iii) the cost-cutting side of VFC's Reinvent turnaround plan had been prioritized over the new product and marketing investment needed to drive growth in brands like Vans.

177

464.    VFC's stock price dropped over two consecutive days as the markets digested the news of the midday March 6, 2025 Investor Day. First, VFC common stock fell from a closing price of $23.45 per share on March 5, 2025 to a close at $20.56 per share on March 6, 2025, representing an approximately 12.32% drop, on higher than usual trading volume. Then, VFC fell further to a closing price of $19.13 on March 7, 2025, representing an approximately 6.96% drop, on even higher trading volume. Collectively, VFC's stock price dropped approximately 18.42% over the two-day period.

465.    Analysts reacted negatively to VFC's 2025 Investor Day disclosures, expressing concern that the Vans turnaround was not progressing on the timeline Defendants previously falsely represented, and reacting to the disclosures that Vans, until that point, had not been targeting marketing and product design towards its core consumer:

a)    On March 6, 2025, BTIG issued a report highlighting that Vans had acknowledged it had been "failing to connect with its core younger consumer, chasing trends vs. reinforcing its authenticity in skate culture, and losing focus on franchise management, allowing the brand to become over-distributed."

b)    On March 7, 2025, analysts from Wells Fargo issued a report titled "…Turnaround Timing Remains a Question," lowering their price target for VFC stock from $21 per share to $18 per share (down ~14%) based on VFC's "**more cautious tone on Vans turnaround timing**[.]" Wells Fargo emphasized that based on VFC's disclosures that day, "**we feel the turnaround timing is being**

178

**pushed out**" and that "VFC top-line remains a serious question, and we remind investors that ultimately a sustainable rev[enue] turn is what matters here[.]"

## D. May 21, 2025 Final Corrective Disclosures

466.    Defendants issued a final set of partially corrective disclosures on May 21, 2025, in the FY2025 Investor Presentation and during the FY2025 Earnings Call. Defendants revealed, *inter alia*, that, contrary to prior misrepresentations, Vans had still failed to adequately innovate new products and the Vans turnaround remained stalled, resulting in "deliberate actions" that caused Vans' 4Q2025 revenue to decline 20%.

467.    Upon the news of May 21, 2025, VFC's stock price fell from a closing price of $14.43 per share on May 20, 2025 to a close at $12.15 per share on May 21, 2025, representing a drop of $2.28, or approximately 15.8%, per share.

468.    Analysts reacted negatively to VFC's May 21, 2025 disclosures, expressing surprise and frustration with managements' revelations that they had taken more aggressive, intentional actions for Vans in 4Q2025, which in turn demonstrated both that Vans' had not implemented new products and marketing to drive a turnaround, and Defendants' previous assurances regarding the timeline of the brand's turnaround were false and the timeline would be extended yet again:

a)    On May 22, 2025, Williams Trading issued a report reacting to, *inter alia*, the fact that revenue for "Vans decreased 20%" in 4Q2025, writing that "[t]he plan to clean up Vans global distribution, improve product offerings, and use marketing to drive brand heat" as announced that day "is necessary[.]" Noting that "weak DTC sales traffic drove (-40%) of the decline" in Vans sales, Williams

179

Trading analysts wrote that the weak store traffic was "**attributable to stale product offerings which is failing to bring young consumers to the brand**."

b)    In a May 21, 2025 early "First Take" report, Goldman Sachs analysts wrote they were "disappointed by the revenue trends in the quarter[,]" noting that while "[m]anagement attributed the Vans weakness to deliberate channel rationalization," "**we have yet to see stabilization in this business**." The following day, Goldman Sachs issued a second, more fulsome report noting that "the Vans brand underperformed expectations" in a "largely disappointing update where revenue trends remain particularly choppy at the Vans brand[.]" Reducing their price target from $12 per share to $11 (down ~8.33%), Goldman Sachs analysts added that "turnaround at Vans remains a key focus area, where **strength in recent innovation (such as Super Lowpro) was not enough to offset declines in classic icons in the quarter**[,]" leading the analysts to believe following the call that "**a sustainable inflection in Vans momentum remains longer-dated**[.]"

c)    On May 21, 2025, BNP Paribas issued a report stating that because one of "the two **most important indicators of the VF turnaround disappointed in 4Q with Vans decelerating** to a 20% cc decline vs down 8% in 3Q," driven 60% by the "deliberate actions" that management had made in the quarter, BNP Paribas translated that the implication was that "**the VF turnaround is taking time and becoming harder for investors to underwrite**." Slashing its target price for VFC stock from $25 per share to just $11 per share (down ~56%), BNP Paribas

180

explained that "[e]arlier this year [2025], VF shares traded above $25/shr as investors effectively fully priced in the FY28 turnaround[,]" but "**[n]ow, with Vans decelerating … the stock has de-rated and shares are trading on NT [near-term] expectations with the longer term forecast in question**."

d) On May 21, 2025, BofA issued lowered their price target for VFC stock from $18 to $12 per share (down ~33.33%), reacting to the FY2025 Earnings Call disclosures by writing that "**a recovery in fundamentals will take longer than expected**" and lowering their earnings-per-share estimates "to reflect a **slower pace of Vans turnaround**."

e) On May 21, 2025, analysts from BTIG noted that Vans' "weaker performance" had been "driven in large part by intentional steps to reduce less profitable distribution[,]" thus "play[ing] into our bigger picture questions around the ultimate 'right size' of the brand[.]" Noting that Vans' new product offerings to date had not alleviated the fact that there were "**still bigger picture challenges in re-igniting brand heat**[,]" BTIG reacted to the fact that "40% of the decline was driven by weak DTC traffic, which we believe **reflects the continued need to build buzz around the brand (both from a product and marketing perspective)**."

f) On May 21, 2025, UBS analysts wrote that "**[t]he reason**" for the drop in VFC's stock price "…**is VF's turnaround is moving slower than expected**." In a later, second report that same day, UBS lowered its target price for VFC shares from $16 per share to $14 per share and lowered its multiple used to value the stock "**due to our sense the chance VF's turnaround doesn't**

181

**materialize as expected has increased**.” UBS indicated that management's "deliberate actions" to address Vans in 4Q2025 and "rolling out new product" were too little too late, writing that "**it might take some time before these initiatives meaningfully improve Vans brand heat**."

g)      On May 21, 2025, Evercore lowered their price target for VFC stock from $27 per share to $15 (down ~44.44%) because they were "**disappointed at yet another large-scale Vans reset**[,]" which demonstrated that the brand was "**still surprising to the downside at this point**."

h)      On May 21, 2025, Baird pointedly wrote that they were "disappointed by the timing of steeper re-set actions for Vans, putting further pressure on driving 2H26E inflection" in downward revenue trends, noting that VFC and Vans' managements' "near-term credibility is further challenged by incremental brand re-set actions which were not pursued with the re-set 1+ year ago or signaled at the March investor day." Echoing their earlier remarks in the report, Baird analysts also wrote that "today's update reduces visibility to timing an inflection especially with the re-set revenue drag expected to continue during FQ1-FQ3." In summary, Baird wrote that "VFC has been pressured by a series of financial challenges stemming from a lengthy turnaround for Vans (still challenging amid two-year+ turnaround), inventory (still resetting marketplace, now reducing value accounts and closing more DTC stores), balance sheet strain (net debt still >$3B), and lack of full visibility regarding longer-term enterprise-wide strategies."

182

i)      On May 27, 2025, Seaport issued a report pointedly summarizing that for the 4Q2025 Earnings call, '**[t]he biggest news, and what we believe took VFC's shares down 16% on the print, was Vans**[,]" elaborating that "**4Q25 was a surprising result,** seeing how growth was so much worse than 3Q25, down 8% CC. **What made 4Q25 so bad is that VFC took deliberate strategic actions to manage the marketplace**." Seaport noted that the poor results had also been driven, and that management's intentional actions had been necessitated by, lack of meaningful new product innovation, writing that "**it is especially important for a company to manage** distribution, channel inventory, **and most importantly, product development. VFC didn't do this**, **and the Vans icons became too big as a result, and the brand wasn't able to fill the void when trends shifted and popularity of the icons began to wane**."

j)      On June 17, 2025, Value Insights wrote in an analyst report for Seeking Alpha that Vans' quarterly "back-to-back deceleration strongly suggests that **there is a deep, fundamental issue with the brand—organic demand is falling off the chart**." While Value Insights noted steps that management was purportedly taking to turn Vans around, the "bad news" of the FY2025 Earnings Call was that "**it simply shows that management doesn't have a clear understanding of the Vans' positioning in the market**[,]" noting that the brand's declining DTC traffic was "really bad because it points to diminishing brand relevance." In short, Value Insights walked away from the FY2025 Earnings Call

183

understanding "**there will be no near-term recovery … [u]ntil Vans shows signs of stabilization supported by hard data**[.]"

## IX.    CLASS ALLEGATIONS

469.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired VFC securities between September 28, 2022 and May 20, 2025, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are VFC and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

470.    The members of the Class are so numerous that joinder of all Class members is impracticable. Throughout the Class Period, VFC's securities actively traded on the NYSE. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by VFC or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

471.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel who are experienced in class action and securities litigation.

184

472.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

- Whether Defendants violated the federal securities laws as alleged herein;

- Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about VFC's business and operations;

- Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

473.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

185

## X.     PRESUMPTION OF RELIANCE

474.     Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for VFC's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- VFC's securities were actively traded on the NYSE;

- The market price of VFC securities reacted promptly to the dissemination of public information regarding the Company;

- VFC's stock was followed by several financial analysts, including those cited in this Complaint;

- The average weekly trading volume for VFC stock during the Class Period was approximately 7.86 million shares;

- As a regulated issuer, VFC filed with the SEC periodic public reports during the Class Period;

- VFC regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, VFC had over 388 million shares in the public float and the Company's market capitalization ranged between approximately $3.79 billion and $13.34 billion.

475.     Throughout the Class Period, VFC was consistently followed by the market, including securities analysts and the media. The market relies upon VFC's financial

186

results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding VFC and material facts concerning Vans' production innovation, ability to keep pace with consumer trends, and turnaround timing. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of VFC's securities.

476.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for VFC securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Plaintiffs and other Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

477.    Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of VFC securities at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

478.    Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

479.    Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth

187

behind Defendants' material misstatements, they would not have purchased VFC securities at artificially inflated prices

## XI.    NO STATUTORY SAFE HARBOR

480.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

481.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

482.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of VFC who knew that the statement was false when made.

**XII.    CLAIMS FOR RELIEF**

## COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

483.    Plaintiffs reallege each allegation as if fully set forth herein.

484.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

485.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of VFC securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire VFC securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

486.    During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for VFC securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal

non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

487.   During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of VFC's allegedly materially misleading statements, and/or their associations with VFC which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

488.   Defendants, as senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of VFC to members of the investing public, including Plaintiffs and the Class.

489.   As a result of the foregoing, the market price of VFC securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business

190

plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of VFC securities during the Class Period in purchasing VFC securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

490.   Had Plaintiffs and the other members of the Class been aware that the market price of VFC securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased VFC securities at the artificially inflated prices that they did, or at all.

491.   As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased VFC securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of VFC securities through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of, among other things, Defendants' concealment of material facts related to VFC's business and operations, in violation of federal and state laws.

492.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and

the other members of the Class for substantial damages which they suffered in connection with their purchases of VFC securities during the Class Period.

## COUNT II

## FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST ALL INDIVIDUAL DEFENDANTS

493. Plaintiffs reallege each allegation as if fully set forth herein.

494. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

495. The Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

496. The Individual Defendants acted as controlling persons of VFC within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause VFC to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

497. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of VFC, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in VFC securities within the meaning of Section 20(a) of the Exchange Act.

192

Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

498.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

499.    The Individual Defendants knew or recklessly disregarded the fact that VFC's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

500.    By virtue of their high-level positions and their participation in and awareness of VFC's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

501.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

502.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of VFC securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

E.    Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

194

**DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues

involved, now, or in the future, in this action.

Respectfully submitted,

Dated: February 23March 11, 2026                    LEVI & KORSINSKY, LLP


*/s/ Gregory M. Potrepka*
Shannon L. Hopkins
Gregory M. Potrepka
P. Cole Von Richthofen
Tyler C. Winterich
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: cvrichthofen@zlk.com
Email: twinterich@zlk.com

*/s/ Brenda Szydlo*
Jeremy A. Lieberman
Brenda Szydlo
Dean P. Ferrogari
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
E-mail: bszydlo@pomlaw.com
E-mail: dferrogari@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the Class*

**CERTIFICATION RE: USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

The undersigned counsel certify that generative artificial intelligence was not used

to draft this filing.


*/s/ Gregory M. Potrepka*
Gregory M. Potrepka

*/s/ Brenda Szydlo*
Brenda Szydlo